**LiLaw Inc., a Law Corporation**
J. James Li (SBN 202855)
5050 El Camino Real, Suite 200
Los Altos, California 94022
Telephone: (650) 521-5956
Facsimile:  (650) 521-5955
Email:  lij@lilaw.us

Attorneys for Plaintiff Dynetix Design Solutions Inc.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| DYNETIX DESIGN SOLUTIONS INC., a California corporation,<br><br>            Plaintiff,<br><br>      vs.<br><br>SYNOPSYS INC., a Delaware corporation, and DOES 1-50<br><br>            Defendants. | Case No. CV11-05973 PSG<br><br>**PLAINTIFF'S OPENING CLAIM CONSTRUCTION BRIEF**<br><br>**Date: October 10, 2012**<br>**Time: 10:00 a.m.**<br>**Court: Courtroom 5 - 4th Floor**<br>**Judge: Hon. Paul S. Grewal** |



# TABLE OF CONTENTS

I.   INTRODUCTION ................................................................................................ 1

II.  BACKGROUND ................................................................................................ 1

   A. Simulation and HDLs ................................................................................... 1

   B. Event-Driven Logic Simulators .................................................................... 2

   C. Simulation on Multiprocessor Systems ........................................................ 3

   D. The Parties' Meet-and-Confer regarding Claim Construction ...................... 3

III. LEGAL STANDARDS ...................................................................................... 3

   A. The General Principles of Claim Construction ............................................ 3

   B. The Law of Indefiniteness ............................................................................ 4

IV.  ARGUMENT .................................................................................................... 5

   A. The Construction of "Multithreaded Simulation" ........................................ 5

      1. The Claim Context of the Term .............................................................. 5

      2. The Disputed Issues .............................................................................. 5

      3. Dynetix's Construction Is Supported by Intrinsic Evidence ................... 6

      4. Synopsys's Construction Is Erroneous for Improperly Altering the Scope of the Term .. 6

   B. The Construction of "To Achieve Linear to Super-Linear Scalable Performance Speedup" as the Term Is Used in Claim 1 ................................................................................. 7

      1. The Context of the Term in Claim 1 ....................................................... 7

      2. The Disputed Issues .............................................................................. 8

      3. The Term in Question Denotes the Purpose of a Limitation in Claim 1, Instead of Being a Substantive Limitation Itself ........................................................................... 8

      4. The  Prosecution History Supports Dynetix's Construction ................... 10

      5. Synopsys's Mathematical Definition Is Unnecessarily Complicated ..... 11

   C. The Construction of "Achieving Super-Linear Scalable Simulation" as the Term Is Used in Claims 36 and 45 ............................................................................................... 12

      1. The Context of the Term in Claims 36 and 45 ...................................... 12

      2. The Modified Proposed Construction ................................................... 12

      3. The Preamble Term Is Non-Limiting, but Merely Indicating the Desired Effect of the Invention ............................................................................................................ 13

      4. The Prosecution History Is Consistent with Dynetix's Construction ..... 14

Case No. CV11-05973 PSG

PLAINTIFF'S OPENING CLAIM CONSTRUCTION BRIEF

D. The Construction of "Event Queue" .................................................................... 15

    1. The Claim Context of the Term .................................................... 15

    2. The Disputed Issues ...................................................................... 16

    3. Dynetix's Construction of "Event" Is Supported by Instrinsic Evidence ....................... 16

E. The Construction of "Common Design Database" ............................................. 17

    1. The Term Is Not Indefinite ........................................................... 17

    2. Dynetix's Proposed Construction Should Be Adopted ................. 18

F. The Construction of "To Create a Master Thread and a Plurality of Slave Threads" ............ 19

G. The Construction of "Pre-Examining Each Source File" ...................................... 20

H. The Construction of "To Specify Remote Hosts" ................................................ 21

I. The Construction of "Graphical User Interface ("GUI")" ....................................... 22

J. The Construction of "By at the Beginning" ......................................................... 22

K. The Construction of "Means to Provide a Graphical User Interface Program ("GUI") on the User's Local Hosts" ....................... 23

V. CONCLUSION .................................................................................................. 24

**CASE**

*Am. Med. Sys. v. Biolitec, Inc.*, 618 F.3d 1354, 1358 (Fed. Cir. 2010) ........... 13, 14

*Baldwin Graphic Sys., Inc. v. Siebert, Inc.*, 512 F.3d 1338, 1342 (Fed. Cir. 2008) ................................................................................................................ 19

*Exxon Research & Eng'g Co. v. United States*, 265 F.3d 1371, 1375 (Fed. Cir. 2001) ........................................................................................................... 4

*HTC Corp. v. IPCom GmbH & Co., KG*, 667 F.3d 1270, 1278 (Fed. Cir. 2012) ............................................................................................................... 24

*Modine Mfg. Co. v. U.S. Int'l Trade Comm'n*, 75 F.3d 1545, 1557 (Fed. Cir. 1996) ........................................................................................................ 4, 23

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1359 (Fed. Cir. 2008) .............................................................................................. 11

*Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) ............................. 3

*Silicon Graphics, Inc. v. ATI Techs., Inc.*, 607 F.3d 784, 792 (Fed. Cir. 2010) ............................................................................................................ 8, 19

*Storage Tech. Corp. v. Cisco Sys.*, 329 F.3d 823, 833 (Fed. Cir. 2003) .............. 15

**STATUTES**

**35 U.S.C. § 112** .......................................................................................................**4**



Case No. CV11-05973 PSG

PLAINTIFF'S OPENING CLAIM CONSTRUCTION BRIEF

## I.   **INTRODUCTION**

For this claim construction proceeding regarding U.S. Patent No. 6,466,898 ("the '898 patent"), the parties submitted 10 disputed terms for construction and one additional term with stipulated construction.

Out of the 10 disputed terms, Dynetix believes only 7 terms that truly need constructions. The other three terms are in plain English and understandable by a jury.

For the disputed terms, Dynetix's constructions are reasonable interpretations of the terms based on intrinsic evidence.  In contrast, Synopsys's proposed constructions suffer from various defects including importation of limitations from the specification, improper alterations of the scopes of the terms, and unnecessary complexity.

Synopsys's arguments on indefiniteness are inapposite.  These arguments improperly rely on the minor ambiguities of the terms in question that can be resolved through the regular exercises of the claim construction process.  Contrary to Synopsys's claim, these terms are not indefinite under the established law because their meanings are reasonably discernible.

## II.   **BACKGROUND**

### A.   **Simulation and HDLs**

A typical design process of an integrated circuit ("IC"), or a "chip", starts with the design engineers writing down the design of the chip using one or more forms of hardware description language or HDL.  Chan Decl. ¶ 2.  This design is then simulated and debugged using a logic simulation program.  *Id.* A design that has passed the logic simulation will go through various physical verifications and eventually fabricated.  *Id.*

The '898 patent features inventions in the field of the logic simulation.  As described by the patent itself, logic simulation is an essential design tool for complex circuit designs such as computer microprocessors.  Li Decl. Ex. 8 1:7-12.  By using logic simulation, the designers can "verify the functional behavior and timing characteristics of their circuit designs on their engineering workstations before committing such designs to fabrication."  *Id.* 1:14-16.

A logic simulation starts with the design coded in HDLs.  Chan Decl. ¶ 4.  HDLs are standard



text-based expressions of the components, connectivities, and timing of a digital circuit. *Id.* Before the advent of HDLs, the design engineers had to use circuit schematics to represent their designs, which are similar to blueprints used in architecture. *Id.* HDLs are not only more efficient than schematics for creating large-scale complex designs, they are essential for modeling and simulating the designs. *Id.*

There are various forms of HDLs, such as Verilog and VHDL. *Id.* ¶ 5. A complex design may contain modules written in different HDLs. *Id.* One aspect of the inventions of the '898 patent is to allow a simulation to be conducted using a design written in mixed HDLs. *Id.*

### B. Event-Driven Logic Simulators

In general, there are two kinds of logic simulators, event-driven and cycle-based. Li Decl. Ex. 8 1:46-47. Although the '898 patent claims inventions that can be used for both event-driven and cycle-based logic simulations, only the event-driven logic simulation is at issue in this case, based on the characteristics of the accused product, VCS. Chan Decl. ¶ 6.

An event-driven logic simulator models both the functional and timing behavior of a circuit design. Li Decl. Ex. 8 1:48-49. An "event" in the logic simulation simply means a program object to be processed during the simulation and may be a signal event or a logic gate event. *Id.* 7:8-27; Chan Decl. ¶ 7. A signal event is to update the state of a signal at a specified time, and that in turn will cause all logic gates driven by the signal to be processed accordingly. *Id.* A logic gate event is to evaluate a logic gate at a specified time, and if the logic gate drives one or more signals, to determine if any of the signals will be changing states at either the current or future time, and to schedule signal events for those signals accordingly. *Id.*

A logic gate can be: (a) a primitive logic component like an AND gate, an OR gate or a XOR gate; (b) a complex logic component like a multiplier, an adder or a multiplexer; (c) a register transfer level (RTL) process block. *Id.* ¶ 8; Li Decl. Ex. 8, 6:5-14. Specifically, a process block may execute a sequence of user-defined RTL code, perform waveform dumping, assertion checking, functional coverage monitoring, etc. Chan Decl. ¶ 8. Thus, a logic gate event may be a variety of processing tasks that are not necessarily restricted to a change of state of a logic gate. *Id.*



## C. Simulation on Multiprocessor Systems

One major problem with simulating a complex design is the time, especially for event-driven simulation. Chan Decl. ¶ 9. Sometimes it could take literally weeks or even months for a simulation to complete. *Id.* One way to speed up the simulation is to use hardware accelerators or hardware emulators. Li Decl. Ex. 8, 2:4-14. The problem with such solutions is the prohibitive expense and the inability to accurately model the timing of the circuit design. *Id.* 2:15-22.

The invention of the '898 patent uses parallel processing on a multiprocessor system to accelerate simulation, using a multithreaded approach, which may include both multiprocessing and multi POSIT threads processing. Chan Decl. ¶ 10. The multiprocessor system that the inventions were using for testing its embodiment included the UltraSparc workstation sold by the former Sun Microsystem, which is now part of Oracle, a Linux workstation with dual Intel Pentium Pro chips, and a Windows-NT workstation with dual Intel Pentium Pro CPU chips. Li Decl. Ex. 8, 16:62-67.

## D. The Parties' Meet-and-Confer regarding Claim Construction

Synopsys initially proposed 26 terms to be construed, including 7 means-plus-function terms. Li Decl. Ex. 1. Dynetix proposed 10 terms as required by the Court. *Id.* Ex. 2. Through several rounds of meet-and-confers, Synopsys eventually agreed to reduce the number of disputed terms to 10, as required by this Court. *Id.* ¶ 4. Out of the 10 terms, Dynetix only considers 7 terms that truly require construction. *Id.* The parties also agreed on the construction of one additional term, "master/slave thread." *Id.*

# III. LEGAL STANDARDS

## A. The General Principles of Claim Construction

"The claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (internal citations and quotations omitted). The words of a claim "are generally given their ordinary and customary meaning." *Id.* The ordinary and customary meaning "is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Id.* at 1313. In some cases, general purpose dictionaries may be

helpful for ascertaining the meaning of a term where claim construction "involves little more than the application of the widely accepted meaning of commonly understood words." *Id.* at 1314. In all cases, however, claims "must be read in view of the specification, of which they are a part." *Id.* at 1315. The specification, in fact, is "the primary basis for construing the claims." *Id.* The prosecution history of the patent should also be consulted as part of the intrinsic evidence. *Id.* at 1317.

Other than the intrinsic evidence, the court may also consult the extrinsic evidence, which "consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Id.* The extrinsic evidence, however, "is less significant than the intrinsic record" (*id.* at 1317) and "unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence." *Id.* at 1319.

**B.    The Law of Indefiniteness**

The definiteness requirement derives from Section 112 paragraph 2 of the Patent Act, which requires that a patent specification conclude with one or more claims "particularly pointing out and distinctly claiming subject matter which the applicant regards as his invention." 35 U.S.C. § 112, P 2. The standard for determining whether a patent claim is indefinite is whether "one skilled in the art would understand the bounds of the claim when read in light of the specification. *Exxon Research & Eng'g Co. v. United States*, 265 F.3d 1371, 1375 (Fed. Cir. 2001).

A claim is not indefinite merely because it "poses a difficult issue of claim construction." *Id.* As long as "the meaning of the claim is discernible," the claim is not indefinite even though "the conclusion may be one over which reasonable persons will disagree. *Id.* "[W]hen claims are amenable to more than one construction, they should when reasonably possible be interpreted to preserve their validity". *Modine Mfg. Co. v. U.S. Int'l Trade Comm'n*, 75 F.3d 1545, 1557 (Fed. Cir. 1996).



## IV.   ARGUMENT

### A.   The Construction of "Multithreaded Simulation"

#### 1.   The Claim Context of the Term

This phrase is found in the preambles of the asserted claims 1, 19, 23, and 36[1] in the following context:

> 1. A method of performing a <u>multithreaded</u> event-driven logic <u>simulation</u> of an integrated circuit design, coded in one or a plurality of Hardware Description Language ("HDL") languages including VHDL, Verilog languages and a mixed thereof on a multiprocessor platform, comprising the steps of (Li Decl. Ex. 8, 23:7-12)

> 19. A method of executing remote Hardware Description Language ("HDL") compilation and <u>multithreaded simulation</u> (event-driven, cycle-based, and a combination of both) of a circuit design employing a user's local and remote single-processor or multiprocessor hosts, comprising the steps of (*Id.* at 25:66-26:4)

> 23. A program product of executing remote Hardware Description Language ("HDL") compilation and <u>multithreaded simulation</u> of a circuit design employing a user's local and remote single-processor or multiprocessor hosts, comprising (*Id.* at 26:37-40)

> 36. A method of achieving super-linear scalable Hardware Description Language simulation for a <u>multithreaded</u> event-driven <u>simulation</u> of a circuit design on a multiprocessor platform, comprising the steps of (*Id.* at 28:29-32)

#### 2.   The Disputed Issues

The parties' proposed claim constructions of this term are:

| Dynetix | Synopsys |
|---|---|
| A "thread" is a process flow in a program that runs on a central processor unit (CPU); "Multithreaded simulation" means a simulation of circuit functionalities by executing multiple process flows concurrently on multiple CPUs. | A "thread" is a process flow in a program that runs on a processing unit and shares address space and system resources with other threads. "Multithreaded Simulation" means a simulation of circuit functionalities that executes multiple threads concurrently on multiple processing units. |

There are two disputed issues here.  First, while Dynetix's construction uses the term "CPU", Synopsys's construction uses the term "processing unit."  Second, Synopsys's construction includes the additional phrase "shares address space and system resources with other threads."  For reasons

---

[1] The joint claim construction mistakenly identified claim 45 as containing this phrase.



discussed below, the Court should adopt Dynetix's construction.

### 3. Dynetix's Construction Is Supported by Intrinsic Evidence

Dynetix's proposed construction is based on the definition of the phrase by the specification, which states:

> EDA tools that employ multiple CPUs on a single workstation to accelerate their performance are said to be multithreaded. Specifically, a thread is a process flow in a program that runs on a CPU. If a program can have multiple threads executing on multiple CPUs concurrently, then it[] is a multithreaded applications.

Li Decl. Ex. 8, 2:39-44.

Elsewhere, the specification states that "[a] multithreaded application … can run its separate threads on multiple CPUs concurrently." *Id.* at 8:40-42. Thus, Dynetix's proposed construction fits exactly with how the term is described in the specification.

### 4. Synopsys's Construction Is Erroneous for Improperly Altering the Scope of the Term

Synopsys's proposed construction is similar to Dynetix's except that it changes "CPU" to "processing unit" and adds the requirement that the thread "shares address space and system resources with other threads."

The change from "CPU" to "processing unit" broadens the claim because a CPU is not just any processing unit, but a "central" processing unit. There is no intrinsic evidence to support this obvious deviation from the plain meaning of the term CPU. The specification certainly uses "central processing unit" instead of "processing unit." Id. at 2:41-42. The term "processing unit" is not a term of art; it is not even listed in the IEEE Standard Dictionary of Electrical and Electronics Terms (the "IEEE Dictionary"). The use of this nonstandard term will certainly introduce unnecessary ambiguity because outside of its usage with the term "central processing unit," it is not clear exactly what it means. If a "processing unit" simply means a "processor," which is the most reasonable interpretation, the use of this term impermissibly expands the scope of the claim because "processor" includes simple data processors found in devices such as desk calculators or tabulating machines. Li Decl. Ex. 3, p. 823 ("processor"); p. 255 ("data processor"). The word "thread" in the current invention certainly does not cover simple data processing as found in a calculator. Therefore,



Synopsys's proposed construction is erroneous in replacing CPU with "processing unit." The erroneous construction improperly broadened the scope of the claim.

While trying to broaden the scope of the claim on one aspect, Synopsys at the same time attempts to narrow the scope in another aspect of the term. Without any support, Synopsys attempts to add the limitations to the term "thread" by requiring a thread to "share[] address space and system resources with other threads." Synopsys cited Response to Office Action, pp. 29-33. Nothing in the cited section, however, supports the addition of this limitation. Thus, Synopsys's proposed construction should be rejected.

Indeed, there is no indication from the intrinsic evidence that threads are required to share address space and system resources with other threads. The specification explicitly defined thread as "a process flow in a program that runs on a CPU." There is not a scintilla of evidence to support the claim that threads must share address space and system resources with each other. In fact, the invention covers both "multiprocessing" and multi-POSIX threads situations. Chan Decl. ¶. 10. Only the latter situation requires a thread to share address space and system resources with other threads. Id. No such sharing happens in the multiprocessing situation. Id. Synopsys's proposed construction should be rejected.

**B.      The Construction of "To Achieve Linear to Super-Linear Scalable Performance Speedup" as the Term Is Used in Claim 1[2]**

**1.      The Context of the Term in Claim 1**

The term in question is found in the following context of claim 1:

> 1. … (c) automatically detecting the number of microprocessors (CPUs) available on the multiprocessor platform to create a master thread and a plurality of slave threads for concurrent execution of the multithreaded event-driven simulation of the design <u>to achieve linear to super-linear scalable performance speedup</u> as according to the number of CPUs on the multiprocessor platform.

Li Decl. Ex. 8, 23:21-27.

---

[2] In the Joint claim Construction Statement, this phrase is said to be found in claims 1, 36, and 45. That is not entirely accurate. The phrase is used differently in claim 1 from claim 36 and 45. This section addresses the meaning of the term as it is used in claim 1 only.



## 2. The Disputed Issues

The parties proposed the following claim constructions of the term "to achieve linear to super-linear scalable performance speedup/simulation":

| Dynetix | Synopsys |
|---------|----------|
| For the purpose of enhancing the simulation speed in a rate proportional to, or even faster than, the increase in the number of processors. | The terms linear and super-linear describe the speedup that a parallel simulator will achieve when performed on hardware containing one or more processing units. A simulation is "linear" if the speedup that is achieved is equal to the number of available processing units. For example, a simulation that runs 2X as fast on hardware containing two processing units is linear. Similarly, if the simulation runs 4X as fast on four processing units it is again linear. A simulation that has a speedup greater than the number of processing units is super-linear. For example, if a simulation executed on two processing units runs 3X as fast as the same |

There are two major disputes here. First, Synopsys's construction adds to the term a substantive limitation by using the phrase "will achieve", while Dynetix's construction makes it clear that the term only denotes the purpose or desired effect of the limitation immediately preceding this term. Second, Synopsys uses a complicated mathematical definition of linear/superlinear while Dynetix suggests a definition in plain English. As discussed below, Dynetix's definition is supported by the intrinsic evidence and should be adopted.

## 3. The Term in Question Denotes the Purpose of a Limitation in Claim 1, Instead of Being a Substantive Limitation Itself

The term, as it is used in claim 1, starts with "to achieve ....", which in plain meaning indicates the purpose of the structural limitation instead of a feature of the limitation. It is true that the specification describes the preferred embodiment as "a linear/super-linear HDL simulator." Li Decl. Ex. 8, 16:67-17:2. Claim 1, however, does not claim a linear/superlinear simulator; it claims "a method of performing a multithreaded event-driven logic simulation" which uses various maneuvers "to achieve linear to superlinear scalable performance speedup." *Id.* at 23:8-27. The features of the embodiments thus should not be read into the claim as limitations. *See Silicon Graphics, Inc. v. ATI Techs., Inc.,* 607 F.3d 784, 792 (Fed. Cir. 2010) ("A construing court's reliance on the specification

must not go so far as to import limitations into claims from examples or embodiments appearing only in a patent's written description unless the specification makes clear that the patentee intends for the claims and the embodiments in the specification to be strictly coextensive.") (international quotations omitted).

Although the specification gives a mathematical definition of linear and superlinear scalability, it also makes it clear that there is no method of simulation that can achieve the absolute linear or superlinear scalability:

> It is generally possible for a multithreaded tool to demonstrate sub-linear scalability on some test cases, and linear or even super-linear scalability on other test cases. If a tool consistently demonstrates linear to super-linear scalability <u>on most test cases</u> it processes, then it can be classified as a linear/super-linear scalable tool. Otherwise it is classified as a sub-linear scalable tool.

Li Decl. Ex. 8, 16:54-61(emphasis added).

The above quoted statement shows two relevant points.  First, there is essentially no multithreaded simulation method that can enhance the simulation performance with linear or superlinear scalability all the time.  Second, for any given method, whether linear or superlinear scalability is achieved depends on the particular test cases, i.e., the chip designs being tested.

Even the test data on the preferred embodiment does not meet the mathematical definition of linear/superlinear scalability, especially when the numbers of processors were high.  For example, for an 8-CPU system, while the linear scalability requires 8 times increase in performance, only 6.3, 6.2, and 5.6 times increase were achieved in test case 2, 3, and 4, respectively.  *Id.* at 17:10-15 (Tab. 3).  Thus, it would be illogical for claim 1 to be drafted as requiring linear/superlinear scalability as a limitation, while the preferred embodiment did not even meet the requirement and while such an outcome obviously depends on many external factors instead of the method itself.

Indeed, as discussed above, claim 1 was not drafted to require linear/superlinear scalability.  Instead, it was drafted to claim the linear/superlinear scalability as the purpose and desired effect of the method, especially as the purpose and desired effect of the preceding step, i.e., "automatically detecting the number of microprocessors (CPUs) available on the multiprocessor platform to create a master thread and a plurality of slave threads for concurrent execution of the multithreaded event-



driven simulation of the design." Therefore, the plain meaning of the claim and the specification indicate that the term "to achieve" linear to super-linear scalable performance speedup should be construed as "for the purpose of achieving" linear to super-linear scalable performance speedup.

### 4. The Prosecution History Supports Dynetix's Construction

The term at issue in claim 1 was added through an amendment as shown below:

> automatically detecting the number of microprocessors (CPUs) available on the multiprocessor platform to [creating] create a master thread and (one or more) a plurality of slave threads for concurrent execution of the multithreaded event-driven [logic] simulation [algorithm] of the design to achieve linear to super-linear scalable performance speedup as according to the number of CPUs on [the single-processor or] the multiprocessor platform.

Response to Office Action ("Resp. to OA"), at DYN500 (brackets and emphases in the original)

Although the amendment was made to distinguish prior art, the distinction was on the point of concurrent execution on multiple processors, instead of the linear to super-linear scalability, as explained by the patentee in his response to the office action:

> Furthermore, the instant system uses threads to carry out concurrent execution of the event-driven simulation algorithm, which is different from the systems of Rompary, Davis, or Liao et al., where they used threads to model design object operations at the behavioral level. Finally, the system makes use of state-of-the-art multiprocessor computers (e.g., Sun OltraSparc server, HP PA-RISC severs, Intel Xeon-based server) to accelerate the event-driven simulation performance. None of the prior art specified cited above teaches any use of multiprocessor computers.
>
> …
>
> … Claim 1 as amended now recites the following limitations: … (2) the instant method automatically detects the number of microprocessors (CPUs) available on the multiprocessor platform to create a master thread and a plurality of slave threads for concurrent execution of the multithreaded event-driven simulation algorithm the multiprocessor platform.

Li Decl. Ex. 5 (Resp. to Office Action), p. 20 (DYN482) (emphasis added).

Nowhere was linear or superlinear performance even mentioned in the above commentary; nor was it necessary. As stated by the patentee, the prior art at issue did not even teach "any use of multiprocessor computers." *Id.* Scalability, which means the performance enhancement proportionate to the number of processors, was thus never an issue in that amendment, regardless of whether it was sublinear, linear, or superlinear. The distinction from the cited prior art is claim 1's



requirement of concurrent execution of the simulation on multiple CPUs. The linear/superlinear scalability is simply the purpose or desired effect of this inventive step of the method, as the plain meaning of the claim language shows. The prosecution history is thus consistent with this plain meaning.

### 5. Synopsys's Mathematical Definition Is Unnecessarily Complicated

One main purpose of claim construction is to obtain a proper jury instruction on the meaning of the claims. *See O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1359 (Fed. Cir. 2008) ("A claim construction order always dictates how the court will instruct the jury regarding a claim's scope."). A jury instruction should be "prepared to assist judges in communicating effectively and in plain English with jurors in patent cases." Li Decl. Ex. 4 (Model Patent Jury Instructions for Northern District of California), p. i. Synopsys's claim construction violates this basic principle. It is so long and complicated that it takes a lawyer some considerable efforts to understand it, let alone a juror.

It is true that Synopsys's definition uses the literal languages found in the specification. This, however, is by no means necessary. As discussed above, the whole term merely denotes the purpose or desired effect of the concurrent processing on multiple processors. The mathematical precision is neither necessary nor proper for understanding the term. Thus, Synopsys's convoluted mathematical definition should be rejected.

### 6. Dynetix's Construction Is Based on the Plain Meaning of "Linear"

The word "linear" simply denotes a relationship between two variables that, if plotted graphically, resemble a straight line. *See* Li Decl. Ex. 6 (Merriam-Webster Online Dictionary for "linear"). In common English, this linear relationship means the second variable changes in proportion to the changes of the first variable, i.e., "having or being a response or output that is directly proportional to the input." *Id.* This is the situation here. The "input" or the first variable is the number of processors while the "response" or the second variable is the increase in the speed of the simulation. Thus, Dynetix's proposed construction, i.e., "For the purpose of enhancing the simulation speed in a rate proportional to, or even faster than, the increase in the number of



Case No. CV11-05973 PSG

processors," conforms to the ordinary meaning of the term "linear." Importantly, this ordinary meaning does not deviate in essence from the way the term is used in the specification. Therefore, Dynetix's proposed construction should be adopted.

**C.  The Construction of "Achieving Super-Linear Scalable Simulation" as the Term Is Used in Claims 36 and 45**

### 1.  The Context of the Term in Claims 36 and 45

The term at issue is used in the following claim context:

> 36.  A method of <u>achieving super-linear scalable</u> Hardware Description Language <u>simulation</u> for a multithreaded event-driven simulation of an integrated circuit design on a multiprocessor platform, comprising the steps of:

> 45. A program product of <u>achieving super-linear scalable</u> Hardware Description Language <u>simulation</u> for an event-driven logic simulation of a circuit design on a multiprocessor platform, comprising:

Although, in the Parties' joint claim construction statement, this term was lumped together with a similar term in claim 1, it in fact differs from its counterpart in claim 1 both in form and in function, as discussed below; hence the separate section.

### 2.  The Modified Proposed Construction

The proposed claim construction should be slightly modified, given the form of the term used in claims 36 and 45, as follows:[3]

> The phrase, as it is used in claims 36 and 45, is nonlimiting other than denoting the purpose or desired effect of the inventions, i.e., for enhancing the simulation speed in a rate faster than the increase in the number of processors.

The reason for deleting "proportional to" is obvious, as the particular form of the term used in claims 36 and 45 refers to "superlinear" only, instead of "linear/superlinear" as the term is used in claim 1. The reasons for adding the part "The phrase, as it is used in claims 36 and 45, is nonlimiting other than denoting the purpose or desired effect of the inventions" is to make sure that the definition

---

[3] The modification to the original proposed construction is marked below:

> [The phrase denotes a method or device that is designed for] ~~For the purpose of~~ enhancing the simulation speed in a rate ~~proportional to, or even~~ faster than~~,~~ the increase in the number of processors.



PLAINTIFF'S OPENING CLAIM CONSTRUCTION BRIEF

does not implicitly introduce an unwarranted limitation, as discussed below.

### 3. The Preamble Term Is Non-Limiting, but Merely Indicating the Desired Effect of the Invention

The phrase at issue is part of the preamble of claims 36 and 45.  The first task thus is to ascertain whether the preamble term is limiting or nonlimiting.  *See Am. Med. Sys. v. Biolitec, Inc.*, 618 F.3d 1354, 1358 (Fed. Cir. 2010) ("Whether to treat a preamble term as a claim limitation is determined on the facts of each case in light of the claim as a whole and the invention described in the patent.") (internal quotations omitted).

The *Biolitec* court succinctly summarized the rules of construing a preamble term:

> Generally … the preamble does not limit the claims. Nonetheless, the preamble may be construed as limiting if it recites essential structure or steps, or if it is necessary to give life, meaning, and vitality to the claim.  A preamble is not regarded as limiting, however, when the claim body describes a structurally complete invention such that deletion of the preamble phrase does not affect the structure or steps of the claimed invention.  If the preamble is reasonably susceptible to being construed to be merely duplicative of the limitations in the body of the claim (and was not clearly added to overcome a prior art rejection), we do not construe it to be a separate limitation.  We have held that the preamble has no separate limiting effect if, for example, the preamble merely gives a descriptive name to the set of limitations in the body of the claim that completely set forth the invention.

*Id.* at 1358-59 (internal citations and quotations omitted).

In *Biolitec,* the District Court construed the term "photoselective vaporization" found in preambles as a substantive element, i.e., "using a wavelength that is highly absorptive in the tissue, while being absorbed only to a negligible degree by water or other irrigant," and later granted summary judgment for the defendant based on the construction.   The Federal Circuit reversed, finding the preambles nonlimiting.  *Id.* at 1359.  Of particular relevance to the instant case, the Federal Circuit found that "implicit" in the trial court's claim construction, an improper limitation was injected into the nonlimiting preamble.  *Id.*

Similar to *Biolitec,* if this court simply construes the literal meaning of the phrase "achieving superlinear scalable simulation," without a proper regard for the fact that the term is used in preambles, the court would implicitly introduce substantive limitations where none is warranted.

Indeed, as in *Biolitec,* the preamble term at issue is not limiting.  First, it does not recite



essential structures or steps.  The claim body here "describes a structurally complete invention such that deletion of the preamble phrase does not affect the structure or steps of the claimed invention." *Am. Med. Sys.*, 618 F.3d at 1358 (Fed. Cir. 2010)    In fact, eight out of twelve test data in the preferred embodiment show sublinear instead of superlinear speedup.  *See* Li Decl. Ex. 8,, Table 3, 17:5-15.[4]  Thus, the superlinear scalability is merely a desired effect which may or may not be achievable depending on factors outside the recited inventions, especially the construction of each tested design itself.   For that reason, superlinearity cannot be an essential structure or step.

Second, the preamble term is not required "to give life, meaning, and vitality to the claim." To the contrary, the inventions recited in claims 36 and 45 do not in any way depend on the inventions being superlinear scalable.  As shown by the preferred embodiment, depending on the test programs, the recited structures or steps may yield linear or even sublinear scalability.  *See* Li Decl. Ex. 8,, Table 3, 17:5-15.  Thus, the functions or workability of the recited inventions do not in any way depend on the superlinear scalability.   The essence of the inventions is to significantly speed up simulation performance through parallel processing among multiple CPUs, to the extent that superlinear scalability is achievable.  Thus, if this term is in any way useful to the understanding of the recited invention, it provides the desired effect or purpose of the invention, which fits with Dynetix's proposed construction.

### 4.  The Prosecution History Is Consistent with Dynetix's Construction

Claims 36 and 45 are former claims 53 and 62, respectively.  *See* Li Decl. Ex. 5, DNY473-74.  The preambles at issue were amended only by adding the phrase "a multithreaded".  *Id.* DYN510-11.  Thus, "super-linear scalable" was in the original claims and cannot be said to be added to distinguish prior art.

Synopsys relies on some statements that the patentee made during the prosecution.  In traversing the rejection of former claims 53-70, the patentee made the casual statement that the prior art "does not specify any means to perform super-linear scalable concurrent simulation of the system

---

[4] For superlinear, the speedup must be greater than 2x for 2-CPU, greater than 4x for 4-CPU, and greater than 8x for 8-CPU.  Eight out 12 data in Table 3 of the '898 patent do not meet that criteria.



function" or "does not perform any super-linear scalable concurrent simulation." *Id.* DYN497-98. These comments, however, should not be taken out of context.

The context of these comments are the detailed discussion by the patentee in the same response to office action of the prior art references at issue, i.e., "Duenloup", "Bahra et al.", "Rompary et al.", "Davis et al.", and "Liao et al." *Id.* at DYN479-82. As stated in the response to office action, the rejection of claims 53-70 was for the same "reasons as applied to claims 1-8." *Id.* at DYN 497. It was in response to the rejection of claims 1-8 that the patentee discussed in detail the difference between the cited prior art and the inventions. *Id.* at DYN479-83. Superscalability was not mentioned among the distinction between the inventions and the prior art. *Id.*

This point is similar to *Storage Tech. Corp. v. Cisco Sys.*, 329 F.3d 823, 833 (Fed. Cir. 2003). In *Storage Tech*, the District Court limited a term to "filtering and auditing" based in part on the patentee's response to office action. *Id.* The Federal Circuit found that the comment at issue, when read in its proper context, does not clearly and unambiguously distinguish the prior art by limiting the scope of the term to "filtering and auditing," and thus reversed the District Court's claim construction. *Id.*

Therefore, as in *Storage Tech,* there is no "clear and unambiguous disavowal of claim scope as required to depart from the meaning of the term provided in the written description." Synopsys's undue restriction on the term at issue should be rejected.

**D.      The Construction of "Event Queue"**

**1.      The Claim Context of the Term**

The term at issue is used in the following claim context:

5. … (d) providing a per-thread specific <u>event queue</u> to store future events and a fanout queue to store zero-delay events; ….

6. The method of performing a multithreaded event-driven logic simulation according to claim 5 further comprises the step of allocating and maintaining a private heap memory region, an <u>event queue</u> and a fanout queue for each of the master thread and the slave threads at the beginning of the simulation to maximize concurrency and minimize thread synchronization when adding or deleting events during the simulation.

36. … (b) minimizing thread interaction and synchronization by assigning a private heap memory, <u>event queue</u>, and fanout queue region for each of the



master thread and the slave threads at the beginning of the simulation to eliminate thread synchronization resulting from subsequent addition or deletion of signals or logic gate events during the simulation; ….

45. … means to minimize thread interaction and synchronization by assigning a private heap memory, <u>event queue</u>, and fanout queue region for each of the master thread and the slave threads at the beginning of the simulation to eliminate thread synchronization resulting from subsequent addition or deletion of signals or logic gate events during the simulation; ….

### 2. The Disputed Issues

The parties proposed the following claim constructions of the term "event queue":

| Dynetix | Synopsys |
|---|---|
| An "event" in simulation is a task to be processed at a specified time and may be either a signal or logic event. "Event queue" is a sequence of events held in temporary storage waiting to be processed. | An "event" in simulation is a change in state in a logic gate or signal that occurs at a scheduled time. An "event queue" is a sequence of events held in temporary storage waiting to be processed. |

Although originally, the parties disputed the meaning of queue. Eventually, Synopsys adopted Dynetix's construction of "queue." Li Decl. ¶ 5. Consequently, the parties' dispute on this term focuses on the meaning of "event" instead of "event queue." While Dynetix defines "event" generically as "a task to be processed at a specified time and may be either a signal or logic event," Synopsys defines "event" as "a change in state in a logic gate or signal that occurs at a scheduled time."

### 3. Dynetix's Construction of "Event" Is Supported by Intrinsic Evidence

The specification describes the process of generating an event queue as "chain[ing] all events that are to be processed at the same simulation time point into a linked-list." Li Decl. Ex. 8, 6:44-46. This event queue "may contain both signal events and logic gate events." *Id.* 6:46-48. For signal events, the specification discloses an embodiment that "process[es] signal events" and "update[s] signal states." Li Decl. Ex. 8,, Fig. 3. The specification further describes the embodiment as "schedule[ing] events for these selected signals to change states according to the stimulus specification." *Id.* at 6:42-44. Thus, at least for this specific embodiment, a "signal event" is not coterminous with the change of signal state. Instead, a signal event is scheduled for a selected signal

Case No. CV11-05973 PSG



"to change states according to the stimulus specification." *Id.* In other words, a signal event in the embodiment is "a task to be processed", as defined by Dynetix, that enables a selected signal to change states according to the stimulus specification. The task, to use the common terminology of computer programming, is an object which may contain more than one discrete events. Chan Decl. ¶ 7. By the same token, a logic gate event is also a task or object to be processed at a given time point to evaluate the logic gate according to the stimulus specification. Thus, even for this specific embodiment shown in Figure 3 of the '898 patent, it is an oversimplification to say that an event is a change of state in a logic gate or signal, as Synopsys has proposed. In fact, a logic gate event can be many things that cannot be characterized as a change of state, such as dumping waveform data to a file, dumping debug information to a file, doing assertion checking or doing functional coverage monitoring. *Id.* ¶ 8.

Generally speaking, an event simply means an "action" or "occurrence." Li Decl. Ex. 7 (Merriam-Webster Dictionary for "event"). It by no means has to be a change in states. Nor is there any intrinsic evidence that the word as it is used in the claims of the '898 patent should be limited to changes in states. In fact, as discussed above, the intrinsic evidence shows that the word should not be limited to a change of state. Thus, Dynetix's proposed construction for "event queue" should be adopted.

### E. The Construction of "Common Design Database"

#### 1. The Term Is Not Indefinite

The term "common design database" is used in the following claim context in claims 1, 9 and 16.

> … pre-examining each user-specified HDL source file and automatically invoking an appropriate HDL compiler to compile a design source file into a <u>common design database</u>; ….

The term is not indefinite, as Synopsys contends. In fact, it is not difficult for a person skilled in the art to understand the meaning of common design database in this context. Chan Decl. ¶ 12. First, no person skilled in the art does not understand the meaning of "design database", which basically means a collection of compiled design modules in this case, especially in light of the



preceding sentence in the claim, i.e., "to compile a design source file into a common design database."

*Id.* The word "common" is also easily understood, in view of claim 1's preamble that this invention is for performing simulation of integrated circuit design "coded in one or a plurality of" HDL languages. So the common design database simply means the design database which contains various compiled design modules that may be coded in different design languages.

## 2. Dynetix's Proposed Construction Should Be Adopted

The parties' proposed constructions for "common data base" are:

| Dynetix | Synopsys |
|---------|----------|
| A "design database" is a database into which the simulator compiles the design files and stimulus file supplied by the user. The phrase "common design database" refers to the design database which contains various compiled design modules that may be coded in different design language | An organized representation of all HDL design components that are processed by the same simulation engine. |

Dynetix's construction is supported by the intrinsic evidence. In explaining Figure 1, which is a block diagram of a simulator, the specification states that "The logic simulator compiles the design files and stimulus file supplied by the user into a database." Li Decl. Ex. 8, 1:32-33. Thus, the phrase "design database" denotes a "database into which the simulator compiles the design files and stimulus file supplied by the user," which is the proposed definition by Dynetix. The specification also makes it clear what it means by "common design database," with the following description:

> To accomplish the aforementioned purposes the simulator compiles VHDL and/or Verilog design files into a common database to which the event-driven and cycle-based logic simulation will be performed.

*Id.* 10:22-25.

This description shows that the word "common" in "common design database" merely indicates the fact that design codes written in different design languages such as VHDL and Verilog may be compiled into the same database or at least the same group of databases to be simulated. Thus, Dynetix's proposed claim construction is completely supported by the disclosures in the specification.

Synopsys's definition imports limitations from embodiments. The plain meaning of the

Case No. CV11-05973 PSG



phrase "common design database" does not require "all HDL components". Nor does it require all the components be "processed by the same simulation engine." In fact, the claims use the phrase "a" common database which means "one or more" common databases. *See Baldwin Graphic Sys., Inc. v. Siebert, Inc.*, 512 F.3d 1338, 1342 (Fed. Cir. 2008) (it is a general construction rule that "a" or "an" can mean "one or more"). Thus, it would be improperly limiting to require the phrase "common design database" to include "all HDL components" and "processed by the same simulation engine" if there are one or more such common databases. Although the preferred embodiment in the '898 patent may use one common design database, it does not mean such limitation should be imported into the scope of the claim. *See Silicon Graphics, Inc. v. ATI Techs., Inc.,* 607 F.3d 784, 792 (Fed. Cir. 2010) ("A construing court's reliance on the specification must not go so far as to import limitations into claims from examples or embodiments appearing only in a patent's written description unless the specification makes it clear that the patentee intends for the claims and the embodiments in the specification to be strictly coextensive.") (internal quotation marks omitted). Thus, the court should reject Synopsys's proposed construction for "common design database" and adopt Dynetix's proposed construction for the term.

**F. The Construction of "To Create a Master Thread and a Plurality of Slave Threads"**

This term is used in the following claim contexts:

1. … (c) automatically detecting the number of microprocessors (CPUs) available on the multiprocessor platform <u>to create a master thread and a plurality of slave threads</u> for concurrent execution of the multithreaded event-driven simulation of the design to achieve linear to super-linear scalable performance speedup as according to the number of CPUs on the multiprocessor platform ….

36. … (a) minimizing frequencies of thread creation and destruction by <u>creating a master thread and a plurality of slave threads</u>, based on the number of available CPUs on the multiprocessor platform, prior to the start of simulation ….

45. … means to minimize frequencies of thread creation and destruction by <u>creating a master thread and a plurality of slave threads</u> based on the number of available CPUs on the multiprocessor platform, prior to the start of simulation ….

The parties' proposed constructions for this term are:



| Dynetix | Synopsys |
|---|---|
| No need for construction. Alternatively, it means "to create a master thread and two or more of slave threads." | Creating one thread for each processor where the master thread is executed on one processor and each of the slave threads is executed on a separate remaining processor. |

Indeed, this term does not require any construction, in light of the fact that the only words in the term that need construction are "master thread" and "slave thread", which the parties have agreed on a stipulated construction (Dkt. No. 59, p. 1). If the Court is to construe this term, it should be simply construed as "to create a master thread and two or more slave threads."

Synopsys's proposed construction is a blatant attempt to import limitations from specific embodiment in contradiction to the plain meaning of the claim term. Nowhere does the term call for "creating one thread for each processor". Nor does the term require that "the master thread is executed on one processor and each of the slave threads is executed on a separate remaining processor." Synopsys's improper construction should be rejected.

**G.    The Construction of "Pre-Examining Each Source File"**

This term is used in the following claim contexts:

> 1. … (a) <u>pre-examining each</u> user-specified HDL <u>source file</u> and automatically invoking an appropriate HDL compiler to compile a design source file into a common design database;

The parties' proposed constructions for this term are:

| Dynetix | Synopsys |
|---|---|
| No need for Construction. Alternatively, it means "examining each source file before compiling the source files." | The simulator examining the content of each source file to automatically detect its coded file language before compiling the source files. |

This term does not contain any special terms or jargons and thus does not require any claim construction. Further, this term is cherry-picked from a longer term "pre-examining each user-specified HDL source file." Synopsys never disclosed why such cherry-picking is necessary and why the entire term should be construed. It is a realistic likelihood that the construction of the incomplete term, when read to the jury, would distort the meaning of the term. Synopsys's proposed construction reveals its intent to distort the meaning of the full term. Synopsys wants to insert the phrase "automatically" into the meaning of the term, despite the fact the word "automatically" is part



of the next term. However, the phase "user-specified HDL", which Synopsys deliberately cut out from its proposed construction, indicates that this is not an automatic process but requires user's specification.

If it has to be construed, the term at issue simply means "examining each source file before compiling the source files." This construction construes the term "pre-examining" by taking into consideration the term's claim context, i.e., "to compile a design source file into a common design database."

Other than its improper cherry-picking, Synopsys's proposed construction is also a naked attempt to read in limitations from the specification. There cannot be any reasonable dispute that the term at issue does not contain the limitation "to automatically detect its code file language." Although an embodiment may be interpreted to have such a function, such a limitation should not be imported into the scope of the claim.

## H.    The Construction of "To Specify Remote Hosts"

This term is used in the following claim contexts:

19. … installing and executing a graphical user interface program ("GUI") on the user's local host <u>to specify remote hosts</u> on which the HDL design compilation and simulation is to be performed ….

23. … means to provide a graphical user interface program ("GUI") on the user's local host <u>to specify remote hosts</u> on which the HDL design compilation and simulation is to be performed

The parties' proposed constructions for this term are:

| Dynetix | Synopsys |
|---|---|
| No need for construction. Alternatively, it means "to specify the remote servers." | The user identifying remote computer(s) by name. |

Indeed, this term does not need any construction. There is certainly no need to construe "specify." The term "remote hosts" is used throughout claims 19 and 23. It simply means remote computer generally and "remote server" if the context of the term is considered.

Synopsys's construction again tries to improperly narrow the term "specify", by requiring identification by name. "Specify" means "to name or state explicitly or in detail." Li Decl. Ex. 6 (Dictionary). It does not necessarily require identification by name. Synopsys's construction should



be rejected.

## I. The Construction of "Graphical User Interface ("GUI")"

The parties have proposed the following constructions for GUI:

| Dynetix | Synopsys |
|---|---|
| A computer user interface that allows the human-machine interaction by using graphical objects such as icons, images and windows. | A computer user interface that allows the user to interact using icons, images, and a pointing device, as opposed to a command line interface. |

The point of dispute here is whether it is justified to exclude command line interface from GUI. There is no intrinsic evidence that the inventor of the '898 patent wanted or was obligated to exclude text-based command line from its user interface. In fact, the GUI embodiment that the specification describes requires text command inputs from the user. Fig. 13; Chan Decl. ¶ 15.

Synopsys relied on extrinsic evidence to make its case, but conspicuously left out one of the most common and most reliable extrinsic evidence sources, the IEEE Dictionary. The reason for this obvious omission is probably because the IEEE Dictionary actually contradicts Synopsys's position; it defines GUI as

> a user interface that is graphical in nature; that is, the user <u>can</u> enter commands by using a mouse, icons and windows.

Li Decl. Ex. 3, p. 458 (emphasis added).

The operative word here is "can", which does not require the user to enter commands by using a mouse, icons, and windows, and which does not preclude the use of text command. The GUI that the embodiment in Figure 13 of the '898 patent actually requires the user to enter the command (and other information) by typing the text in a graphical environment. Chan Decl. ¶ 15. Thus, Synopsys's proposed construction unduly restricts the meaning of GUI and should be rejected.

## J. The Construction of "By at the Beginning"

The phrase is used in the following claim context:

> 39. The method of achieving super-linear scalable Hardware Description Language simulation according to claim 36 further comprises the step of scheduling the master thread and the slave threads to bind to CPUs of the microprocessor <u>by at the beginning of simulation</u> to eliminate the time spent in scheduling threads for execution during subsequent simulation.

The parties have proposed the following constructions for the term:



| Dynetix | Synopsys |
|---|---|
| The word "by" is a typographical error. The phrase means "at the beginning" | Indefinite. It is unclear whether this requires that action occur prior to the start of simulation or at the start of simulation. |

Synopsys is attempting to take advantage of an obvious typographical error. From the context of the term, it is clear that the element that the term modifies, i.e., "the step of scheduling the master thread and the slave threads to bind to CPUs of the microprocessor" is a step of the simulation method claimed, which compels the meaning "at the beginning" of the simulation. Thus, the term is not indefinite because it does have a reasonable interpretation. *Modine Mfg. Co. v. U.S. Int'l Trade Comm'n*, 75 F.3d 1545, 1557 (Fed. Cir. 1996) ("[W]hen claims are amenable to more than one construction, they should when reasonably possible be interpreted to preserve their validity").

Synopsys's argument attempts to manufacture an issue where none exists. The step in question is obviously part of the simulation method claimed and thus it should be "at" instead of "by" the beginning of the simulation. Chan Decl. ¶ 13. Alternatively, if one insists that the step of binding the threads to CPUs is not part of the core simulation tasks, then this person would have to choose "by" instead of "at." *Id.* In any event, one has the perfect understanding that the process of binding the threads to CPUs is performed before the core steps of the simulation. Thus, there is no ambiguity as to what the claimed invention is. *Id.* Thus, the typographical error does not render the claimed invention indefinite, whichever way one slices the issue.

### K. The Construction of "Means to Provide a Graphical User Interface Program ("GUI") on the User's Local Hosts"

The parties' proposed constructions for this term are:

| Dynetix | Synopsys |
|---|---|
| Corresponding Structure:<br>The combination of computer monitors, graphics drivers, input devices such as keyboard and mouse and the enabling software, allowing the user to receive, display, manipulate, and output information, graphics, and commands on the user's local hosts. | Corresponding Structure:<br>Indefinite. No corresponding structure, act, or material is disclosed in the specification. |

The issue here is whether the means-plus-function limitation is indefinite. To address this issue, this Court should apply a two-step analysis:



> First, a court identifies the particular claimed function. … After identifying the particular claimed function, a court, in the second step of the analysis, looks to the specification and identifies the corresponding structure, material, or acts that perform that function.

*HTC Corp. v. IPCom GmbH & Co., KG*, 667 F.3d 1270, 1278 (Fed. Cir. 2012).

The claimed function of the term at issue is to provide a GUI on the user's local hosts in a remote simulation method of claim 19. The specification discloses a "local host" that can run a user interface (UI) "program" that allows the user to communicate with the server program via Internet or Intranets. '898 Pat. 13:7-12. This "local host" of course has to be a computer or equivalent machine that can run a UI program. Chan Decl. ¶ 14. It also goes without saying that this computer or equivalent machine must have some input devices such as a keyboard and/or mouse. *Id.* The specification further discloses the algorithm of the UI program and describes the program as "allow[ing] the users to specify a remote machine name, and a remote directory pathname, on which they desire their HDL design compilation and/or simulation to be performed." Li Decl. Ex. 8, Fig. 12; 13:13-15. The specification further discloses a sample of the UI. Fig. 13.

In light of these disclosures, Synopsys's claim that no corresponding structure, act, or material is disclosed is difficult to understand. To be sure, the law does not require literal disclosure of every detail of the implementation, so long as a skilled artisan understands what it takes to implement the invention. *See HTC Corp. v. IPCom GmbH & Co., KG*, 667 F.3d 1270, 1279 (Fed. Cir. 2012) ("Although the specification here does not literally disclose a processor and transceiver, a person skilled in the art would understand that the mobile device would have to contain a processor and transceiver.") The key component of the means-plus-function element is the UI program, for which the specification provides both the basic algorithm and an example display of the UI. Li Decl. Ex. 8, Figs. 12 & 13. All the other components are obvious to a person skilled in the art. Synopsys's argument is thus inapposite.

## V.    <u>CONCLUSION</u>

For the foregoing reasons, the Court should adopt Dynetix's proposed claim construction, with the sole modification discussed in Sec. V.C.2, *supra*, regarding the term "achieving super-linear scalable simulation" as the term is used in claims 36 and 45.



DATED: September 14, 2012

**LILAW INC.**
**ATTORNEYS FOR PLAINTIFF DYNETIX DESIGN**
**SOLUTIONS, INC.**

By    /s/ J. James Li

J. James Li, Ph.D.

