1  CHRIS R. OTTENWELLER (STATE BAR NO. 73649)
   cottenweller@orrick.com
2  I. NEEL CHATTERJEE (STATE BAR NO. 173985)
   nchatterjee@orrick.com
3  JASON K. YU (STATE BAR NO. 274215)
   jasonyu@orrick.com
4  ORRICK, HERRINGTON & SUTCLIFFE LLP
   1000 Marsh Road
5  Menlo Park, California 94025
   Telephone:    +1-650-614-7400
6  Facsimile:    +1-650-614-7401

7  BENJAMIN J. HOFILEÑA (STATE BAR NO. 227117)
   bhofilena@orrick.com
8  ORRICK, HERRINGTON & SUTCLIFFE LLP
   777 South Figueroa Street Suite 3200
9  Los Angeles, CA 90017
   Telephone:    +1-213-629-2020
10 Facsimile:    +1-213-612-2499

11 Attorneys for Defendant and Counterclaimant
   SYNOPSYS, INC.
12

13                  UNITED STATES DISTRICT COURT

14              NORTHERN DISTRICT OF CALIFORNIA

15

16 | DYNETIX DESIGN SOLUTIONS, INC., a California corporation, | Case No. 5:11-cv-05973-PSG |
|---|---|
| Plaintiff, | **SYNOPSYS INC.'S RESPONSE CLAIM CONSTRUCTION BRIEF** |
| v. | |
| SYNOPSYS, INC., a Delaware corporation, and DOES 1-50, | |
| Defendant. | |
| SYNOPSYS, INC., a Delaware corporation, | |
| Counterclaim Plaintiff, | |
| v. | |
| DYNETIX DESIGN SOLUTIONS, INC., a California corporation, | |
| Counterclaim Defendant. | |

**TABLE OF CONTENTS**

Page

I. INTRODUCTION ..................................................................................... 1

II. OVERVIEW OF THE '898 PATENT ...................................................... 1

    A. Mixed Hardware Description Language (HDL) Simulation .................................. 2

    B. Multithreaded Simulation ................................................................. 3

    C. Remote Simulation ........................................................................ 4

III. LEGAL STANDARD FOR CLAIM CONSTRUCTION ................................... 5

IV. DYNETIX HAS FAILED TO COMPLY WITH PATENT L.R. 4-3 ................... 6

V. THE TERMS SUBMITTED FOR CONSTRUCTION ................................... 7

    A. "Multithreaded Simulation" ............................................................. 8

        1. '898 Patent Claims Threads, Not Processes ................................... 9

        2. There Is A Well-Understood Difference Between Multithreaded Programs And Multiprocess Programs ...................................... 10

    B. "To achieve linear to super-linear scalable performance speedup/simulation" ...................................................................... 12

        1. Linear To Super-Linear Scalable Performance Speedup Is Defined In The Patent. ....................................................... 12

        2. "To Achieve Linear To Super-Linear Scalable Performance Speedup" Is A Limitation In Claim 1. ...................................... 14

        3. Super-Linear Scalable Simulation is a Limitation of Claims 36 and 45 ............................................................................... 18

    C. "Event Queue" ............................................................................ 19

        1. "Event" Is A Well-Understood Term of Art ................................ 20

        2. Dynetix's Construction Impermissibly Broadens The Claim Term ......... 21

    D. "Common Design Database" .............................................................. 22

    E. "To create a master thread and a plurality of slave threads"; "by creating a master thread and a plurality of slave threads" ...................................... 23

        1. The Intrinsic Record Supports Synopsys's Construction ....................... 24

    F. "Pre-examining each user-specified HDL source file" ........................................ 26

- i -

1. Synopsys's Proposed Construction Is Supported By The Intrinsic Record. ........................................................................ 26

G. "To specify remote hosts" ............................................................. 27

H. "Graphical User Interface" ............................................................ 28

I. "By at the beginning" ................................................................... 30

J. "Means to provide a graphical user interface program ("GUI") on the user's local hosts" ........................................................................ 31

1. Claim 23 Does Not Adequately Identify A Claimed Function ................. 32

2. The Specification Does Not Disclose And Link A Corresponding Structure For "Providing a GUI Program" ................................. 33

VI. CONCLUSION ....................................................................................... 34

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Alloc, Inc., v. Int'l Trade Comm'n,*
    342 F.3d 1361 (Fed. Cir. 2003) ................................................................................. 5

*American Medical Systems, Inc v. Biolitec, Inc.,*
    618 F.3d 1354 (Fed. Cir. 2010) ............................................................................... 19

*American Piledriving Equipment, Inc. v. Geoquip, Inc.,*
    637 F.3d 1324 (Fed. Cir. 2011) ............................................................................... 17

*Bell & Howell Document Mgmt. v. Altek Sys.,*
    132 F.3d 701 (Fed. Cir. 1997) ................................................................................... 7

*Bell Atlantic Network Servs., Inc. v. Covad Commc'n. Group, Inc.,*
    262 F.3d 1258 (Fed. Cir. 2001) ................................................................................. 6

*C&C Jewelry Mfg., Inc. v. Trent West,*
    Case No. 09-1303-JF, 2010 WL 2681921 (N.D. Cal. July 6, 2010) (Fogel, J.) ..................... 17

*C.R. Bard, Inc. v. U.S. Surgical Corp.,*
    388 F.3d 858 (Fed. Cir. 2004) ................................................................................... 5

*Catalina Mktg. Int'l v. Coolsavings.com, Inc.,*
    289 F.3d 801 (Fed. Cir. 2002) ............................................................................ 18, 19

*CBT Flint Partners, LLC v. Return Path, Inc.,*
    654 F.3d 1353 (Fed. Cir. 2011) ............................................................................... 31

*Chicago Bd. Options Exchange, Inc. v. Int'l Sec. Exch, LLC,*
    677 F.3d 1361 (Fed. Cir. 2012) ................................................................................. 9

*Chimie v. PPG Industries, Inc.,*
    402 F.3d 1371 (Fed. Cir. 2005) ............................................................................... 17

*Dow Chemical Co. v. Mee-Industries, Inc.,*
    341 F.3d 1370 (Fed. Cir. 2003) ............................................................................... 17

*Fast Memory Erase, LLC v. Spansion, Inc.,*
    Case No. 3:08-cv-977, 2010 WL 363498 (N.D. Tex., Feb. 2010), *aff'd*, Case No.
    2010-1302 (Fed. Cir. June 8, 2011) ......................................................................... 18

*Hoechst Celanese Corp. v. BP Chems. Ltd.,*
    78 F.3d 1575 (Fed. Cir. 1996) ................................................................................. 20

*Honeywell Int'l, Inc. v. ITT Indus., Inc.,*
    452 F.3d 1312 (Fed. Cir. 2006) ............................................................................. 5, 6

*IGT v. Bally Gaming Int'l, Inc.*,
    659 F.3d 1109 (Fed. Cir. 2011) ........................................................................... 27

*Lemelson v. Gen. Mills, Inc.*,
    968 F.2d 1202 (Fed. Cir. 1992) ...................................................................... 15, 17

*Markman v. Westview Instruments, Inc.*,
    52 F.3d 967 (Fed. Cir. 1995) ................................................................. 1, 5, 6, 7

*Med. Instrumentation & Diagnostics Corp. v. Elekta AB*,
    344 F.3d 1205 (Fed. Cir. 2003) ........................................................................... 34

*Noah Sys., Inc. v. Intuit, Inc.*,
    675 F.3d 1302 (Fed. Cir. 2012) ...................................................................... 33, 34

*NTP, Inc. v. Research In Motion, Ltd.*,
    418 F.3d 1282 (Fed. Cir. 2005) ...................................................................... 8. 18

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) ................................................................... passim

*Standard Oil Co. v. Am. Cyanamid Co.*,
    774 F.2d 448 (Fed. Cir. 1985) ............................................................................. 6

*Sun Microsystems, Inc. v. Network Appliance, Inc.*,
    688 F. Supp. 2d (N.D. Cal. 2010) ........................................................................ 7

*Verizon Services Corp. v. Vonage Holdings Corp.*,
    503 F.3d 1295 (Fed. Cir. 2007) ........................................................................... 5

**RULES**

Local Rule 4-3 ............................................................................................. 1, 6, 7, 22

Local Rule 4-4 ............................................................................................................ 6

**OTHER AUTHORITIES**

*Greenskeepers of Delaware, LLC, et al. v. Softspikes LLC, et al.*,
    Case No. 07-2419, Memorandum on Claim Construction (E.D. Pa Feb. 5, 2010)
    (Docket No. 99) ..................................................................................................... 18

IEEE 100, The Authoritational Dictionary of IEEE Standards Terms
    (7th ed. 2000) ............................................................................... 11, 21, 22, 30

Merriam-Webster Dictionary(10th ed. 1999) ................................................... 15, 17

Microsoft Computer Dictionary(4th ed. 1999) ................................................... 3, 27

Newton's Telecom Dictionary (24th ed. 2008) ....................................................... 30

Oxford Dictionary of Computing (4th ed. 1996) ........................................................................ 30

# I. INTRODUCTION

The parties have taken sharply divergent approaches to claim construction in this case. Defendant Synopsys Inc. ("Synopsys") has followed the Federal Circuit's directives that the intrinsic record – the claims, specification, and prosecution history – provides the best evidence for understanding the invention the inventor claims to have conceived and patented. By comparison, Plaintiff Dynetix Design Solutions, Inc. ("Dynetix") places principal reliance on a litigation-inspired declaration from the inventor and CEO of Dynetix which was submitted in violation of Patent Local Rule 4-3 and improperly attempts to rewrite the patent prosecution history. The inventor's declaration, which was never before the Patent Office at the time of prosecution and never disclosed to the public, is of no relevance to an understanding of the boundaries of the claimed invention. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 983 (Fed. Cir. 1995) ("the testimony of [the inventor] on the proper construction of the claims is entitled to no deference"). Dynetix's decision to rely on inadmissible material, while paying little heed to the intrinsic record, speaks volumes about Dynetix's strategy for prosecuting this case. Recognizing that the claims of the patent in suit, properly construed, do not read on Synopsys's accused product, Dynetix is attempting to broaden the invention beyond what was approved by the Patent Office.

# II. OVERVIEW OF THE '898 PATENT

The parties have submitted 10 terms from the patent in suit, U.S. Patent No. 6,466,898 (the "'898 patent"), for construction. The '898 patent, entitled "Multithreaded, Mixed Hardware Description Languages Logic Simulation on Engineering Workstations," relates to the field of logic simulation and logic simulators. '898 Patent at 1:1-4:2, Background. Before circuit designers begin the expensive process of committing a design to silicon, they use logic simulators to verify that a particular circuit design works the way it is supposed to (i.e., that it produces the proper outputs when receiving a set of inputs). *Id.*

The simulation process starts with a circuit design, which is written in a Hardware Description Language ("HDL"). *Id.* at 1:21-30. Circuit designers have a number of HDL

1  languages they can employ, including Verilog and VHDL.  *Id.*  The code a circuit designer writes

2  to describe the functions of the circuit are contained in files called "HDL source files."

3  In the simulation process, the logic simulator operates on inputs supplied by two sources:

4  (1) the HDL source files and (2) a set of input stimuli to be applied to the design under testing.

5  *Id.*  The simulator compiles the HDL source files (*i.e.*, converts them into machine readable

6  code).  It then simulates how the circuit design would react to the input stimuli, calculating the

7  outputs the circuit would produce if the input stimuli were actually applied to a physical circuit.

8  *Id.* at 132-45.

9  The '898 Patent discloses and claims three features relevant to claim construction:

10  (1) Mixed HDL Simulation, *i.e.*, simulating circuits written in Verilog *and* VHDL;

11  (2) Multithreaded logic simulation to achieve linear to super-linear speedup in performance; and

12  (3) Remote logic simulation.  '898 Patent at Abstract.  Each of these features is briefly reviewed

13  below.

14  **A.  Mixed Hardware Description Language (HDL) Simulation.**

15  The '898 Patent discloses and claims a method for simulating circuit designs that are

16  written in multiple HDL languages, specifically Verilog and VHDL.  As stated in the Summary

17  of Invention, "[t]his invention describes further a novel HDL logic simulator that supports both

18  VHDL and Verilog HDL design languages in a single program . . . .  These features allow

19  [integrated] chip designers and/or system designers to mix-and-match their HDL designs

20  (Verilog and/or VHDL) and run simulation on any hardware resource they have available."  *Id.*

21  at 4:13-19.

22  The invention discloses a simulator that includes two compilers, one for VHDL and

23  another for Verilog.  *Id.* at 9:41-43.  After the user specifies the source files to be simulated, the

24  simulator "pre-examine[s] the file content to detect automatically the coded file language.  It will

25  then invoke an appropriate compiler [VHDL or Verilog] to process that file."  *Id.* at 9:43-46.

26  Because the simulator selects the appropriate compiler automatically, the user does not have to

27

28

use a "special program invocation switch" to tell the simulator which compiler to use.[1]  *Id.* at 9:47-51.  The '898 Patent touts this as one of the advantages of the claimed simulator.  *Id.*  After invoking the appropriate compiler, "the simulator compiles VHDL and/or Verilog design files into a common database to which the . . . simulation will be performed."  *Id.* at 10:22-25.  The contents of the database are then "processed by the same . . . simulation engine."  *Id.* at 10:37-39.  The '898 Patent claims that this single-program method is much more efficient than prior art "simulation backplanes," which simply "interconnect a VHDL [simulator] and [a separate] Verilog simulator, so that a user can simulate his VLSI design coded in both VHDL and Verilog."  *Id.* at 2:57-60.

### B.  Multithreaded Simulation.

The '898 Patent discloses multithreaded simulation that achieves "linear to super-linear scalability on multiprocessor systems."  *Id.* at Abstract.  As stated in the Summary of the Invention, the simulator "enables the logic simulator provided by the invention to achieve a scalable performance (i.e., from linear to super-linear) according to the number of CPUs on the selected platform."  *Id.* at 4:5-13.

A "multithreaded" program is a program that uses multiple "threads."  A "thread" is a "process flow in a program that runs on a CPU."  *Id.* at 2:41-42.  Threads exist within a "process," which is essentially an individual program with its own memory and system resources to accomplish its intended tasks.  Each of the threads within a process shares the memory and system resource of its "parent" process.  Declaration of Jason K. Yu in Support of Synopsys, Inc.'s Response Claim Construction Brief ("Yu Decl."), Ex. J (Programming with POSIX threads) at p. 10 ("Each process has a separate virtual memory address space, but threads running within the same process share the virtual address space and all other process data").

In order to best use the resources of a multiprocessor platform, it is desirable to create a sufficient number of threads such that all available microprocessors are in use.  Because "overheads increase exponentially as more threads are used in a process," however, it is also

---

[1] A "program invocation switch" is a command used to execute a particular program (e.g., a VHDL compiler instead of a Verilog compiler or *vice verse*).  Yu Decl., Ex. M (Microsoft Computer Dictionary at p. 429) ("switch . . . 5. . . . an argument used to control the execution of a command or application").

desirable to "use as few threads as possible during the simulation process." '898 Patent 17:39-50. In balancing these two considerations, and in order to obtain the best speedup possible, the simulator disclosed by the '898 Patent creates exactly one thread for every available microprocessor. *Id.* at 17:51-54 ("To reduce the number of threads employed in a process upon which n CPUs are available on a platform, the simulator will create exactly n threads . . . at program starts [*sic*] up"). The specification describes the "one thread per CPU" concept as a benefit over the prior art. *Id.* at 17:65-18:12.

The '898 patent claims that the invention will achieve a "linear to super-linear scalable speedup in performance." The patent defines "linear to super-linear scalability."

> If the C factor of a multithreaded tool remains at 1.0 on [a] different number of CPU configurations, the tool is said to demonstrate linear scalability. If the C factor of the tool is less than 1.0, then it is said to demonstrate sub-linear scalability. Finally, if the C factor of the tool is above 1.0, then it is said to demonstrate a super-linear scalability.

*Id.* at 16:49-58. The patent explains that the "C factor" is a constant that indicates the performance speedup per microprocessor (e.g., a C factor of 1 would lead to 4x speedup on a 4 CPU system, 8x speedup on an 8 CPU system, etc.). *Id.* at 16:20-48. If the C factor of a particular simulation is 1, then the simulation demonstrates linear speedup. If the C factor is greater than 1, then it demonstrates a super-linear speedup. *Id.* at 16:49-57.

### C. Remote Simulation.

The '898 Patent discloses a method for "remote" simulation. *Id.* at Abstract. This feature "provides seamless access of network resources for HDL compilation and simulation." *Id.* at 4:20-23. In order to accomplish this, the invention requires installing a "server program" on a remote workstation and installing a "graphical user interface (GUI) program" on a local workstation. *Id.* at Claim 19 and 4:20-30. Using the GUI, the user may "specify a remote machine name, and a remote directory pathname, on which they desire their HDL design compilation and/or simulation to be performed." *Id.* at 13:10-15. The GUI program "will open a network connection [] to the server process [i.e., program] on each user-specified host, and then transmits the user's commands to the server to be executed at the user-specified directory." *Id.* at

13:20-25. "After the commands are executed . . . simulation results are automatically transferred back" to the GUI program for display. *Id.* at 25-30.

## III.   LEGAL STANDARD FOR CLAIM CONSTRUCTION

A claim term is to be given the ordinary and customary meaning that would be attributed to it by one of ordinary skill in the art at the time of the invention, which is the effective filing date of the patent application. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005). To ascertain this meaning, the Court primarily looks to the intrinsic evidence: the claims themselves, the specification, and the prosecution history. *Markman,* 52 F.3d at 979.

Because the claims "are part of 'a fully integrated written instrument,' [they] 'must be read in view of the specification, of which they are a part.'" *Phillips*, 415 F.3d at 1315 (citations omitted). "Usually, [the specification] is dispositive; it is the single best guide to the meaning of a disputed term.'" *Id.* "In light of the statutory directive that the inventor provide a 'full' and 'exact' description of the claimed invention, the specification necessarily informs the proper construction of the claims." *Id.* at 1316 (citations omitted). "It is therefore entirely appropriate for a court, when conducting claim construction, to rely heavily on the written description for guidance as to the meaning of the clams." *Id.* at 1317.

Where the specification describes particular attributes of a method or structure as "the present invention" or "the current invention," this description limits the scope of the claims even if the claims might otherwise be susceptible to a broader interpretation. *See, e.g., Verizon Services Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1308 (Fed. Cir. 2007) ("When a patent thus describes the features of the "present invention" as a whole, this description limits the scope of the invention."); *Alloc, Inc., v. Int'l Trade Comm'n*, 342 F.3d 1361, 1368-1370 (Fed. Cir. 2003) ("where the specification makes clear at various points that the claimed invention is narrower than the claim language might imply, it is entirely permissible and proper to limit the claims"). *Accord Honeywell Int'l, Inc. v. ITT Indus., Inc.,* 452 F.3d 1312, 1318 (Fed. Cir. 2006); *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 864 (Fed. Cir. 2004). In this context, the claims are properly limited to the invention disclosed because "[t]he public is entitled to take the patentee at his word." *Honeywell*, 452 F.3d at 1318.

The prosecution history also acts to limit the scope of the claims. Where the inventor clearly defines claim scope or disclaims claim coverage during prosecution before the Patent Office in order to gain allowance of his claim, the claims should be so limited. *Bell Atlantic Network Servs., Inc. v. Covad Commc'n. Group, Inc.,* 262 F.3d 1258, 1273 (Fed. Cir. 2001); *Standard Oil Co. v. Am. Cyanamid Co.,* 774 F.2d 448, 452 (Fed. Cir. 1985). The Court may also look to extrinsic evidence to ascertain the correct meaning of the claims to a person of ordinary skill in the art. *Phillips,* 415 F.3d at 1317. Extrinsic evidence includes dictionaries, learned treatises, and expert testimony. *Id.* at 1317-18 (citing *Markman,* 52 F.3d at 980).

Synopsys proposes that a person of ordinary skill in the art would have an M.S. degree in Electrical Engineering or Computer Science and at least two years of experience with Electronic Design Automation (EDA) tools.

## IV.   DYNETIX HAS FAILED TO COMPLY WITH PATENT L.R. 4-3

Patent Local Rule 4-3 requires parties to a patent case to submit a Joint Claim Construction and Prehearing Statement in which each party identifies any witness who will present testimony at the claim construction hearing and a summary of his or her testimony. This disclosure gives the opposing party an opportunity under Patent Local Rule 4-4 to take discovery of the witness, including a deposition. Dynetix has violated Rule 4-3. It submitted the declaration of Terence Chan, the named inventor and CEO of Dynetix, in support of its opening claim construction brief, but it never disclosed Mr. Chan as a witness for the claim construction hearing in compliance with Patent L.R. 4-3 nor did it serve a summary of his testimony. Docket No. 59 (Joint Claim Construction and Prehearing Statement).

Accordingly, the Court should strike the Chan declaration and any references to it in Dynetix's Opening Brief. Dynetix should be barred from offering any testimony of Mr. Chan, by declaration or live, at the hearing given its failure to comply with the Patent Local Rules. To allow Dynetix to rely on Chan testimony would be highly prejudicial to Synopsys given that Synopsys was deprived the opportunity to take discovery on Mr. Chan's expected testimony.

Furthermore, Mr. Chan's declaration is irrelevant to claim construction. The Federal Circuit has long held that "the testimony of [the inventor] on the proper construction of the claims

is entitled to no deference." *Markman*, 52 F.3d at 983; *accord Bell & Howell Document Mgmt. v. Altek Sys.*, 132 F.3d 701, 706 (Fed. Cir. 1997) ("The testimony of an inventor is often a self-serving, after-the-fact attempt to state what should have been part of his or her patent application"); *Sun Microsystems, Inc. v. Network Appliance, Inc.*, 688 F. Supp. 2d, 965 (N.D. Cal. 2010) ("this Court has previously followed federal circuit authority that inventor testimony is irrelevant to [claim] construction").

## V. THE TERMS SUBMITTED FOR CONSTRUCTION

The parties submit the following 10 terms for construction (independent claims are identified by bolding):

| No. | Term | Asserted Claims |
|-----|------|-----------------|
| A | Multithreaded simulation | **1**, 2, 5-7, **19**, 20-22, **23**, **36**, 39, 44, **45**, 48, 53 |
| B | To achieve linear to super-linear scalable performance speedup/simulation | **1**, 2, 5-7, **36**, 39, 44, **45**, 48, 53 |
| C | Event queue | 5, **36**, 39, 44, **45**, 48, 53 |
| D | Common design database | **1**, 2, 5-7 |
| E | To create a master thread and a plurality of slave threads | **1**, 2, 5-7, **36**, 39, 44, **45**, 48, 53 |
| F | Pre-examining each source file | **1**, 2, 5-7 |
| G | To specify remote hosts | **19**, 20, 21, 22, **23** |
| H | Graphical user interface ("GUI") | **19**, 20, 21, 22, **23** |
| I | By at the beginning | 39 |
| J | Means to provide a graphical user interface program ("GUI") on the user's local hosts | **23** |

## A. "Multithreaded Simulation."

| Dynetix's Construction | Synopsys's Construction |
|---|---|
| Claims **1**, 2, 5-7, **19**, 20-22, **23**, **36**, 39, 44, **45**, 48, 53 | |
| A "thread" is a process flow in a program that runs on a central processor unit (CPU); "Multithreaded simulation means a simulation of circuit functionalities by executing multiple process flows concurrently on multiple CPUs. | Original proposal: A "thread" is a process flow in a program that runs on a processing unit and shares address space and system resources with other threads. "Multithreaded Simulation" means a simulation of circuit functionalities that executes multiple threads concurrently on multiple processing units.<br><br>Modified proposal: A "thread" is a process flow in a program that runs on a processing unit; a thread is different from a process. "Multithreaded Simulation" means a simulation of circuit functionalities that executes multiple threads concurrently on multiple processing units. |

The parties agree that "multithreaded simulation" means "a simulation of circuit functionalities that creates multiple threads concurrently on multiple processing units" (Synopsys's proposed language).[2] Where the dispute arises is the meaning of "thread." In its original construction Synopsys added language ("shares address space and system resources with other threads") to distinguish a "thread" from a "process," two terms used in the patent specification.

Dynetix argues that "thread" encompasses both threads and processes. Dynetix Br. at 7; Chan Decl., ¶ 10. Synopsys disagrees. Upon reviewing Dynetix's Opening Brief, Synopsys believes that the dispute can be simplified. Synopsys thus proposes in its modified construction to simply state "a thread is different from a process." As discussed below, that it is consistent with the intrinsic record.

---

[2] In claims 19, 23, 36 and 45, "multithreaded simulation" is used only in the preambles, but it clearly is used as an antecedent basis and is thus limiting. It is an antecedent basis to "simulation." *See NTP Inc. v. Research In Motion Ltd.,* 418 F.3d 1282, 1306 (Fed. Cir. 2005). Dynetix does not argue that "multithreaded simulation" is not a limitation in each claim in which it appears. Dynetix objects to Synopsys's use of the word "processing unit." Dynetix Br. at 6. Synopsys does not object to the use of the term "central processing unit" or "microprocessor" instead of "processing unit."

### 1. The '898 Patent Claims Threads, Not Processes.

Dynetix argues that the '898 Patent uses the term "thread" broadly to include both threads and processes. While a patentee may act as his own lexicographer to define terms contrary to their standard use, the patentee did not do so in this regard. The '898 Patent specification differentiates between threads and processes, explaining that a thread is part of a process. The specification explains that "a thread is a *process* flow in a program that runs on a CPU." '898 Patent at 2:41-42. (emphasis added). In numerous other places, the specification uses "thread" and "process" in the same sentence to indicate that a thread is part of a process. Specifically:

- "In general, the thread manipulation overheads increase exponentially as more threads are used *in a process*. *Id.* at 17:39-40 (emphasis added).

- "To reduce the number of threads *employed in a process* upon with n CPUs are available on a platform, the simulator will allocate exactly n threads. . . ." *Id.* at 17:51-54 (emphasis added).

- "Furthermore, by using a minimum number of threads *in a process*, it also reduces the memory needed to support the process execution." *Id.* at 17:60-61 (emphasis added).

Some of the claims of the '898 patent refer to "threads," while other claims refer to "processes," strongly suggesting that the terms are not synonyms or equivalents. *See Chicago Bd. Options Exch., Inc. v. Int'l Sec. Exch., LLC*, 677 F.3d 1361, 1369 (Fed. Cir. 2012) ("In the absence of any evidence to the contrary, we must presume that the use of different terms in the claims connotes different meanings"). Claims 26-35 use the term "process" in claiming job scheduling capabilities, an aspect of the '898 patent not at issue in this case. As the specification explains, the job scheduling function creates multiple processes to accomplish jobs. '898 Patent at 15:18-26. It states:

> For each newly added user-defined job, the UI will create a *child process* to handle that job . . . . The *child process* will run independently from the UI, and it will terminate when the target job has been completed . . . . Specifically, when the *child process* starts up, it will record its process identification number to a job entry in the 'job' description file.

*Id.* (emphasis added). *See also id.* at 15:61-63 ("If there are jobs yet to be executed but their correspondent *child processes* are no longer running, the server will create new *child processes* to handle these jobs.") (emphasis added).

The specification also explains that the threads within a process can share system memory, further reinforcing the conclusion that a thread is different from a process. *Id.* at 17:32-37 ("Finally, if some global data that [sic] may be concurrently accessed by multiple threads . . . then those threads must be synchronized"). Indeed, one of the aspects of the invention is allocating portions of memory that is shared within a process among the threads in that process. *Id.* at 18:29-32 ("When a thread uses up its allocated heap memory, it will allocate another block of memory from the [shared] *process* heap region (this process will involve thread synchronization)") (emphasis added).

In arguing that the term "thread" encompasses both threads and processes, Dynetix ignores perhaps the most obvious references in the specification. The title of the patent is "*Multithreaded*, Mixed Hardware Description Languages Logic Simulation on Engineering Workstations." *Id.* at Title (emphasis added). The Abstract of the '898 Patent states that "*[t]his invention* describes a *multithreaded* HDL logic simulator." *Id.* at Abstract (emphasis added). The Summary of the Invention states that "*[t]his invention* describes a novel concurrent, *multithreaded* algorithm to accelerate the execution of logic simulation." *Id.* at 4:5-9. Moreover, the claims at issue expressly state that they claim "multithreaded" simulation. *Id.* at claims 1, 36, and 45. There is no suggestion that the patentee intended the term "thread" to encompass a "process."

### 2. There Is A Well-Understood Difference Between Multithreaded Programs And Multiprocess Programs.

Not only does the intrinsic record indicate that the patentee used "thread" and "process" to convey different meanings, but a person of ordinary skill in the art would clearly understand that the terms mean different things. Synopsys has submitted multiple technical references, published around the time of the '898 Patent application, that explain that a thread is different from a process. Specifically, these references are consistent with the specification in explaining that a

SYNOPSYS, INC.'S RESPONSE CLAIM CONSTRUCTION BRIEF
CASE NO.: 5:11-CV-05973-PSG

thread is a flow of control *within* a process, and that threads share address space. Yu Decl., Exs.

E, I, J, and K:

- thread: A single sequential flow of control *within a process*. . . Anything whose address may be determined by a thread . . . shall be accessible to all threads in the same process. (IEEE Dictionary at p. 1176) (emphasis added)

- "All threads *in a process* share the state of that process . . . . They reside in the exact same memory space, see the same functions, see the same data." (A Guide to Multithreaded Programming at p. 10) (emphasis added)

- "Each process has a separate virtual memory address space, but *threads running within the same process* share the virtual address space and all other process data." (Programming with Posix Threads at p. 10). (emphasis added)

- "Several Threads *may run under the same process* and all of them share the state of that process." (Mittra at p. 71) (emphasis added)

Dynetix has not presented any evidence – intrinsic or extrinsic – that supports its assertion that threads encompass processes (with the exception of the improper Chan declaration that should be struck). Because Synopsys's modified construction goes to the heart of the matter, and is supported by both intrinsic and extrinsic evidence, the Court should adopt it. It would assure that Dynetix does not argue at a later phase in the case that a thread encompasses a process.

### B. "To achieve linear to super-linear scalable performance speedup/simulation."

| Dynetix's Construction | Synopsys's Construction |
|---|---|
| Claims **1**, 2, 5-7, **36**, 39, 44, **45**, 48, 53 | |
| For the purpose of enhancing the simulation speed in a rate proportional to, or even faster than, the increase in the number of processors. | The terms linear and super-linear describe the speedup that a parallel simulator will achieve when performed on hardware containing one or more processing units. A simulation is "linear" if the speedup that is achieved is equal to the number of available processing units. For example, a simulation that runs 2X as fast on hardware containing two processing units is linear. Similarly, if the simulation runs 4X as fast on four processing units it is again linear. A simulation that has a speedup greater than the number of processing units is super-linear. For example, if a process executed on two processing units runs 3X as fast as the same simulation on one processing unit, it is super-linear. "Scalable performance" means there is a linear to super-linear increase in performance for each added processing unit. |

Claim 1 contains the term "to achieve linear to super-linear scalable performance speedup." The preambles of Claims 36 and 45 contain a similar phrase: "achieving super-linear scalable Hardware Description Language simulation." All three claims call upon the Court to construe what linear to super-linear scalable performance speedup/simulation means. A second dispute is whether the phrase as used in Claim 1 is a claim limitation. Finally, use of the term "super-linear scalable Hardware Description Language simulation" in the preambles of Claims 36 and 45 presents the issue of whether the preambles are limiting.

### 1. Linear To Super-Linear Scalable Performance Speedup Is Defined In The Patent.

The patentee, acting as its own lexicographer, defined what it means to achieve linear to super-linear scalable performance speedup. *See Phillips*, 415 F.3d at 1316 (where the patentee has attributed a special definition to a claim term, "the inventor's lexicography governs"). That definition is set forth in the following passage of the specification.

> [W]hen a user runs a multithreaded tool on an *n* CPU system (where *n* > 1), he would expect that the performance of the tools should improve by C*n times, where C is an empirical constant. . . . For example, if C is 0.75 then the expected speedup of a multithreaded tool on different configurations of a multiprocessor system are:

| Number of CPU | Speedup |
|---|---|
| 2 | 1.5 times |
| 4 | 3.0 times |
| 8 | 6.0 times |

Where the speed up of a multithreaded tool is computed as: Speedup ($x$) = Performance on a multi-CPU system/Performance on a single-CPU system.

*If the C factor of a multithreaded tool remains at 1.0 on [a] different number of CPU configurations, the tool is said to demonstrate linear scalability. If the C factor of the tool is less than 1.0, then it is said to demonstrate sub-linear scalability. Finally, if the C factor of the tool is above 1.0, then it is said to demonstrate super-linear scalability.*

'898 Patent at 16:26-57 (emphasis added).

Synopsys's proposed construction incorporates the patentee's definition precisely, as Dynetix concedes. It provides that a performance speedup is "linear" when the speedup is equal to the number of processors available. In other words, linear speedup has a one-to-one ratio with the number of available processors (e.g., 2x speedup for 2 processors, 3x speedup for 3 processors, etc.). *Id.* That is, it has a "C Factor" of 1.0. A performance speedup is "super-linear" when the speedup is greater than a one-to-one ratio with the number of available processors. *Id.* That is, it has a "C Factor" of greater than 1.0.

Further, Synopsys's proposed construction adopts the patentee's definition of "scalable." The specification states that linear or super-linear scalability depends on consistent achievement of the speedup in performance on a different number of microprocessor configurations (e.g., 2 microprocessors, 4 microprocessors, 8 microprocessors, etc.).

If the C factor of a multithreaded tool ***remains at 1.0 on [a] different number of CPU configurations***, the tool is said to demonstrate linear ***scalability***. If the C factor of the tool is less than 1.0, then it is said to demonstrate sub-linear scalability. Finally, if the C factor of the tool is above 1.0, then it is said to demonstrate super-linear scalability.

'898 Patent at 16:49-57 (emphasis added).

Dynetix's proposed construction does not adhere to the definition in the specification. Instead, it introduces ambiguous language, such as "enhancing the simulation speed in a rate

13

proportional to, or even faster than, the increase in the number of processors."  None of that language is used in the specification.  "Proportional" does not capture the precision of the patentee's definition.  Dynetix argues that "proportional" indicates that the relationship between speedup and the number of available processors "resembles a straight line."  Dynetix Br. at 11.  But resembling a straight line is not an accurate substitute for the patentee's definition.  A performance speedup of less than 1.0 might resemble a straight line, but under the patentee's definition it would not be either linear or super-linear.  Dynetix criticizes the "mathematical precision" of Synopsys's construction, but it is the patentee who decided on that mathematical precision.  Dynetix Br. at 11.  Because Synopsys's construction incorporates the patentee's definition, it should be accepted.

### 2. "To Achieve Linear To Super-Linear Scalable Performance Speedup" Is A Limitation In Claim 1.

Achieving "linear to super-linear scalable performance speedup" is an express component of Claim 1 and its dependent claims.  The relevant portion of Claim 1 states:

> (c) automatically detecting the number of microprocessors (CPUs) available on the microprocessor platform to create a master thread and a plurality of slave threads for concurrent execution of the multi-threaded event-driven simulation of the design, *to achieve linear to super-linear scalable performance speedup as according to the number of CPUs on the multiprocessor platform.*

'898 Patent at Claim 1 (emphasis added).

Synopsys contends actual achievement of such speedup is a condition of patentability.  Dynetix's position is confusing at best.  On the one hand, Dynetix refers to the term as a "structural limitation" but in other places in its Opening Brief it asserts "Claim 1 was not drafted to require linear/super-linear scalability."  Compare Dynetix Brief at 8, 9.  To the extent that Dynetix argues that the reference to "linear to super-linear scalable performance speedup" is merely an intended or hoped-for result that is not limiting, Dynetix is contradicting the plain terms of the intrinsic record.

At numerous places, including the Abstract and the Summary Invention, the specification describes the invention as *achieving* linear to super-linear scalable performance speedup.  *Id.* at

Abstract ("This invention . . . uses special concurrent algorithms to accelerate the tool's performance on multiprocessor platforms *to achieve* linear to super-linear scalability on multiprocessor systems") (emphasis added); *id.* at Summary of the Invention ("The algorithm *enables* the logic simulator provided by the invention *to achieve* a scalable performance (i.e., from linear to super-linear) according to the number of CPUs on the select platform.") (emphasis added); *id.* at 17:17-19 ("The simulator *achieves* linear and super-linear scalability by using special new concurrent methods that are described in the following sections.") (emphasis added). These are statements describing a condition of patentability, not just a hoped-for or intended result.

Further, during prosecution, the patentee disclaimed simulators that do not achieve linear to super-linear speedup by amending Claim 1 to require "linear to super-linear . . . speedup," and then relying on that amendment to distinguish the prior art. *See, e.g., Lemelson v. Gen. Mills, Inc.*, 968 F.2d 1202, 1207 (Fed. Cir. 1992) (holding that a patentee that accepts an examiner's rejection of a broad claim by filing narrower claims cannot later regain the broader scope previously abandoned). In response to an office action rejecting the original claims, the patentee filed amended claims, adding to Claim 1 the phrase "to achieve linear to super-linear scalable performance speedup." Yu Decl., Ex. D at 2 (Amended Claim 1); *compare* Yu Decl., Ex. B at 34 (Original Claim 1). In his response, the patentee also presented arguments to distinguish his invention from five prior art patents cited by the examiner. The patentee explicitly distinguished his invention from the five prior art patents based on the speedup that it achieved. In response to the rejections of claims 1-8, for example, the patentee argued that the various prior art references did not teach methods to speedup the performance:

> nor does [Dunenloup] make use of any multiprocessor platform to accelerate the performance of its system . . .

> Bahra does not teach concurrent use of any multiprocessor to *speedup* the performance of their system . . .

> there is . . . no teaching [in Rompaey] of making concurrent use of multiprocessor platform to *speedup* their system performance . . .

> Davis system does not make use [of] any multiprocessor platform to *speedup* their system performance . . .

1        Liao does not make use of any multiprocessor platform to *speedup* the execution
2    of their system . . .

3    Yu Decl., Ex. D (Response to Office Action) at p. 18-19 (emphasis added).

4        Later in the response, the patentee explicitly distinguished the same prior art references on

5    the ground they do not achieve "super-linear scalable simulation." *Id.* at p. 35-36. The patentee

6    stated:

7        The Examiner's rejections are traverse[d] for the reasons set forth below.
     First, Dunenloup teaches a system for converting a RTL design (coded in a
8    plurality of HDL languages) into a generic netlist, using a logic synthesis tool.
     *Dunenloup does not specify any means to perform super-linear scalable*
9    *concurrent simulation of the system function.*

10       Bahra et al teaches a system which can accept VHDL and Verilog design
     files . . . *However, Bahra et al. does not teach any means to perform super-linear*
11   *scalable concurrent simulation of the system function.*

12       Rompary [*sic*] et al. teaches a system that supports hardware/software co-
     synthesis and co-simulation . . . . *Rompary [sic] does not perform super-linear*
13   *scalable concurrent simulation function.*

14       Davis et al. teaches a system that can map a software applications . . . .
     *Davis, however, does not perform any super-linear scalable concurrent*
15   *simulation.*

16       Liao et al. teaches another hardware/software co-design and co-simulation
     system . . . . *Liao does not perform any super-linear scalable concurrent*
17   *simulation.*

18       *In contrast, the method and program according to the claim 53-70 of the*
     *instant invention presented a new super-linear scalable concurrent simulation*
19   *method that are not disclosed or taught at all by any of the prior art. In view of*
     *the foregoing, neither Dunenloup, Bahra et al., Rompaey et al., Davis or Liao et*
20   *al[.] renders the instantly amended claims 53-70 anticipated.*

21   *Id.* at p. 35-36 (emphasis added).

22       Dynetix's characterization of the prosecution history is misleading. Dynetix's assertion

23   that the patentee did not rely upon "speedup" or "super-linear scalable concurrent simulation" to

24   distinguish the prior art is contrary to the patentee's response to the office action. Further,

25   Dynetix's argument that the point of distinction can be ignored because the patentee cited other

26   distinguishing features is contrary to the law. A patentee's disclaimer on one particular ground is

27   binding even if he distinguishes the prior art on other grounds as well. *See American Piledriving*

28   *Equipment, Inc. v. Geoquip, Inc.*, 637 F.3d 1324, 1336 (Fed. Cir. 2011) ("We have made clear

16

that an applicant's argument that a prior art reference is distinguishable on a particular ground can serve as a disclaimer of claim scope even if the applicant distinguishes the reference on other grounds as well") (citation omitted). Dynetix is bound by its representations that its claimed invention actually achieves speedup in performance whereas the prior art did not. *See e.g., Lemelson*, 968 F.2d at 1207; *Chimie v. PPG Industries, Inc.,* 402 F.3d 1371, 1384 (Fed. Cir. 2005) (claims cannot be "construed one way in order to obtain their allowance and in a different way against accused infringers").

In addition to the express representations in the file history, courts have found phrases similar to "to achieve" to be limitations, not simply hoped-for results. For example, in *Dow Chemical Co. v. Mee-Industries, Inc.,* 341 F.3d 1370 (Fed. Cir. 2003), the Federal Circuit construed the phrase "with the mass flow rate of the liquid droplets being increased over time *to avoid destructive thermal stresses within the gas turbine*." *Id.* at 1375 (emphasis added). The Federal Circuit stated:

> The issue is whether by increasing the amount of water over time in the systems sold by Mee, *destructive stress is avoided*. Even if an operator increased water over time in a Mee system for an entirely different reason, that would not avoid infringement, as the motive of the accused infringer when performing a claimed method is *simply not relevant*.

341 F.3d at 1380 (emphasis added and citations omitted).

In *C&C Jewelry Mfg., Inc. v. Trent West*, Case No. 09-1303-JF, 2010 WL 2681921 at *4-6 (N.D. Cal. July 6, 2010) (Fogel, J.), this Court construed the term "grinding the at least one external faucet to a predetermined shape *to provide a pleasing appearance*." (emphasis added). The patentee argued the phrase should be treated like a whereby clause and given no limiting effect. Judge Fogel rejected that position. The Court held that the phrase "to provide a pleasing appearance" was a limitation, not just desired results.

In *Fast Memory Erase, LLC v. Spansion, Inc.,* Case No. 3:08-cv-977, 2010 WL 363498, at *4 (N.D. Tex., Feb. 2010), *aff'd*, Case No. 2010-1302 (Fed. Cir. June 8, 2011), the court construed a whereby clause in a patent relating to flash memory technology. The clause stated: "Whereby source leakage of the semiconductor device is reduced." The patentee argued that the phrase should not be construed because it appears in a whereby clause and describes intended

results. The district court rejected the argument, holding that "the reduction of source leakage was material to patentability." *Id. See also Greenskeepers of Delaware, LLC, et al. v. Softspikes LLC, et al.*, Case No. 07-2419, Memorandum on Claim Construction (E.D. Pa Feb. 5, 2010) (Dkt. No. 94) (construing "to enhance lateral stability and traction" to require that the alleged infringer actually provide more stability than certain prior art products).[3]

### 3. Super-Linear Scalable Simulation is a Limitation of Claims 36 and 45.

The term "achieving super-linear scalable simulation" is found in the preambles of Claims 36 and 45. It is well settled that a preamble is limiting "if it 'recites essential structure or steps, or if it is necessary to give life, meaning, and vitality to the claim." *NTP, Inc. v. Research In Motion, Ltd.*, 418 F.3d 1282, 1305 (Fed. Cir. 2005) (citation omitted). "Thus, if the preamble helps to determine the scope of the patent claim, then it is construed as part of the claimed invention." *Id.* In particular, "[w]hen limitations in the body of the claim rely upon and derive antecedent basis from the preamble, then the preamble may act as a necessary component of the claimed invention." *Id.* at 1306 (citations omitted). Moreover, "clear reliance on the preamble during the prosecution to distinguish the claimed invention from the prior art transforms the preamble into a claim limitation because such reliance indicates the use of the preamble to define, in part, the claimed invention." *Catalina Mktg. Int'l v. Coolsavings.com, Inc.*, 289 F.3d 801, 808 (Fed. Cir. 2002) (citations omitted).

In this case, the patentee relied on the "super-linear scalable simulation" language during prosecution to distinguish the invention claimed in claims 36 and 45 from the prior art. The examiner rejected every original claim (1-70) as anticipated by five different prior art patents, (1) Dunenloup, (2) Bahra, (3) Rompaey, (4) Liao, and (5) Davis. Yu Decl., Ex. C (Office Action) at 4-5. The examiner's rejection covered the claims that ultimately issued as claims 36 and 45. *Id.* As noted above, the patentee distinguished each of the prior art references on the ground that the claimed invention "perform[s] super-linear scalable concurrent simulation," whereas the prior art systems do not. Yu Decl., Ex. D (Response to Office Action).

---

[3] Yu Decl., Ex. L.

1    Dynetix complains Synopsys is taking the disclaimers "out of context" and that the

2    patentee's representation to the examiner was merely a "casual statement." Dynetix Br. at 14-15.

3    Dynetix's attempts to minimize its prosecution disclaimers is unavailing. The representations

4    Dynetix made to the Patent Office about super-linear simulation are precisely the type of

5    prosecution statements the Federal Circuit referred to when it held that "clear reliance on the

6    preamble during the prosecution to distinguish the claim invention from the prior art transforms

7    the preamble into a claim limitation . . . ." *Catalina Mktg.*, *supra,* 289 F.3d at 808. Dynetix

8    misleads the Court by referring it to the patentee's arguments for the patentability of the claims

9    that issued as Claims 1-8. Dynetix Br. at 15. For purposes of Claims 36 and 45, the patentee

10   distinguished the five prior references on one, *and only one,* basis: the prior art did not "perform

11   super-linear scalable concurrent simulation." Yu Decl., Ex. D at 35-36.

12   Contrary to Dynetix's argument, the facts of this case are not similar to *American Medical*

13   *Systems, Inc. v. Biolitec, Inc.*, 618 F.3d 1354, 1358 (Fed. Cir. 2010) (finding that preamble was

14   not limiting). In *Biolitec* the Federal Circuit held that the preamble was not limiting because

15   (1) there was no evidence that the preamble term was used to distinguish prior art, (2) the

16   preamble did not provide an antecedent basis, and (3) the term "photoselective" was merely a

17   descriptive name for the invention. *Id.* at 1359. None of those reasons applies here. Unlike

18   *Biolitic*, the patentee of the '898 Patent clearly relied on the term "super-linear scalable

19   simulation" to distinguish the prior art, the preamble gives life, meaning, and vitality to the claim,

20   and super-linear scalable simulation is not a descriptive name for the invention.

21

22

23

24

25

26

27

28

### C. "Event Queue."

| Dynetix's Construction | Synopsys's Construction |
|---|---|
| Claims 5, **36**, 39, 44, **45**, 48, 53 ||
| An "event" in simulation is a task to be processed at a specified time and may be either a signal or logic event. "Event queue" is a sequence of events held in temporary storage waiting to be processed. | An "event" in simulation is a change in state in a logic gate or signal that occurs at a scheduled time. An "event queue" is a sequence of events held in temporary storage waiting to be processed. |

Various claims use the term "event queue." For example, Claim 36 states, "assigning a private heap memory, event queue, and fanout queue region for each of the master thread and the slave threads." '898 Patent at Claim 36. The terms "event" and "event queue" have specific meanings in the art of simulation, and specifically in the art of event-driven logic simulation. Synopsys contends that the Court should construe the terms "event" and "event queue" as they are used in this area of technology by defining an event as a change in the state of a logic gate or a signal, and an "event queue" as a sequence of events waiting to be processed. Dynetix's construction impermissibly broadens the term "event" by defining it as any "task to be processed," a meaning that finds no support in either intrinsic or extrinsic evidence.

### 1.    "Event" Is A Well-Understood Term of Art.

"The words of a claim are generally given their ordinary and customary meaning." *Phillips*, 415 F.3d at 1312 (citations omitted). The "ordinary and customary meaning of a claim term," however, "is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Id.* at 1303. Accordingly, "[a] technical term used in a patent document is interpreted as having the meaning that it would be given by persons experienced in the field of the invention." *Hoechst Celanese Corp. v. BP Chems. Ltd.,* 78 F.3d 1575, 1578 (Fed. Cir. 1996).

According to the '898 Patent, the terms "event" and "event queue" relate to event-driven logic simulation. The specification explains that an "event" is a change in the state of a signal or logic gate:

FIG. 3 illustrates the *event-driven simulation process* in which the input stimulus consists of new states to be assigned to the primary input and bi-directional signals (e.g., I1, I2, and B1 of FIGS. 2) of the design being simulated at various simulation time points. The simulator schedules *events for these selected signals to change states* according to the stimulus specification.

'898 Patent at 6:38-44 (emphasis added).

When a signal changes state, its fanout logic gates will be evaluated. This evaluation may cause the *fanout signal(s) of the logic gate to either changes* [*sic*] *state immediately or be scheduled to change states at a future time. The logic simulator can keeps* [*sic*] *track of these events* propagation by using the directed graph.

*Id.* at 6:17-22.

The specification's use of the term "event" as "a change in state" is consistent with the definition that a person of ordinary skill in the art would attribute to the term. In the context of simulation, the IEEE dictionary defines "event" as a change in state of a variable in the system being simulated. Specifically it states:

**event (2) (A) (modeling and simulation)** An occurrence that causes a change of state in a simulation. **(B) (modeling and simulation)** The instant in time at which a change in some variable occurs.

Yu Decl., Ex. E (IEEE Dictionary) at p. 398 (emphasis added). In the context of simulation of circuit designs, the variables in the system are the states of logic gates and signals. This is further illustrated in the IEEE definition of event driven simulation, which discusses the simulation of digital circuits specifically:

**event-oriented simulation** A simulation in which attention is focused on the occurrence of events and the times at which those events occur. *for example, a simulation of a digital circuit that focuses on the time of state transition.* Synonyms: event-sequenced simulation; event-driven simulation.

*Id.* (emphasis added). This well-understood definition for the term "event" in the context of event-driven logic simulation is consistent with its use in the specification.

## 2. Dynetix's Construction Impermissibly Broadens The Claim Term.

Dynetix's construction should be rejected because it attempts to broaden the term "event" to any "task to be processed." To support its argument, Dynetix cites the Merriam-Webster Dictionary definition which defines an event as an "action" or "occurrence." Dynetix Br. at 17. There are two fundamental problems with this citation. First, this dictionary definition does not

use the word "task," which is the core of Dynetix's proposed construction. Second, the Merriam-Webster Dictionary does not provide definitions relevant to the art of simulation. *Id.* ("1a: the final outcome or determination of a legal action . . . 2a: something that happens: Occurrence . . . 3: any of the contests in a program of sports"). A person of ordinary skill in the art reading the specification of the '898 Patent would not attribute these definitions to the terms "event" and "event queue." '898 Patent, Title, Abstract, Summary of the Invention, 6:17-44 (describing logic simulation); Yu Decl., Ex. E (IEEE Dictionary) at p. 398 (defining "event" in the context of simulation).

Dynetix cites some passages from the specification for support, but they are the same passages Synopsys relies on. Dynetix Br. at 16. These passages characterize events as changes in states and therefore support Synopsys's construction. Dynetix also cites to the Chan declaration to support its position, but for the reasons discussed above, that declaration is irrelevant, attempts to change the specification, and was submitted in violation of Patent L.R. 4-3. The Court should give it no effect.

### D. "Common Design Database."

| **Dynetix's Construction** | **Synopsys's Construction** |
|---|---|
| Claims **1**, 2, 5-7 | |
| A "design database" is a database into which the simulator compiles the design files and stimulus file supplied by the user. The phrase "common design database" refers to the design database which contains various compiled design modules that may be coded in different design language[s.] | Indefinite<br><br>Alternatively:<br><br>An organized representation of all HDL design components that are processed by the same multithreaded simulation engine. |

Claim 1 requires "compil[ing] a design source file into a common design database." The term "common design database" is not used in the specification. Originally, Synopsys took the position that the term is indefinite. But Synopsys also proposes an alternative construction, one that would save the phrase from a finding of indefiniteness. Synopsys's position is that "common design database" requires that the compiled source files be placed in the same database and

1    processed by the same multithreaded simulation engine.  Dynetix's proposed construction does

2    not specify either point, which causes it to deviate from the disclosures in the specification.

3            The specification indicates that the term "common" requires that the simulator compile

4    the design files into the same database, whether they are coded in Verilog or VHDL.  '898 Patent

5    at 10:22-25 ("the simulator compiles VHDL and/or Verilog design files into *a common*

6    *database*") (emphasis added); *Id.* at 10:36-37 ("Once users' VHDL and/or Verilog designs have

7    been compiled into *the* simulation database") (emphasis added); *Id.* at 11:65-67 ("The simulator

8    also uses the same design database for both event-driven and cycle-based simulation.").

9    Dynetix's argument that the simulation may use "one or more common databases" is inconsistent

10   with these statements.  Dynetix Br. at 19.  The specification also states that the HDL source files

11   in a "common [design] database" are processed by the same simulation engine:

12           Once users' VHDL and/or Verilog designs have been compiled into the simulation
             database*, they are being processed by the same multithreaded simulation engine*.  Thus,
13           the simulation of VHDL-only, Verilog-only, and mixed VHDL and verilog designs are
             accelerated in the same manner.
14

15   '898 Patent at 10:22-41 (emphasis added).  Synopsys's construction mirrors this language

16   precisely.

17           The Court should reject Dynetix's construction because it does not require that VHDL and

18   Verilog files be compiled into the same database:  "The phrase 'common design database' refers

19   to the design database which contains various compiled design modules that *may be coded* in

20   different design language[s]."  Dynetix Br. at 19 (emphasis added).  Moreover, Dynetix's

21   construction does not reflect that a single, "common" database is one that is simulated by the

22   same simulation engine.  *Id.*  Through its broad construction, Dynetix seeks to claim products that

23   use two different, interconnected simulation engines to simulate mixed language designs.  But the

24   specification disclaims such systems as prior art.  *Id.* at 2:57-63 ("A few EDA vendors provide a

25   simulation backplane to interconnect a VHDL and a Verilog simulator, so that a user can simulate

26   his VLSI design coded in both VHDL and Verilog.").  Accordingly, the Court should reject

27   Dynetix's overbroad construction and adopt the construction proposed by Synopsys.

28

### E. "To create a master thread and a plurality of slave threads"; "by creating a master thread and a plurality of slave threads.

| **Dynetix's Construction** | **Synopsys's Construction** |
|---|---|
| Claims **1**, 2, 5-7, **36**, 39, 44, **45**, 48, 53 ||
| No need for Construction. Alternatively, it means "to create a master thread and two or more of slave threads." | Creating one thread for each processor where the master thread is executed on one processor and each of the slave threads is executed on a separate remaining processor. |

Claims 1, 36 and 45 refer to the creation of a master thread and a plurality of slave threads. Limitation (c) of Claim 1 provides that the claimed invention automatically detects the number of microprocessors "to create a master thread and a plurality of slave threads." Claims 36 and 45 incorporate a similar phrase. Limitation (a) of Claim 36 refers to "minimizing frequencies of thread creation and destruction by creating a master thread and a plurality of slave threads, *based on the number of available CPUs* on the multiprocessor platform . . . ." (emphasis added). Claim 45 uses the same wording in a means plus function limitation.

Synopsys contends that the phrases at issue should be construed to accurately reflect the invention claimed in the '898 Patent, namely one in which there is one thread (and only one thread) per processor. Dynetix's position is that the phrase requires no construction, which is tantamount to asserting that the patent requires no relationship between the number of threads and the number of microprocessors. Dynetix's "alternative" construction is nothing more than a restatement of the claim language.

### 1. The Intrinsic Record Supports Synopsys's Construction.

The specification makes clear that the methods claimed in the '898 Patent require the creation of one thread for each available microprocessor on the platform. The specification states:

> To reduce the number of threads employed in a process upon which n CPUs are available on a platform, *the simulator will allocate exactly n threads (one master thread and n-1 slave threads) at program starts up.* Each of these threads will be set as a real-time thread and be scheduled by the operating system directly to bind to a hardware CPU throughout the entire simulation run. *No other threads will be created during the simulation run.* Thus, there is very little overhead in creating threads and to keep track of which threads are alive. Furthermore, by using a

24

minimum number of threads in a process, it also reduces the memory needed to support the process execution. This results in less swapping/paging of the simulator process by the operating system.

'898 Patent at 17:51-64. (Emphasis added)

As explained in this passage, the claimed invention prescribes a one-to-one relationship between threads and CPUs. As explained by the specification, "[n]o other threads will be created during the simulation run." *Id.* at 17:57-58. This requirement is not presented as simply a preferred embodiment, but rather an essential component of the claimed invention.

The specification underscores that point by distinguishing the prior art on the basis of the "one thread per CPU" concept. The specification points out that "it is a common practice for the prior art simulators to allocate n + 1 threads (one master thread and n slave threads) on an n-CPU system." *Id.* at 17:65-67. In other words, the prior art simulators would have more threads than the number of available CPUs. The specification explains that the invention is different from these prior art simulators because the invention creates only one thread per available CPU:

> *Contrary to the invention, it is a common practice for the prior art simulators to allocate n+1 threads (one master thread and n slave threads) on an n-CPU system.* The master thread's main function is to manage the execution of the slave thread's to perform simulation. *In this invention, however, the master thread will spend only a minimum amount of time managing slave threads, and it shares an equal amount of workload with the n-1 salve threads to carry out the simulation.*

*Id.* at 17:65-18:6 (emphasis added)

The manner in which the phrases at issue are used in the claims also supports Synopsys's position. As the Federal Circuit held in *Phillips v. AWH Corp.*, 415 F.3d 1303, 1314, "the context in which a term is used in the asserted claim can be highly instructive." In this case, the claim language supports a "one thread per CPU" construction. Claim 1 provides that the number of microprocessors available on the platform is automatically detected "to create a master thread and a plurality of slave threads . . . ." There would be no need to count the number of microprocessors unless the number determines the number of threads. Similarly, Claims 36 and 45 refer to "creating a master thread and a plurality of slave threads *based on* the number of available CPUs on the multiprocessor platform." '898 Patent at Claim 1 (emphasis added). Such

language requires an objective relationship between the number of microprocessors and the number of threads.

The claims and specification also make clear that each thread is executed on a different microprocessor. Claims 1, 36, and 45 each require "concurrent" execution of the threads created by the simulator. *Id.* at Claim 1 ("for concurrent execution of the multithreaded event-driven simulation"); *id.* at Claims 36 and 45 ("processing multiple signals concurrently rather than serially by the master thread and the slave threads such that each of the master thread and the slave thread will process an individual signal state in parallel with others"). Similarly, the specification states that the separate threads must be run concurrently. *Id.* at 8:40-42 ("a multithreaded application, on the other hand, can run its separate threads on multiple CPUs concurrently.").

Dynetix's alternative position negates any relationship between the number of CPUs and the number of threads; the number of threads could be less than, equal to, or greater than the number of available CPUs. Dynetix's alternative construction would render key claim language a nullity. There would be no reason to automatically detect or count the number of microprocessors unless the number is a factor in creating the threads.

### F. "Pre-examining each user-specified HDL source file."

| **Dynetix's Construction** | **Synopsys's Construction** |
| --- | --- |
| Claims **1**, 2, 5-7 | |
| No need for Construction. Alternatively, it means "examining each source file before compiling the source files." | The simulator examining the content of each source file to automatically detect its coded file language before compiling the source files. |

The method of Claim 1 provides that the initial step in the method is pre-examining each user-specified HDL source file and automatically invoking an appropriate HDL compiler to compile a design source file into a common design database. Synopsys's proposed construction provides that the simulator – as opposed to the user – performs the pre-examination. Dynetix argues that the phrase requires no construction. Alternatively, Dynetix proposes a construction which fails to specify whether the simulator or user performs the pre-examination.

**1. Synopsys's Proposed Construction Is Supported By The Intrinsic Record.**

The specification expressly states that the step at issue – pre-examining the user-specified HDL source file – requires the simulator to examine the content of the HDL source file. '898 Patent at 9:43-46 ("[w]hen the simulator compiles a user-specified HDL source file, *it will pre-examine* the file content to detect automatically the coded file language.") (emphasis added). There is nothing in the specification to support Dynetix's argument that the pre-examining step may be performed by the user.

Contrary to Dynetix's argument, the fact that "automatically" appears after the step of pre-examining supports Synopsys's proposed construction. *See IGT v. Bally Gaming Int'l, Inc.*, 659 F.3d 1109, 1117 (Fed. Cir. 2011) ("claim language must be construed in the context of the claim in which it appears"). The simulator automatically (*i.e.*, without user input) invokes the appropriate compiler after pre-examining the content of the user-specified HDL file. '898 Patent at Claim 1. Use of the term "automatically" indicates that user pre-examination of the HDL files is not part of the invention. Indeed, the specification expressly disclaims prior art methods that require user's input to invoke the appropriate compiler. '898 Patent at 9:47-49 ("Thus, unlike other prior art, the simulator provided by the invention does not require a special invocation switch").[4] If, as Dynetix argues, the *user* pre-examines the source files, he or she would also have to tell the simulator which compiler to invoke with an invocation switch. That is contrary to the claim.

**G. "To specify remote hosts."**

| **Dynetix's Construction** | **Synopsys's Construction** |
|---|---|
| Claims **19**, 20-22, **23** | |
| No need for construction. Alternatively, it means "to specify the remote servers on which the simulation is to be performed." | The user identifying remote computer(s) by name. |

---

[4] A "program invocation switch" is a command used to execute a particular program (e.g., a VHDL compiler or a Verilog compiler). Yu Decl., Ex. M (Computer Dictionary) ("switch . . . 5. . . . an argument used to control the execution of a command or application").

The central dispute between the parties is whether the term "specify" requires that the user identify a particular computer by name. The Court should adopt Synopsys's construction, which requires the user to identify the remote computer by name, because that construction is dictated by the specification and the claim language.

The text of this limitation appears in claim 19 as follows:

> installing and executing a graphical user interface program ("GUI") on the user's local host *to specify remote hosts* on which the HDL design compilation and simulation is to be performed.

*Id.* at claim 19 (emphasis added); *see also* claim 23. In describing the remote simulation features of the invention, the '898 specification states that the user specifies remote hosts by name. *Id.* at 13:12-15 ("This UI program allows *the users to specify a remote machine name*, and a remote directory pathname, on which they desire their HDL compilation and/or simulation to be performed.") (emphasis added). Moreover, the specification makes clear that if a user does not specify the remote host's name, the system will not perform the claimed remote simulation. *Id.* at 13:16-18 ("If *the users* do not specify these parameters, then they are default *to the local machine* and to the current work directories of the users.") (emphasis added).

Dynetix appears to take issue with the term "name" in Synopsys's construction. Dynetix Br. at 21-22. The term "name," however, is specifically used in the specification and refers to the unique identifying information for a remote host. '898 Patent at 13:61-66 ("[w]hen a user specifies a *remote host name* and a remote directory pathname . . . for compilation or simulation . . . the UI [] will contact the remote host *RMI naming service* to obtain a handle for the server by specifying the registered name of the server.") (emphasis added). Dynetix does not dispute that such identification information (whether it be a proper name, IP address, or other detail) is necessary to "specify" a remote host. Dynetix Br. at 21.

**H. "Graphical User Interface."**

| Dynetix's Construction | Synopsys's Construction |
|---|---|
| Claims **19**, 20-22, **23** ||
| A computer user interface that allows the human-machine interaction by using graphical objects such as icons, images and windows. | A computer user interface that allows the user to interact using icons, images, and a pointing device, as opposed to a command line interface. |

The main dispute between the parties is whether the term Graphical User Interface includes a Command Line Interface. Synopsys contends that it does not, while Dynetix argues that it does.

A User Interface can either be a Graphical User Interface (GUI) or a Command Line Interface (CLI), but it cannot be both. The two are mutually exclusive subcategories of the broader category "User Interface."

The text of the '898 Patent supports the distinction between these two types of interfaces because it uses the broad term "user interface" throughout the specification, but limits the claims to a "graphical user interface" in the claims. '898 Patent at 14:49-16:15; *compare id.* at Claim 19. Indeed, after the examiner's first rejection, the patentee amended the claims to claim only a "Graphical User Interface" instead of broadly claiming a "User Interface." Yu Decl., Ex. D (Response to Office Action) at 7; *compare* Yu Decl., Ex. B ('898 Patent Application) at 41.

The differences between a Graphical User Interface and a Command Line Interface are further supported by the extrinsic evidence submitted by Synopsys:

- **graphical user interface**: a computer program designed to allow a computer user to interact easily with the computer typically by using a mouse to make choices from menus or groups of icons Yu Decl., Ex. F (Merriam-Webster Dictionary) at p. 508.

- **graphical user interface (GUI)**: An interface between a user and a computer system that makes use of input devices other than the keyboard and presentation techniques other than

29

alphanumeric characters. Typical GUIs involve the use of *windows, *icons, *menus, and * pointing devices. Yu Decl., Ex. G (Dictionary of Computing) at p. 215.[5]

Dynetix cites to the IEEE Dictionary but improperly crops the definition of GUI. Dynetix fails to include the full definition, which ends with the phrase: "*Contrast*: character-based user interface." Li Decl., Ex. 3 at p. 458. A Command Line Interface accepts user input through textual commands, not icons. Yu Decl., Ex. N (Dictionary of Computing) at p. 86 ("**command-line interface (CLI)** An interactive system where user input is achieved through lines of text").

Dynetix's reference to Figure 13 of the specification also does not support its argument. Synopsys does not dispute that Figure 13 displays a GUI. This is not inconsistent with Synopsys's construction because Figure 13 is not a Command Line Interface. A Command Line Interface would not provide icons like the "Add," "Delete," "OK," "Cancel," or "Help" buttons to execute commands. '898 Patent at Figure 13. To the contrary, a Command Line Interface would require a textual command to enter the same information.

### I. "By at the beginning."

| Dynetix's Construction | Synopsys's Construction |
|---|---|
| Claim 39 | |
| The word "by" is a typographical error. The phrase means "at the beginning" | Indefinite. It is unclear whether this requires that action occur prior to the start of simulation or at the start of simulation. |

Both parties acknowledge that Claim 39 contains a typographical error: The dispute between the parties is whether the Court may correct the typographical error, "*by at* the beginning of simulation."

When reviewing a claim that is indefinite because of a typographical error, "a district court may correct an obvious error . . . *only if* (1) the correction is not subject to reasonable debate on consideration of the claim language and the specification and (2) the prosecution history does not suggest a different interpretation of the claims." *CBT Flint Partners, LLC v. Return Path,*

---

[5] *See also* Yu Decl., Ex. H (Telecom Dictionary) (defining GUI as an interface that allows commands to be entered using a pointing device).

*Inc.*, 654 F.3d 1353, 1358 (Fed. Cir. 2011) (internal citations and quotations omitted) (emphasis added). The Court should deem this claim term indefinite because there is at least reasonable debate as to how the claim should read based on the claim language and the specification. In fact, there is hardly any basis to determine whether the term "by at" should be corrected to "by" or "at," and Dynetix admits that either is reasonable.

Because of the typographical error, the claim language is unclear as to whether the claim requires threads to bind to the CPUs "by" (prior to) the beginning of simulation or "at" the beginning of simulation. Claim 39 states:

> scheduling the master thread and the slave threads to bind to CPUs of the microprocessor *by at* the beginning of simulation

'898 Patent at Claim 39 (emphasis added). The rest of the claims and specification are of no help in making this determination. For example, claim 48 is similar to claim 39, except that it is an apparatus claim, but it has a similar typographical error:

> means to schedule the master thread and the slave threads to bind to CPUs of the microprocessor *by an operating at* the start of simulation

'898 Patent at Claim 48 (emphasis added). Other claims are also of no help because they claim some activity that occurs "prior to the start of simulation" and some activity that occurs "at the beginning of simulation." '898 at Claim 36. For example, in relevant portion, Claim 36 states:

> (a) minimizing frequencies of thread creation and destruction by creating a master thread and a plurality of slave threads, based on the number of available CPUs on the multiprocessor platform, *prior to the start of simulation*;

> (b) minimizing thread interaction and synchronization by assigning a private heap memory, event queue, and fanout queue region for each of the master thread and the slave threads *at the beginning of the simulation* to eliminate thread synchronization resulting from subsequent addition or deletion of signals or logic gate events during the simulation

*Id.* (emphasis added).

Moreover, neither the specification nor prosecution history discloses whether the inventor intended the threads to be bound "by" or "at" the start of simulation. For example, when describing the feature that threads are to be bound to CPUs, the specification states, "[e]ach of these threads will be set as a real-time thread and be scheduled by the operating system directly to

bind to a hardware CPU throughout the entire simulation run." *Id.* at 17:54-58. Accordingly, in light of the ambiguous claim language and specification, it is unclear whether the activity stated in claims 39 and 48 should occur "prior to" or "at" the beginning of simulation.

Dynetix admits that there is a reasonable debate as to whether the typographical error should be corrected to the term "by" or the term "at." Specifically, Dynetix argues:

> From the context of the term, it is clear that the element that the term modifies . . .is a step of the simulation method claimed . . . *which compels the meaning 'at the beginning' of the simulation* . . . . *Alternatively*, if one insists that the step of binding the threads to CPUs is not part of the core simulation tasks, *then this person would have to choose 'by' instead of 'at'* . . . Thus, the typographical error does not render the claimed invention indefinite, whichever way one slices the issue.

Dynetix Br. at 23 (emphasis added). That is tantamount to an admission that the correction is subject to reasonable debate.

### J. "Means to provide a graphical user interface program ("GUI") on the user's local hosts."

| Dynetix's Construction | Synopsys's Construction |
|---|---|
| Claim **23** | |
| Corresponding Structure: | Corresponding Structure: |
| The combination of computer monitors, graphics drivers, input devices such as keyboard and mouse and the enabling software, allowing the user to receive, display, manipulate, and output information, graphics, and commands on the user's local hosts. | Indefinite. No corresponding structure, act, or material is disclosed in the specification. |

The central dispute between the parties is whether the specification of the '898 Patent adequately identifies corresponding structure for the means-plus-function limitation "Means to provide a graphical user interface program ("GUI") on the user's local host." The Court should find that this claim term is indefinite because the corresponding structure that Dynetix advocates is not stated in the specification and is not clearly linked to the claim function

"Construction of a means plus function limitation includes two steps. First, the court must determine the claimed function. Second the court must identify the corresponding structure in the written description of the patent that performs the function." *Noah Sys., Inc. v. Intuit, Inc.*, 675

F.3d 1302, 1311 (Fed. Cir. 2012) (citations omitted). "A structure in the specification qualifies as a corresponding structure if the specification or the prosecution history *clearly links or associates* that structure to the function recited in the claim." *Id.* (emphasis added). "Even if the specification discloses a corresponding structure, the disclosure must be adequate; the patent's specification must set forth an adequate disclosure showing what is meant by that [claim] language. If an applicant fails to set forth an adequate disclosure, the applicant has in effect failed to particularly point out and distinctly claim the invention as required by the second paragraph of section 112.'" *Id.* at 1311-1312.

## 1. Claim 23 Does Not Adequately Identify A Claimed Function.

In relevant portion, Claim 23 states:

means to provide a server program on the user's remote hosts to which the HDL designs compilation and simulation is to be performed;

*means to provide a graphical user interface program ("GUI") on the user's local host* to specify remote hosts on which the HDL design compilation and simulation is to be performed;

means to automatically activate network connection[6] by the GUI to the server program to send the user's commands from the user's local host to the remote hosts to be executed thereof [sic];

'898 Patent at claim 23 (emphasis added).

It is unclear what function this term is claiming. The claim states, and Dynetix argues, that the claimed function is "to provide a GUI [program] on a user's local hosts," but it is unclear what it means "to provide" a program on a host. Dynetix Br. at 24. Nothing in the specification mentions the function "providing a Graphical User Interface" or "providing a User Interface." '898 Patent at 12:58-14:48. Accordingly, the Court should find that the claim function is itself indefinite.

---

[6] Synopsys contends that the other means-plus-function limitations in this claim are also indefinite, but did not present those arguments here in light of the court's ten term limit.

## 2. The Specification Does Not Disclose And Link A Corresponding Structure For "Providing a GUI Program."

The Court should also find this means-plus-function term indefinite because there is no corresponding structure in the specification. *See Noah Sys*, *supra*, 675 F.3d at 1311.

Without citing to any particular portions of the specification, Dynetix argues that the corresponding structure is the following:

> The combination of computer monitors, graphics drivers, input devices such as keyboard and mouse and the enabling software, allowing the user to receive, display, manipulate, and output information, graphics, and commands on the user's local hosts.

Dynetix Br. at 23. This "corresponding structure," however, is not identified as a means for "providing a GUI program" anywhere in the specification. Indeed, none of these structures are mentioned in the remote simulation section. '898 Patent at 12:58-14:48.

Dynetix is unable to identify a sufficiently linked structure because there is none. The patentee merely transferred the claim terms from the method of claim 19 and added the phrase "means for," without regard to the specification. By doing so, the patentee attempted to claim an apparatus claim in purely functional terms and thus did not meet his burden to clearly link or associate structure with the claimed function. *Med. Instrumentation & Diagnostics Corp. v. Elekta AB*, 344 F.3d 1205, 1211 (Fed. Cir. 2003) ("The duty of a patentee to clearly link or associate structure with the claimed function is the quid pro quo for allowing the patentee to express the claim in terms of function under section 112, paragraph 6").

## VI. CONCLUSION

For the foregoing reasons, Synopsys requests that the Court adopt its proposed constructions.

1    Dated: October 1,  2012                    Respectfully submitted,

2                                               CHRIS R. OTTENWELLER
                                                I. NEEL CHATTERJEE
3                                               BENJAMIN J. HOFILEÑA
                                                JASON K. YU
4                                               Orrick, Herrington & Sutcliffe LLP

5

6                                               By: _/s/ Chris R. Ottenweller_
                                                     CHRIS R. OTTENWELLER
7                                                    Attorneys for Defendant
                                                        SYNOPSYS, INC.
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28