**LiLaw Inc., a Law Corporation**
J. James Li (SBN 202855)
5050 El Camino Real, Suite 200
Los Altos, California 94022
Telephone: (650) 521-5956
Facsimile:  (650) 521-5955
Email:  lij@lilaw.us

Attorneys for Plaintiff Dynetix Design Solutions Inc.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| DYNETIX DESIGN SOLUTIONS INC., a California corporation,<br><br>    Plaintiff,<br><br>   vs.<br><br>SYNOPSYS INC., a Delaware corporation, and DOES 1-50<br><br>    Defendants. | Case No. CV11-05973 PSG<br><br>**PLAINTIFF'S REPLY CLAIM CONSTRUCTION BRIEF**<br><br>**Date: October 10, 2012**<br>**Time: 10:00 a.m.**<br>**Court: Courtroom 5 - 4th Floor**<br>**Judge: Hon. Paul S. Grewal** |



# TABLE OF CONTENTS

I.   INTRODUCTION ................................................................................................... 1

II.  ARGUMENT .......................................................................................................... 1

A.   Term 1: A Thread Is a Process Itself and Also a Part of a Larger Process ............................... 2

1.   Synopsys's New Definition Should Be Stricken ................................................ 2

2.   Synopsys Has Conceded Its Error in Replacing CPU with "Processing Unit" .................. 3

3.   Synopsys's New Definition Is Illogical and Unsupported ................................ 3

B.   Term 2: Linear and Super-linear Scalability Are Desired Benefit Instead of Absolute Requirement ........................................................................................................... 4

1.   Term 2A: It Is Improper to Replace "to Achieve" with "Will Achieve" .......................... 4

2.   Term 2B: The Preamble Term Is Non-Limiting ............................................... 10

3.   Synopsys's Definition Is Overly Complicated ............................................... 12

C.   Term 3: An "Event Queue" Is A Sequence of Tasks To Be Processed at Various Times Held in Temporary Storage ........................................................................................... 12

D.   Term 4: Synopsys Imported Limitations for "Common Design Database" .......................... 14

E.   Term 5: It Is Not Limited to One Thread Per CPU ............................................... 15

F.   Term 6: Synopsys Cuts Out a Crucial Phrase to Distort the Meaning of "Pre-examining" and Reads in Limitations from the Embodiment ........................................................ 17

G.   Term 7: "Specify" Should Not Be Limited to "Specify by Names" ................................ 18

H.   Term 8: GUI Does Not Exclude the Use of Command Line ...................................... 18

I.   Term 9: the Court Should Correct the Obvious Error ........................................... 18

J.   Term 10: Synopsys's Indefinite Arguments Are Inapposite .................................... 20

K.   Dynetix Has Complied with the Patent Local Rules ........................................... 21

III. CONCLUSION ..................................................................................................... 21

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



# TABLE OF AUTHORITIES

## CASES

*3M Innovative Props. Co. v. Avery Dennison Corp.*,
    350 F.3d 1365, 1371 (Fed. Cir. 2003)...............................................................4

*Adams Respiratory Therapeutics, Inc. v. Perrigo Co.*,
    616 F.3d 1283, 1290 (Fed. Cir. 2010)............................................................5

*Am. Piledriving Equip., Inc. v. Geoquip, Inc.*,
    637 F.3d 1324 (Fed. Cir. 2011)......................................................................9

*Catalina Mktg. Int'l v. Coolsavings.com, Inc.*,
    289 F.3d 801, 808 (Fed. Cir. 2002)..............................................................11

*CBT Flint Partners, LLC v. Return Path, Inc.*,
    654 F.3d 1353, 1358 (Fed. Cir. 2011)..........................................................19

*Storage Tech. Corp. v. Cisco Sys.*,
    329 F.3d 823, 833 (Fed. Cir. 2003)................................................................9

Case No. CV11-05973 PSG

PLAINTIFF'S REPLY CLAIM CONSTRUCTION BRIEF



# I.    <u>INTRODUCTION</u>

Synopsys's erroneous claim constructions are primarily based on three inappropriate tactics: (1) importation of limitations from embodiments; (2) misinterpretation of intrinsic evidence; and (3) improper reliance of extrinsic evidence.

To justify its importations of limitations from embodiments, Synopsys accuses Dynetix of "paying little heed to the intrinsic record." Resp. Br. at 1:13-14. To the contrary, not only does Dynetix base all of its proposed constructions properly on the intrinsic evidence, it also pays vigilant attention toward the claims and embodiments to expose Synopsys's repeated attempts to read in limitations from the written description.

Synopsys also erroneously accuses Dynetix of violating the disclosure requirements of the local rules, by distorting the local rules to fit its purpose. The relevant local rule, Pat. L.R. 4-2(b), only requires disclosure of intrinsic and extrinsic evidence that a party intends to reply on to support its "proposed construction." Mr. Chan's declaration is submitted to support the technical background description - which is equivalent to a tutorial - and also for rebutting the indefiniteness claims by Dynetix. It was not submitted to support Dynetix's proposed construction. There is thus no violation of the local rules.

# II.   <u>ARGUMENT</u>

The parties submitted 10 terms for construction through their Joint Claim Construction and Prehearing Statement (the "JCC"), which are numbered 1 through 10. *See* Dkt. No. 59. In its response brief, Synopsys renumbered the terms alphabetically. To avoid confusion, the 10 terms are listed below in their original numbers in the JCC, with the splitting of Term 2 into Terms 2A and 2B as discussed in the Opening Brief:

> 1.     Multithreaded simulation;
>
> 2A.    To achieve linear to super-linear scalable performance speedup (in claim 1);
>
> 2B.    Achieving super-linear scalable simulation (in claims 36 & 45);
>
> 3.     Event queue;
>
> 4.     Common design database;



5.      To create a master thread and a plurality of slave thread;

6.      Pre-examining each source file;

7.      To specify remote hosts;

8.      Graphical user interface ("GUI");

9.      By at the beginning; and

10.     Means to provide a graphical user interface program ("GUI") on the user's local hosts.

In the following, Dynetix responds to Synopsys' arguments in the order of the 10 disputed terms.

### A.      Term 1: A Thread Is a Process Itself and Also a Part of a Larger Process

Regarding Term 1, "multithreaded simulation", Dynetix identified two disputed issues based on the parties' final proposed construction in the JCC: (1) Dynetix's use of "CPU" versus Synopsys's use of "processing unit"; (2) Synopsys's insertion of the phrase "shares address space and system resources with other threads."

In the Response Brief, instead of providing arguments to support its proposed construction, Synopsys modified its construction, by removing altogether the phrase "shares address space and system resources with other threads" and by adding a new sentence "a thread is different from a process." *See* Dkt. No. 98 at 8.

#### 1.  Synopsys's New Definition Should Be Stricken

Synopsys's sudden change of position is unfair and prejudicial to Dynetix.  The JCC was submitted on July 3, 2012.  Dynetix filed its opening brief on September 14, 2012.  In the time period of 73 days after the filing of the JCC and before the filing of the opening brief, Synopsys kept mum about its substantial change of position on Term 1.  This recent change of position by Synopsys has the actual effect of taking away Dynetix's opening argument on Term 1, by removing the target of Dynetix's discussion and by adding a new target that Dynetix never had a chance to address.  For that reason, the newly proposed claim construction of Term 1, as well as the portion of the Response Brief discussing the new construction, should be stricken as unfairly prejudicial to Dynetix.



### 2. Synopsys Has Conceded Its Error in Replacing CPU with "Processing Unit"

While admitting that Dynetix's definition of "thread" is a verbatim copy of the definition in the specification of the '898 patent, Synopsys did not provide any explanation or justification on why it may replace the word "CPU" with the phrase "processing unit." As Dynetix discussed in its Opening Brief, this change impermissibly broadens the scope of the term because CPU is not just any processor. *See* Dkt. No. 6:17-7:2. This point is un-rebutted and thus conceded.

### 3. Synopsys's New Definition Is Illogical and Unsupported

In its new definition, Synopsys has added the sentence "a thread is different from a process." Resp. Br. at 8:10-11. Synopsys has devoted nearly all of its discussions on Term 1 to justify this new insertion. *Id.* at 8-11. Of course, none of the evidence cited in the discussion were ever disclosed to Dynetix during the meet and confer because Synopsys never took such a position until it filed the Response Brief. Assuming this Court will consider these arguments, despite the unfair prejudice to Dynetix, Synopsys has again failed to properly prove its position with intrinsic evidence.

In the specification, the patentee clearly defined the word "thread": "Specifically, a thread is a process flow in a program that runs on a CPU." '898 Pat. (Li Decl. Ex. 8), 2:41-42. Nowhere in the specification is the word "process" defined; nor is the relationship between "thread" and "process." To be sure, the word "process" is such a common word that nearly everything on the earth can be said to be part of a process. If by definition "thread" is a "process flow," it must itself be a process of some sort. Because it is used in the "process" of simulation and also is part of a multithreaded set of programming code, a thread is certainly a part of some processes, depending on the vantage point. Thus, the statement that "a thread is not a process" is erroneous to the extent it denies that a process flow is a process. The statement is also ambiguous as it is not clear what process the word "process" is referring to, given the broad meaning of the word. The ambiguity of the statement renders it useless for the fact-finders in formulating infringement or invalidity issues.

Synopsys resorts to speculation to support its new insertion. It cites incidences in the specification where threads are used or employed "in a process." Resp. Br. at 9. It also refers to the title, abstract, and summary of the '898 patent to prove that a thread is not a process, simply because they used the word "multithreaded" to describe the inventions. Resp. Br. at 10:12-21. Of course, a

PLAINTIFF'S REPLY CLAIM CONSTRUCTION BRIEF

thread, like everything else, may be used in a process. That does not mean a thread itself cannot be a process of some sort. Synopsys's argument defies the simple logic and essentially insists on the folly that a process cannot be part of a larger process.

Synopsys also relies on several items of extrinsic evidence to make its point. As a general rule, extrinsic evidence cannot override the clear definition provided by the specification. *See 3M Innovative Props. Co. v. Avery Dennison Corp.*, 350 F.3d 1365, 1371 (Fed. Cir. 2003) ("a definition of a claim term in the specification will prevail over a term's ordinary meaning if the patentee has acted as his own lexicographer and clearly set forth a different definition…."). Further, in this case, there is no evidence that the definition of "thread" provided by the patentee is at odds with the ordinary meaning of the word as it is understood by a person of ordinary skill in the art. The IEEE Dictionary says a thread is "a single sequential flow of control within a process." Yu Decl. Ex. E, p. 11. As discussed above, a thread can be a process itself and also be a part of a larger process at the same time, depending on the vantage point. Thus, the patentee's definition of "thread" has no clear contradiction to the definition of the word by the dictionary. The same is true with the books that Synopsys cites, all of which simply express the meaning that a thread may act within a process, an entirely neutral concept for the purpose of our discussion.

Thus, Synopsys's newfound definition of Term 1 is simply illogical and finds no support in the intrinsic evidence.

**B.      Term 2: Linear and Super-linear Scalability Are Desired Benefit Instead of Absolute Requirement**

As discussed in the opening brief, Term 2 in fact contains two slightly different terms: (1) Term 2A in the body of claim 1 starting with "to achieve …."; and (2) Term 2B in the preambles of claims 36 and 45 starting with "achieving …."  Because of these distinctions, Term 2A and 2B should be discussed separately.

**1.   Term 2A: It Is Improper to Replace "to Achieve" with "Will Achieve"**

Synopsys construes "to achieve …" as "will achieve …."  This construction does not make sense when placed in the context of the term. The context of the terms is "for concurrent execution of the multithreaded event-driven simulation of the design <u>to achieve</u> linear to super-linear scalable



PLAINTIFF'S REPLY CLAIM CONSTRUCTION BRIEF

performance speedup ….'' If the term "will achieve" replaces the term "to achieve", the above clause would become "for concurrent execution of the multithreaded event-driven simulation of the design <u>will achieve</u> linear to super-linear scalable performance speedup," which is nonsensical.

### a. Synopsys's Use of "Will Achieve" Alters the Scope of the Term

As discussed in the opening brief, whether a simulation can be linear or superlinear is determined by many factors external to the invention, especially the properties of the test cases themselves. Open Br. at 9:13-23. The preferred embodiment enabled the linear or superlinear scalability in some test cases, but not in others. '898 Pat., 17:10-15 (Tab. 3); *see also* discussions in Open Br. at 9:17-23. Therefore, if the phrase "will achieve" is used to construe Term 2A, even the preferred embodiment would not practice claim 1, which shows how Synopsys's construction impermissibly alters the scope of the term. *See Adams Respiratory Therapeutics, Inc. v. Perrigo Co.,* 616 F.3d 1283, 1290 (Fed. Cir. 2010) ("A claim construction that excludes the preferred embodiment is rarely, if ever, correct and would require highly persuasive evidentiary support.")

Importantly, even the mixed results of the preferred embodiment are not necessarily attainable <u>for the invention of claim 1</u> because claim 1 does not have all the features of the preferred embodiment. While the preferred embodiment uses exactly one thread per CPU ('898 Pat., 17:51-54), claim 1 does not require the exact configuration. Instead, it claims "one master thread and a plurality of slave threads." Although this feature is implemented "as according to the number of CPUs," the claim does not require the number of threads to be identical to the number of the CPUs, as the preferred embodiment. To be sure, if the patentee had wanted to claim the exact configuration as the preferred embodiment, he knew how to draft it because he described it clearly in the embodiment. *Id.* Instead, the claim is drafted broader than the preferred embodiment, including systems that have thread numbers less or more than the numbers of CPUs.

Furthermore, the invention of claim 1 does not have the following important features of the preferred embodiment:

- The threads are set as real-time threads and are bound to individual CPUs throughout the entire simulation run. *Id.* at 17:54-57.
- Each thread is assigned its own private heap memory, event queue, and fanout queue

Case No. CV11-05973 PSG



for each thread. *Id.* at 18:13-19.

- A process flow that minimizes the slave thread activation overheads by using synchronization objects to block slave threads only at the beginning of each simulation cycle. *Id.* at 19:6-15.

Consequently, it is not known whether the invention of claim 1 can attain the linear to super-linear scalability at all, without all the bells and whistles of the preferred embodiment, regardless of what kind of test cases are used. Such a performance enhancement, however, is certainly the goal or desired effect of an invention as defined by claim 1, and certainly achievable if the implementation is done exactly as the preferred embodiment. In other words, claim 1 as it is drafted covers those less efficient systems which, though having obtained performance speedup through parallel processing, do not reach the level of linear or super-linear speedup as the preferred embodiment did for some test cases.

Therefore, "to achieve" should only be interpreted as the purpose and desired effect, instead of an absolute requirement. To change the term "to achieve" to "will achieve" would impermissibly alter the scope of Term 2A.

### b. The Prior Art Was Not Distinguished by the Linear or Super-linear Scalability

The patentee made it clear in the specification that the prior art could achieve linear or super-linear scalability sometimes:

> It is generally possible for a multithreaded tool to demonstrate sub-linear
> scalability on some test cases, and linear or even super-linear scalability on
> other test cases.

'898 Pat. at 16:54-57. Thus, it cannot be said that Term 2A "to achieve linear to super-linear scalability" was there to distinguish prior art for patentability purposes. The preferred embodiment thus did not invent this feature of linear to super-linear. Instead, it merely attains it more regularly and in more test cases through many enhancements, some but not all of which were claimed in claim 1, as discussed above.

Synopsys relies on the following statements from the Abstract and the Summary of Invention to support its contention that Term 2A was inserted for patentability purposes:



> This invention . . . uses special concurrent algorithms to accelerate the tool's performance on multiprocessor platforms to achieve linear to super-linear scalability on multiprocessor systems  (Abstract)
>
> The algorithm enables the logic simulator provided by the invention to achieve a scalable performance (i.e., from linear to super-linear) according to the number of CPUs on the select platform.  (Summary of Invention)
>
> The simulator achieves linear and super-linear scalability by using special new concurrent methods that are described in the following sections.  (17:17-19)

Resp. Br. at 14:27-15:9.  None of these statements, however, specifically apply to the invention of claim 1.  The statement in the abstract and summary of invention are general statements applied to what the preferred embodiment represents, which is different from claim 1 as discussed above.  The last statement in the above quote describes the simulator that is the preferred embodiment.  Therefore, these statements do not support the notion that the invention of claim 1 requires the attainment of the linear or super-linear scalability.  These statements could not have been made for the patentability of the feature of linear to super-linear scalability, which the prior art occasionally had shown as discussed above.  The specification, if viewed in its entirety, does not make any statement that Term 2A in claim 1 is a patentable feature or is a feature to distinguish the prior art.  The patentee certainly has not disclaimed any methods or devices that practice claim 1 with sub-linear scalability.

### c.  The Prosecution History Does Not Support Synopsys's Position

In its opening brief, Dynetix discussed in detail why there is no evidence that the patentee disclaimed from claim 1 any methods that do not show linear to super-linear scalability.  Open Br. at 10-11.  While it is true that the amendment of the claim in response to an office action included Term 2A, the response to office action accompanying that amendment shows that the addition of concurrent processing on multiple processors for performance speedup as the distinguishing point from the prior art, not linear or super-linear scalability.  *Id.*

On this point, Synopsys masterfully substituted Term 2A with the generic "speedup," so that it could find supports from the prosecution history.  For example, Synopsys quoted the following statements to make its point that linear to super-linear scalability was added to distinguish prior art:

> nor does [Dunenloup] make use of any multiprocessor platform to accelerate the performance of its system . . .



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

> Bahra does not teach concurrent use of any multiprocessor to *speedup* the performance of their system . . .
>
> there is . . . no teaching [in Rompaey] of making concurrent use of multiprocessor platform to *speedup* their system performance . . .
>
> Davis system does not make use [of] any multiprocessor platform to *speedup* their system performance . . .
>
> Liao does not make use of any multiprocessor platform to *speedup* the execution of their system . . .

Resp. Br. at 15-16 (emphasis in original).

None of the above quoted statements, however, even touches upon the issue of linear to super-linear scalability. To the contrary, these statements prove that the patentee rightfully distinguished the prior art references based on the generic performance speedup achieved through concurrent use of multiple processors.

Synopsys does not in any way suggest that the patentees' statements to the examiner regarding these prior art references were incorrect. A person of ordinary skill in the art could easily confirm the correctness of these statements by reviewing these prior art references, which are attached as Exhibits A through E to the Supplemental Li Declaration. These prior art references do not in any way teach concurrent simulation in a multi-processor system; they thus could not have even begun to address the issue of scalability, which is a concept for the enhanced performance with the increase of the number of processors in a multi-processor simulation. Thus, Term 2A could not have been added to distinguish these prior art references as Synopsys contends.

### d. Synopsys's Reliance on Statements Made for Claims 36 and 45 Is Inapposite

Synopsys further relies on a series of ambiguous and inconsequential statements where the patentee stated that the prior art "does not specify any means to perform super-linear scalable concurrent simulation of the system function" or "does not perform any super-linear scalable concurrent simulation." *See* Li Decl. Ex. 5, DNY473-74. There are several points in this regard that are clear from the prosecution history which Synopsys has failed to mention. First, these statements were made to defend claims 36 and 45, not for claim 1. *See* discussions in Open Br. at 14:19-15:2. They are not exactly applicable to the discussion for claim 1. For one thing, it only mentions "super-linear" but not "linear". Synopsys surely is not suggesting that the patentee made an argument for



Term 2A to justify only half of the term related to "super-linear" but not the other half relating to "linear". If these statements are treated as waivers, the patentee would have waived the "linear scalability," which is clearly not the case as it was expressly claimed in claim 1 as a desired effect.

More importantly, these statements do not override the pertinent statements that the patentee made to traverse the rejection of claim 1, which is the issue at hand. As discussed above, the patentee made it clear to the examiner that none of the prior art references that the examiner relied on actually taught concurrent simulation on multiple processors. It goes without saying that these items of prior art did not teach <u>any</u> scalable performance enhancement, regardless of whether it is sub-linear, linear, or super-linear. Thus, the statements at issue are inconsequential to patentability. These statements do not meet the standard of "clear and unambiguous disavowal of claim scope as required to depart from the meaning of the term provided in the written description." *Storage Tech. Corp. v. Cisco Sys.*, 329 F.3d 823, 833 (Fed. Cir. 2003).

Synopsys erroneously argued that "Dynetix is bound by its representations that its claimed invention actually achieves speedup in performance whereas the prior art did not." Resp. Br. at 17:3-4. In fact, what the patentee stated to the examiner, as discussed above, was that the prior art does not practice concurrent simulation on multiple processors to speed up the performance, without mentioning scalability in any way in the context of claim 1. Of course, Dynetix stands by the patentee's statement that the prior art does not practice concurrent simulation on multiple processors to speed up performance. That, however, is a different issue from whether the patentee distinguished the prior art on linear and superliner scalability, which he did not.

Synopsys also relies on *Am. Piledriving Equip., Inc. v. Geoquip, Inc.*, 637 F.3d 1324 (Fed. Cir. 2011), which is distinguishable. In *Geoquip*, the patentee "unambiguously argued that 'integral' meant 'one-piece' during reexamination." *Id.* at 1336. The court rejected the patentee's contention that the statement was not a disavowal because it was only one of the arguments it made to the examiner, and the examiner was not persuaded by that argument. *Id.*

*Geoquip* has no application to this case. Unlike in *Geoquip*, the patentee in this case did not explain any terms in a limiting way. What the patentee said in this case primarily in response to the rejection of claim 1 was that the prior art does not practice concurrent simulation on multiple



Case No. CV11-05973 PSG
PLAINTIFF'S REPLY CLAIM CONSTRUCTION BRIEF

processors, which everybody agrees was a correct characterization of the prior art. What the patentee said later in response to the rejection of claims 36 and 45, even assuming they are applicable to the discussion of claim 1, was that the prior art did not perform "super-linear scalable concurrent simulation." This statement does not mean that the prior art references perform sub-linear or linear scalable concurrent simulation, which they do not. Thus, unlike *Geoquip*, there was no clear disavowal of sub-linear or linear scalable concurrent simulation.

### e. Synopsys's Reliance on Irrelevant Cases Are Misplaced

Synopsys cited a string of cases to support the proposition that an infinitive phrase such as "to achieve" may be interpreted as a limitation. Resp. Br. at 17-18. Synopsys has gone too far in its reliance on extrinsic materials. These cases have no relationship whatsoever with the present case. How they interpret an infinitive phrase, which can function essentially as any grammatical component depending on the context, bears little relevance to how the term "to achieve" should be interpreted in this case, which is determined primarily by the intrinsic evidence as discussed above. The legal cases that Synopsys relies on have nothing to do with how a person of ordinary skill in the art understands the meaning of the term. Whether the infinitive phrase "to achieve" in Term 2A should be interpreted as a purpose/desired effect or as an absolute requirement should be determined by the intrinsic and, possibly, relevant extrinsic evidence. Synopsys's reliance on these cases, which are neither intrinsic nor extrinsic evidence, is thus misplaced.

### 2. Term 2B: The Preamble Term Is Non-Limiting

In its opening brief, Dynetix stated that the preambles at issue did not recite essential structures or steps and that the claim body described a structurally complete invention such that deletion of the preamble phrase does not affect the structure or steps of the claimed invention. Open Br. at 13:27-14:2. Synopsys does not dispute with these facts. Instead, Synopsys claims that Dynetix relied on the preamble to distinguish the prior art during the patent prosecution. Synopsys's argument finds insufficient support in law and in facts.

The case which Synopsys relies on for this proposition states:

> [C]lear reliance on the preamble during the prosecution to distinguish the
> claimed invention from the prior art transforms the preamble into a claim



limitation because such reliance indicates the use of the preamble to define, in part, the claimed invention.

*Catalina Mktg. Int'l v. Coolsavings.com, Inc.*, 289 F.3d 801, 808 (Fed. Cir. 2002).

The operative phrase here is "clear reliance." There is no such "clear reliance" in the instant case. The patentee made statements in passing that the prior art "does not specify any means to perform super-linear scalable concurrent simulation of the system function" or "does not perform any super-linear scalable concurrent simulation." *See* Li Decl. Ex. 5, DNY473-74. In no instances did the patentee point to the preamble for this statement. Based on the context, the patentee was most likely emphasizing the fact that the prior art did not practice concurrent simulation on multiple processors, with a careless addition of the phrase "super-linear". The prior art references at issue, as stated by the patentee, do not even practice concurrent simulation, let alone any kind of scalability irrespective of whether it is sub-linear or super-linear. No neutral person of ordinary skill in the art would have understood that the statement as a clear reliance on the preambles to distinguish the prior art.

It is well established that "preamble language merely extolling benefits or features of the claimed invention does not limit the claim scope without clear reliance on those benefits or features as patentably significant." *Catalina Mktg. Int'l*, 289 F.3d at 809. This is exactly the case here. The super-linear scalability is merely a benefit or feature of the claimed invention in claim 36 or 45.

Synopsys claims that "Dynetix misleads the Court by referring it to the patentee's arguments for the patentability of the claims that issued as Claims 1-8." Resp. Br. at 19:7-9. What Synopsys is referring to is the fact that in one response to office action, the patentee first traversed the rejection of claim 1, by discussing in details what the prior art references taught and what they did not teach. It is not clear why this discussion is not a legitimate part of the context of the discussions later on the same prior art for traversing the rejection of claims 36 and 45. Nor is it clear why Dynetix has misled the Court by referring to this proper context, especially in view of the fact that Dynetix has expressly discussed the same statements earlier in the same brief in the context of Term 2A (*see* Open Br. at 10-11).



### 3. Synopsys's Definition Is Overly Complicated

In its opening brief, Dynetix criticized Synopsys's construction of Term 2A & 2B as unnecessarily complicated especially in light of the fact that the construction will be a jury instruction. Open Br. at 11:5-18. Synopsys did not respond to this criticism. Instead, Synopsys simply emphasized that its definition was based on the patentee's own definition set forth in the specification.

Synopsys misses the point here. This is not a case where the patentee espouses a definition that is broader or narrower than the plain meaning of the term; it is a case where the inventor's definition is unnecessarily complicated to be used as a jury instruction. Instead of using the plain meaning of the word "linear" as the basis for defining "linear to super-linear scalable" as Dynetix has done, Synopsys uses a mathematical definition that, though conveying essentially the same meaning, is unnecessarily complicated. As shown in the opening brief, even the preferred embodiment cannot meet the mathematical accuracy of the definition. There is thus really no point of adopting such a complication.

### C. Term 3: An "Event Queue" Is A Sequence of Tasks To Be Processed at Various Times Held in Temporary Storage

The dispute on Term 3 focuses on whether the word "event" should be limited to changes of states of gates and signals, as Synopsys has suggested. There are two lines of evidence contradicting Synopsys's suggested definition.

First, based on both the specification and the IEEE dictionary, an event at the very least is the occurrence that causes a state change instead of being the change itself. In the preferred embodiment, "event" is used as a processing task that causes a change of a signal state. *See* '898 Pat. at 6:42-44 ("the simulator schedules events for these selected signals to change states according to the stimulus specification"). Interestingly, Synopsys relied on the same statement, but concluded that the event <u>is</u> the change of a signal state. Resp. Br. at 21. Although Synopsys's interpretation is one way of roughly understanding the statement, the precise meaning of the statement compels a different understanding of "event." Instead of itself being the change of the state of a signal, an event is the reason or causation for the signal to change its state. If we substitute "change of state" for event in



Case No. CV11-05973 PSG

the above quoted statement, as Synopsys's definition requires, the statement would become "the simulator schedules <u>changes of states</u> for these selected signals to change states according to the stimulus specification," which is an empty and circular statement. In contrast, the statement comes alive when we substitute "processing tasks" for "events": i.e., "the simulator schedules <u>processing tasks</u> for these selected signals to change states according to the stimulus specification." This exercise shows that Dynetix's interpretation of the statement for the preferred embodiment is much more reasonable than Synopsys's. It further demonstrates that, at least for describing the preferred embodiment, an event is the causation for the state change of a signal, not the change itself. This usage of "event" by the preferred embodiment happens to conform to the definition of the IEEE Dictionary, i.e., an event is "an occurrence that causes a change of state in a simulation." Although an event may sometimes be the change of the state of a gate or signal, the word should not be limited to that narrow definition.

Second, being the causation of the change of state, an event can essentially be any processing task at a given time. Neither the specification nor the IEEE Dictionary prescribes any limits on what task may or may not qualify as the "occurrence" that causes a change of state. In the preferred embodiment, an event queue is depicted as a series of lists of tasks to be processed at various points of time. '898 Pat., Fig. 21. That is the essence of "event queue" in a simulation, i.e., the simulator sets up lists of occurrences at various time points which in theory should result in certain outcomes (in other words, changes) based on the design of the circuit. The actual outcome of the simulation would either verify the design purpose or reveal design defects. Whatever needs to be tested in a simulation could be listed as events. For example, when the simulation calls for waveform dumping at a given time, it may be listed as an event which, upon processing, would result in the waveform being "dumped." Although the preferred embodiment provides two types of events, gate and signal (i.e., occurrences causing the change of states in gates and signals), the plain meaning of the word "event" does not warrant it being limited to these two types of occurrences.

Further, an event may not necessarily cause changes in theory or in reality. It is conceivable that a designer sometimes may want to list an event which in theory should not cause any changes. In this scenario, if a simulated event, which is not supposed to cause changes, ends up causing



changes, the simulation has identified a design bug, hence its usefulness. It is equally conceivable that an event, which is supposed to cause a change, does not actually result in any change due to a defect revealed by the simulation. Therefore, an event in the language of event-driven simulation is essentially a processing task at a given time which may or may not result in change of states, which conforms to Dynetix's construction.

In light of these discussions, Dynetix suggests a simplified version of its definition of Term 3: An "event queue" is a sequence of tasks to be processed at various specified times held in temporary storage.

### D.      Term 4: Synopsys Imported Limitations for "Common Design Database"

Although argued strenuously about the indefiniteness of "common design database" during the meet-and-confer, Synopsys has not offered any arguments or evidentiary supports for the purported indefiniteness in its response brief. Thus, it should be deemed conceded that Term 4 "common design database" is not indefinite.

Synopsys's suggested definition for Term 4 is a classic example of importation of limitations from the preferred embodiment. While it is true that in the preferred embodiment the common design database may be used in specific ways, the plain meaning of Term 4 does not incorporate these specific limitations, namely, "all HDL design components that are processed by the same simulation engine." Such limitations thus should not be imported into Term 4.

Synopsys argues that Dynetix's contention that the simulation may use one or more common databases is inconsistent with the written description. Resp. Br. at 23. Synopsys puts the cart in front of the horse because such a construction is based on the words of the claim, which should be the starting point of any claim construction. The claim language uses "a" common design database, which is well accepted to mean one or more. Thus the plain meaning of the claim allows the claimed invention to use one or more common design databases. It does not really matter that the preferred embodiment used only one common design database. The claim is not drafted as such and should not be so limited.

Synopsys also took issues with the word "may" in the phrase "various compiled design



modules may be coded in different design languages." However, the invention in claim 1 does not require the designs being coded in more than one design languages, as shown by its plain meaning:

A method of performing a … simulation of an integrated circuit design, <u>coded in one or a plurality</u> of Hardware Description Language ….

'898 Pat. claim 1, preamble.

Thus, the context of Term 4 in claim 1 compels the use of the word "may", hence the definition by Dynetix. The word "common" is reflected in the fact that "various" design modules are compiled into the same database. The plain meaning of claim 1, however, does not require these various design modules to be coded in different design languages.

Synopsys further argues that Dynetix's construction, which does not require a single simulation engine, would cover the prior art that the patentee disavowed in the specification. Synopsys is referring to the prior art where a simulation backplane is used to interconnect a VHDL and a Verilog simulator. '898 Pat. at 2:57-63. If claim 1 only claims the common design database, this argument would have some force. The term, however, was not the reason that claim 1 is granted. It was granted because of the concurrent simulation on multiple processors, as discussed above. Not every feature of an invention must be different from the prior art, as long as there are some features that set the invention apart from the prior art. Not only is the word "single simulation engine" loaded with ambiguity in a multi-processor simulation, claim 1 itself does not require a single simulation engine, whatever that term may mean. Nor has the patentee ever argued anywhere that "common design database" means a single simulation engine. Thus, there is no basis for introducing the limitation of a single simulation into the meaning of "common design database."

Thus, the Court should reject Synopsys's overt attempt to read in limitations from the preferred embodiment, and should adopt Dynetix's proposed construction on Term 4, "common design database."

### E. Term 5: It Is Not Limited to One Thread Per CPU

The main issue for Term 5, "to create a master thread and a plurality of slave threads", is whether it should mean "one thread for each processor" as suggested by Synopsys. Again, Synopsys is attempting to limit the plain meaning of the term by the described features of the preferred



PLAINTIFF'S REPLY CLAIM CONSTRUCTION BRIEF

embodiment. As Synopsys has consistently done in this claim construction proceeding, it points to the fact that the preferred embodiment uses one thread per processor to support its alteration of the plain meaning of the term. Suffice it to say that if the patentee had intended to claim one thread per processor, he certainly knew how to draft it. But the reality is he did not so draft and there was no prior art that precluded him from obtaining a patent on the invention he actually claimed.

Synopsys pointed to the discussion in the specification about the n+1 threads used in the prior art. Synopsys, however, missed the point of that discussion. The point is not exactly about the prior art's using n+1 threads, but about its having a master thread whose "main function is to manage the execution of the slave threads to perform simulation." '898 Pat. at 17:67-18:2. The patentee states that in his invention, the master thread will spend only a minimum amount of time managing the slave threads, and it shares an equal amount of workload with the n-1 slave threads to carry out the simulation." *Id.* 18:3-5. Therefore, the issue is not about the prior art's number of threads, but about it having an extra master thread to manage the slave thread without itself participating in the simulation works.

Synopsys also relies on the "context" of Term 5 where the number of processors is taken into consideration. Synopsys basically resorts to speculation because none of the context phrases actually require one thread per processor. The creation of the master and slave threads is simply "based on" the number of processors. There are of course numerous ways of implementing the requirement "based on" without adopting a one-to-one ratio. For example, two threads per processor may be used, which may not be as efficient as the preferred embodiment, but still falls under the coverage of the claims. The bottom-line is still that if the inventor had wanted to draft a one-to-one relationship between threads and processors, he knew how to draft it. The fact he chose a different language to claim as his invention means he intended to cover more than the one-to-one ratio, which should be a fact clear to any person of ordinary skill in the art. Unless there is a prior art that precludes him from doing so, he is entitled to so claim. There is certainly no indication in the prosecution history that he has disavowed configurations that do not have one thread per processor. Thus, Synopsys's proposed construction of Term 5 is again marred by its naked attempt to import limitations from the embodiment.



### F.     Term 6: Synopsys Cuts Out a Crucial Phrase to Distort the Meaning of "Pre-examining" and Reads in Limitations from the Embodiment

For Term 6, "pre-examining each source file," the first issue is whether the term needs any interpretation.  It appears that the only reason that Synopsys wants to construe it is to impermissibly inject unwarranted limitations into the phrase, especially the word "automatically."

To justify its improper definition, other than employing its usual tricks of reading in limitations, Synopsys carefully cherry-picked the words to be construed by mutilating the phrase at issue.  As discussed in the opening brief, the complete phrase that encompasses the term that Synopsys asks to be construed is "pre-examining each user-specified HDL source file."  Synopsys dissected out a part of the phase and asks the Court to construe only "pre-examining each source file."

Despite an open challenge by Dynetix on this point (Open Br. at 20:23-21:3), Synopsys never even attempted to explain why such a dissection is justified.  Important here is the fact that this dissection carves out a crucial context of the "pre-examining", i.e., the phrase "user-specified," which plainly contradicts the word "automatically".  If the process relies on user-specified source code, it simply cannot be fully automatic.  Synopsys's Machiavellian maneuver cannot cover up its attempt to distort the meaning of the claims.

Synopsys argues that the existence of "automatically" in the element following the term at issue actually supports its construction.  This is a rather curious argument.  The use of the word in the same sentence obviously shows that the patentee knows how to draft a claim to cover only an automatic process, but he did not do so.  Because there is no evidence that he intended to limit this process to an automatic process to avoid prior art, the plain meaning of the term shall prevail over the improper injection of the word "automatically".

Another issue with Synopsys's definition is the use of the word "content."  The pre-examination may be simply looking at the file extension to determine the type of HDL used, not necessarily involving reviewing the contents.  There is no intrinsic evidence requiring "pre-examining" to be limited to content.



### G. Term 7: "Specify" Should Not Be Limited to "Specify by Names"

For Term 7, "to specify remote hosts," the first issue is again whether it needs construction at all. If anything needs construction, it is probably the phrase "remote hosts," which means servers located remotely to the user who accesses the servers using a local computer (or local host). *See* '898 Pat. Fig. 12. The word "specify" certainly does not need any explanation. That is the word, however, which Synopsys is especially interested to construe as "specify by names."

As usual, Synopsys hangs its entire argument on the features of a specific embodiment of the user interface. Resp. Br. at 28. However, these features cannot be imported as limitations into Term 7, unless the patentee expressly limits the word "specify" to "specify by name" to avoid prior art. There is no such evidence. Synopsys's proposed construction of Term 7 should be rejected.

### H. Term 8: GUI Does Not Exclude the Use of Command Line

For Term 8, "graphical user interface (GUI)," the issue is whether a GUI can never use command line or whether a user interface that uses a combination of graphics and command line can never be called a GUI. On this issue, the specification offers a clear guidance where the preferred embodiment uses a mixture of command line and graphical objects. '898 Pat. Fig. 13. All the extrinsic evidence that Synopsys relies on does not preclude the use of command line, together with graphical objects, in GUI.

In its response brief, Synopsys cleverly changed the topic of the debate. It focuses on the argument that a GUI can never be a Command Line Interface or CLI. Apparently, Synopsys has transferred the non-capitalized phrase "command line interface" in its proposed construction into a special terminology - CLI. If that is the case, the proposed construction is inherently improper because it attempts to define a term, GUI, with another term, CLI, which itself needs definition. Without such special term definition, "command line interface" will be understood by the jury to mean the use of command line in the interface, which should not be excluded from the meaning of GUI as Synopsys is attempting to do.

### I. Term 9: the Court Should Correct the Obvious Error

Term 9, "by at the beginning" contains a typographical error. It is a well-settled law that a

district court may correct an obvious error in a patent claim in a patent infringement suit. *CBT Flint Partners, LLC v. Return Path, Inc.*, 654 F.3d 1353, 1358 (Fed. Cir. 2011).

Based on the specification, it is not subject to reasonable dispute that it should be "at the beginning" instead of "by the beginning." This point is shown directly by the claim context. Term 9 is used to modify "the step of scheduling the master thread and the slave threads to bind to CPUs of the microprocessor." '898 Pat. claim 39. This step is part of a "method of achieving super-linear scalable Hardware Description Language simulation, and thus part of the simulation. To be part of the simulation, the step can only be taken "at" the beginning of the simulation instead of "by" the beginning of the simulation.

The support for choosing "at" over "by" also comes from the written description. The preferred embodiment, a simulation program, is described as a simulator which "will allocate exactly n threads … <u>at program starts up</u>. Each of these threads will be … scheduled by the operating system directly to bind to a hardware CPU throughout the entire simulation run." *Id.* at 17:52-56. Thus, the binding of the threads to CPUs occurred in the preferred embodiment "at program starts up," not "by" the program starts up. Therefore, it is unambiguous that the typographical error should be corrected by removing the word "by".

Relying on *CBT Flint*, Synopsys argues that the error is not correctible because the correction is subject to reasonable debate. Resp. Br. at 30-32. Synopsys points to Dynetix's alternative argument, that even using "by" instead of "at" would not change the nature of the invention, as an admission that the correction is subject to reasonable dispute.

Synopsys misunderstood *CBT Flint*. The case in fact is directly applicable to the instant case in support of Dynetix's position. In *CBT Flint*, the District Court found a term, containing a typographical error, indefinite on the ground that it had no authority to correct the error and there were three equally reasonable alternative corrections. The Federal Circuit reversed, holding:

> … we first conclude that the district court erred in this case by holding that it was not authorized to "correct" the supposed "detect analyze" error in claim 13 of the '550 patent. Although the district court found that there are "at least three alternatives that appear to be equally reasonable," … the court here failed to consider those alternatives from the point of view of one skilled in the art. Specifically, the district court failed to recognize that the claim contained an obvious error, which is confirmed by the fact that a person of



skill in the art would find the claim to have the same scope and meaning
under each of the three possible meanings that the court found reasonable. We
conclude that it does, and therefore that the district court had the requisite
authority to make a correction to claim 13 of the '550 patent.

*Id.* at 1358.

The issue regarding Term 9 is nearly identical to that in *CBT Flint*. Like in *CBT Flint*, which used two verbs, "detect" and "analyze", in tandem, Term 9 used two prepositions, "by" and "at", in tandem. As discussed above, based on the specification, it is not subject to any reasonable dispute that it should be "at the beginning" instead of "by the beginning." Alternatively, if the Court finds removing "by" or "or" are equally reasonable ways of correcting the error, the holding of *CBT Flint* would be directly at point. Like in *CBT Flint,* claim 39 would "have the same scope and meaning under each of the [two] possible meanings." *Id.* If the word "at" is chosen over "by", it would mean that the step of "scheduling the master thread and the slave threads to bind to CPUs of the microprocessor" is performed before the core steps of simulation. If the word "by" is chosen over "at", the same step would be performed before the same core steps of simulation, although now only the core steps of simulation are considered simulation. Thus, under either way of correction, the person of ordinary skill in the art understands that the step of "scheduling the master thread and the slave threads to bind to CPUs of the microprocessor" is performed before some other steps which may be referred to as the core steps of the simulation or simply simulation. There would be no substantive difference, but only difference in names. Therefore, the correction is not subject to any reasonable debate in this case, just as in *CBT Flint*.

**J.      Term 10: Synopsys's Indefinite Arguments Are Inapposite**

For Term 10, "means to provide a graphical user interface program ("GUI") on the user's local hosts," Synopsys contends that the claimed function is not identifiable. This argument does not even deserve any serious response because the plain meaning of Term 10 shows the claimed function is "to provide a … GUI on the user's local hosts." The specification certainly described specific embodiments for providing GUI on the user's local hosts. Figure 12 describes the basic algorithms of a user interface labeled as "GUI". Figure 13 provides an example of the display of a GUI. Synopsys's argument should be rejected. A person of ordinary skill in the art knows how to program



the interface according to these descriptions, how to upload the programs into the local hosts, or how to use mouse and keyboard to operate the GUI.

### K. Dynetix Has Complied with the Patent Local Rules

Synopsys accuses Dynetix of violating the disclosure requirement of the local rules. Synopsys is distorting the facts. The relevant local rule states:

> At the same time the parties exchange their respective "Preliminary Claim Constructions," each party shall also identify all references from the specification or prosecution history that <u>support its proposed construction</u> and designate any supporting extrinsic evidence ….

Pat. L.R. 4-2(b) (emphasis added).

Mr. Chan's declaration was not filed to support Dynetix's proposed construction. Instead, it was submitted for the background technology, which is equivalent to the technology tutorial, and for rebutting the claim of indefiniteness by Synopsys. Synopsys's claim of local rule violation is thus baseless.

## III. <u>CONCLUSION</u>

For the foregoing reasons, the Court should adopt Dynetix's proposed claim construction.

DATED: October 5, 2012

**LILAW INC.**
**ATTORNEYS FOR PLAINTIFF DYNETIX DESIGN SOLUTIONS, INC.**

By  /s/ J. James Li
_____
J. James Li, Ph.D.

