**LiLaw Inc., a Law Corporation**
J. James Li (SBN 202855)
5050 El Camino Real, Suite 200
Los Altos, California 94022
Telephone: (650) 521-5956
Facsimile: (650) 521-5955
Email: lij@lilaw.us

Attorneys for Plaintiff Dynetix Design Solutions Inc.

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN JOSE DIVISION

| | |
|---|---|
| DYNETIX DESIGN SOLUTIONS INC., a California corporation,<br><br>    Plaintiff,<br><br>vs.<br><br>SYNOPSYS INC., a Delaware corporation, and DOES 1-50<br><br>    Defendants. | Case No. CV11-05973 PSG<br><br>**DYNETIX'S RESPONSE CLAIM CONSTRUCTION BRIEF**<br><br>**Date: December 13, 2012**<br>**Time: 10:00 a.m.**<br>**Court: Courtroom 5 - 4th Floor**<br>**Judge: Hon. Paul S. Grewal** |



## I. INTRODUCTION

This process of claim construction, in light of the status of the case, is not necessary. The only term to be construed, "finite state machine," is already briefed in connection with Dynetix's motion for summary judgment of noninfringement (the "MSJ"). A supplemental brief to that motion, if necessary, is all that is needed instead of a full-blown Markman proceeding.

As stated in Dynetix's MSJ, based on the intrinsic evidence and the plain meaning of the word "machine", "finite state machine" should not include primitive devices such as flip-flops. Thus, the Court should adopt Dynetix's proposed claim construction, as it is modified by this brief.

## II. LEGAL STANDARDS

### A. The General Principles of Claim Construction

"The claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (internal citations and quotations omitted). The words of a claim "are generally given their ordinary and customary meaning." *Id.* The ordinary and customary meaning "is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Id.* at 1313. In some cases, general purpose dictionaries may be helpful for ascertaining the meaning of a term where claim construction "involves little more than the application of the widely accepted meaning of commonly understood words." *Id.* at 1314. In all cases, however, claims "must be read in view of the specification, of which they are a part." *Id.* at 1315. The specification, in fact, is "the primary basis for construing the claims." *Id.* The prosecution history of the patent should also be consulted as part of the intrinsic evidence. *Id.* at 1317.

Other than the intrinsic evidence, the court may also consult the extrinsic evidence, which "consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Id.* The extrinsic evidence, however, "is less significant than the intrinsic record" (*id.* at 1317) and "unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence." *Id.* at 1319.



## III. ARGUMENT

### A. The Claim Context and Proposed Constructions

The term "finite state machine" is found in the preamble of claim 7:

1. A method of simulating a circuit on a computer system, said circuit including a computer model of a **Finite State Machine** (FSM), said computer system including a processor and memory, said processor being coupled to said memory …

The parties' proposed claim constructions of this term are:

| Synopsys | Dynetix (revised) |
|---|---|
| A "finite state machine" is a sequential circuit that has a finite number of states. A "sequential circuit" is a circuit that has outputs that are dependent on a sequence of previous inputs. The "state" of a circuit is the values assumed at a given instant by the variables that define the characteristics of that circuit. Alternatively, A "finite state machine" is a circuit that has a finite number of output values at a given instant that are dependent on a sequence of previous inputs. | A computational model of sequential circuits. Such sequential circuits have outputs that depend on, among other things, the previous inputs. The phrase "finite state" refers to the fact that such computational model has a finite number of states. The word "machine" excludes simple devices such as flip-flops. |

### B. Synopsys's Proposed Definition Has Several Problems

#### 1. Finite State Machine Is a Software Term Referring to a Computational Model of Sequential Digital Circuits

According to the specification of the patent, FSM is merely another name for sequential circuits. *See* Pat. at 1:23-26 ("Because sequential circuits have a finite number of these states, sequential circuits are referred to as finite state machines (FSMs).) The reason for this "alias" for sequential circuits is because FSM is a software term as shown by the standard technical dictionary:

**finite state machine (software)** A computational model consisting of a finite number of states and transitions between those states, possibly with accompanying actions.

Ex. A (IEEE Dictionary), p. 410 (emphasis in original).

There is no question that the term FSM is used exclusively for computer modeling of sequential circuits in the '473 patent. There is no reliable extrinsic evidence, either, to show that FSM has ever been used to refer to hardware outside the context of computational modeling. For



example, in the classic hardware electronic textbook, The Art of Electronics, there is not a single mention of the term FSM, although it discusses sequential circuits in details. *See, e.g.*, Ex. B, p. 478. Nothing in the prosecution history of the patent shows otherwise. Thus, the Court should not expand the ordinary meaning of the term beyond it as understood by a person of ordinary skill in the art.

The fact that the claim uses the term "computational model of a Finite State Machine" should not change the interpretation. The phrase does not necessarily contradict the fact that Finite State Machine is a computational model, like saying "the disease of chemical dependency" where "chemical dependency" is one kind of disease.

### 2. The State of FSM Depends Not Only on the Previous Inputs

An FSM is a computational model of a sequential circuit. Pat. at 1:23-26. Unlike a combinational circuit, the outputs of a sequential circuit are influenced by the previous inputs to the circuit. *Id.* 1:17-23. At least for some sequential circuits, the output depends on more than just the previous inputs. *Id.* 1:19-23. Thus, it is inaccurate to say that sequential circuits are circuits that have "outputs that are dependent on a sequence of previous inputs." It is more accurate to say they are circuits that "have outputs that depend on, among other things, the previous inputs."

### 3. The Word "Machine" in FSM Excludes Simple Devices Such as Flip-Flops

The goal of the '473 patent is to improve the computer modeling of FSM for multiple purposes. Pat. at 3:64-65 ("It is therefore desirable to have one computer model that can be used by simulation, synthesis and optimization programs."). The specification first reviewed the prior art FSM models, one of which is the FSM 200 depicted in Figure 2. This prior art FSM contains multiple components, including a component called "State Vector Memory Elements 225." Pat. Fig. 2. "The state vector memory elements 225 typically include a number of memory elements such as D flip-flops." *Id.* 1:39-40. Thus, flip-flop is a component of the prior art FSM according to the patent specification. No person of ordinary skill in the art, upon reading the specification, would consider the term FSM as used in the patent covers flip-flops.

This point is further shown elsewhere in the specification, where a netlist computer model is described as "a number of interconnected primitive models," and each "primitive model" is described



as "a model of a <u>primitive digital device</u> such as an AND gate, OR gate, a <u>D flip-flop</u>, or a multiplexor." *Id.* 2:7-11 (emphasis added). "A computer model of FSM 200 can be built up from a list of primitive models and a corresponding interconnection list." *Id.* 3:37-39. Everything in the prosecution history also conforms to this understanding that FSM does not refer to the primitive models such as those for flip-flops.

Synopsys argues that there are many kinds of flip-flops, but the specification only mentions the D flip-flop. Regardless of their types, however, all flip-flops are basic memory units of digital circuits. Ex. B at 504. The specification is never limited to the D flip-flop, but always uses phrases like "memory elements <u>such as</u> D flip-flops." Pat. at 1:39.

Relying on *Nuance Commc'ns, Inc. v. Abbyy Software House, Inc.*, 2012 U.S. Dist. LEXIS 49708 (2012 WL 1188903) (N.D. Cal. Apr. 9, 2012), Synopsys claims that the specification was not a disavowal, disclaimer, or estoppel on the issue of flip-flops. *Nuance* is inapplicable. It is a case rejecting importation of negative limitations from the description of the preferred embodiment. *Id.* at *15 ("Although the preferred embodiment describes archiving by, for instance, placing files onto "removable media" or "off-line," there is no indication from the claim language that the patent intends by those examples to define the term archiving."). The negative limitation in this case, in contrast, is not based on any embodiment, but based on the description of the term FSM by the specification in light of the prior art. There is no issue of importation of limitations here.

The same is true for the ultimate authority that *Nuance* relies on, *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1322-1323 (Fed. Cir. 2003). In *Omega,* the district court excluded from the scope of the term situations where a beam strikes the center or interior of the energy zone because of the use of the phrase "peripheral." *Id.* at 1322. The Federal Circuit reversed, finding that the laser beam may be directed inside the energy zone as well as on the outside. *Id.* at 1323. *Omega* is inapposite. In this case, throughout the specification, flip-flops are always treated as primitive devices that are used as building blocks of an FSM. The inherent meaning of "machine" also requires the assembly of primitive parts together, instead of referring to the parts themselves. This description also conforms to the well-established meaning of flip-flops as the most basic building blocks of any digital memory circuit.



DYNETIX'S RESPONSE CLAIM CONSTRUCTION BRIEF

### 4. The Law of Negative Limitations Revisited

*Omega* has become the most misquoted case on the issue of negative limitations. It has been used as a requirement that there must be a clear and unambiguous disavowal to justify negative limitations, based on a statement by *Omega* toward the end of the opinion. *Omega Eng'g, Inc.*, 334 F.3d at 1323. This is the erroneous position espoused by Synopsys in this proceeding. Synopsys, however, never mentioned this requirement for finding negative limitations merely a month ago when it was arguing for negative limitations for terms such as GUI in the claim construction proceeding for Dynetix's patent. This Court entered its tentative construction of GUI with the negative limitation on the command line interface without finding any clear and unambiguous disavowal, but based on the plain meaning of the word and extrinsic evidence. To be sure, *Omega* made that misquoted statement only after examining the plain meaning of the word and the specification of the patent. *Omega Eng'g, Inc.*, 334 F.3d at 1322-1323. That statement at issue was made as an additional safeguard for the conclusion, not a requirement for finding negative limitations. *Id.* Some district courts, however, selectively quoted this statement which turns it into a prerequisite for finding negative limitations. A more recent case by the Federal Circuit shows that is not the correct law. *Am. Calcar, Inc. v. Am. Honda Motor Co.*, 651 F.3d 1318, 1329 (Fed. Cir. 2011).

In *Calcar,* the district court's claim construction introduces a negative limitation, by construing the term "identifying one of the plurality of providers in response to the vehicle condition" as "a processing element identifies a provider in response to a vehicle condition, <u>not in response to any action on the part of the user.</u>" *Id.* (emphasis added). The court found that "a skilled artisan would understand the claims as requiring a 'cause-and-effect' relationship between the occurrence of the vehicle condition and the processor's identification or selection of the service provider." *Id.* The court also held that the claim term "providing information concerning the identified provider from the memory when a location of the identified provider is within a predetermined distance" requires that "the information is provided after it is determined that the provider is within a predetermined distance from the vehicle and without any intervening action by the user." *Id.* Thus, all the analysis for introducing the negative limitation by the District Court is based on the understanding of the specification by a skilled artisan, not on any clear and unambiguous disavowal. The Federal Circuit

DYNETIX'S RESPONSE CLAIM CONSTRUCTION BRIEF

affirmed, stating that the term "In response to" "connotes that the second event occur in reaction to the first event." *Id.* at 1340.  The court found that "the language of the claim itself suggests that when a vehicle condition is detected, the processing element identifies a provider automatically as opposed to requiring further user interaction."  The court also found that "the specification fails to disclose any embodiment that requires any type of user interaction prior to identification of a service provider." *Id.*  Again, similar to the District Court, the Federal Circuit's analysis is not to look for a clear and unambiguous disavowal, but to examine the intrinsic evidence and the plain meaning of the claim terms for the purpose of justifying the negative limitation.

In this case, the plain meaning of "machine" in "finite state machine" requires something other than the primitive building blocks like flip-flops.  The specification also makes it clear that the concept of FSM does not include the primitive devices like flip-flops which are components or parts of the "machine."  Thus, the analysis in this case that leads to the negative limitation is very similar to that used in *Calcar*.

## IV. <u>CONCLUSION</u>

For the foregoing reasons, the Court should adopt Dynetix's proposed claim construction on FSM.

DATED:  November 26, 2012      **LILAW INC.**
                               **ATTORNEYS FOR PLAINTIFF DYNETIX DESIGN SOLUTIONS, INC.**


                               By  /s/ J. James Li
                               _____
                                   J. James Li, Ph.D.



6                           Case No. CV11-05973 PSG
DYNETIX'S RESPONSE CLAIM CONSTRUCTION BRIEF

# Exhibit A

IEEE Std 100-1996



# The IEEE Standard Dictionary of Electrical and Electronics Terms

## Sixth Edition

Standards Coordinating Committee 10, Terms and Definitions
Jane Radatz, Chair

This standard is one of a number of information technology dictionaries being developed by standards organizations accredited by the American National Standards Institute. This dictionary was developed under the sponsorship of voluntary standards organizations, using a consensus-based process.

05-06-97P12:12 RCVD

ISBN 1-55937-833-6



imum value does not exceed a specified value. *See also:* filter pass band. (CAS) [13]

**filter, tuned** A filter generally consisting of combinations of capacitors, inductors, and resistors that have been selected in such a way as to present a relative minimum (maximum) impedance to one or more specific frequencies. For a shunt (series) filter, the impedance is a minimum (maximum). Tuned filters generally have a relatively high $Q$ ($X/R$).
(IA) 519-1992

**final approach path** *See:* approach path.

**final condition** The values assumed by the variables in a system, model, or simulation at the completion of some specified duration of time. *Synonym:* equilibrium condition. *Contrast:* boundary condition; initial condition.
(C) 610.3-1989

**final contact pressure** *See:* contact pressure, final.

**final controlling element (electric power system)** The controlling element that directly changes the value of the manipulated variable. (PE) 94-1970w

**final design (nuclear power quality assurance)** Approved design output documents and approved changes thereto.
(PE) [124]

**final emergency circuits** All circuits (including temporary emergency circuits) that, after failure of a ship's service supply, may be supplied by the emergency generator. *See also:* emergency electric system. (EEC/PE) [119]

**final emergency lighting** Temporary emergency lighting plus manually controlled lighting of the boat deck and overside to facilitate lifeboat loading and launching. *See also:* emergency electric system. (EEC/PE) [119]

**final sag** The sag of a conductor under specified conditions of loading and temperature applied, after it has been subjected for an appreciable period to the loading prescribed for the loading district in which it is situated, or equivalent loading, and the loading removed. Final sag shall include the effect of inelastic deformation (creep).
(NESC/T&D) C2-1997, C2.2-1960

**final state** The values assumed by the state variables of a system, component, or simulation at the completion of some specified duration of time. *Contrast:* initial state.
(C) 610.3-1989

**final-terminal stopping device (elevators)** A device that automatically causes the power to be removed from an electric elevator or dumbwaiter driving-machine motor and brake or from a hydraulic elevator or dumbwaiter machine independent of the functioning of the normal-terminal stopping device, the operating device, or any emergency terminal stopping device, after the car has passed a terminal landing. *See also:* control. (EEC/PE) [119]

**final trunk (data transmission)** A group of trunks to the higher class office which has no alternate route, and in which the number of trunks provided results in a low probability of calls encountering "all trunks busy." (PE) 599-1985w

**final unloaded conductor tension (electric systems)** The longitudinal tension in a conductor after the conductor has been stretched by the application for an appreciable period, and subsequent release, of the loadings of ice and wind, and temperature decrease, assumed for the loading district in which the conductor is strung (or equivalent loading). *See also:* conductor. (BT) [34]

**final unloaded tension** The longitudinal tension in a conductor after it has been subjected for an appreciable period to the loading prescribed for the loading district in which it is situated, or equivalent loading, and the loading removed. Final unloaded tension shall include the effect of inelastic deformation (creep). (NESC) C2-1997

**final unloaded sag (1) (general)** The sag of a conductor after it has been subjected for an appreciable period to the loading prescribed for the loading district in which it is situated, or equivalent loading, and the loading removed. *See also:* sag.
(BT) [34]

(2) The sag of a conductor after it has been subjected for an appreciable period to the loading prescribed for the loading district in which it is situated, or equivalent loading, and the loading removed. Final unloaded sag shall include the effect of inelastic deformation (creep). (NESC) C2-1997

**final value** The steady-state value of a specified variable. *See also:* control. (IA) [60], [69]

**final voltage** *See:* cutoff voltage.

**finder switch** An automatic switch for finding a calling subscriber line or trunk and connecting it to the switching apparatus. (EEC/PE) [119]

**finding (telephone switching systems)** Locating a circuit requesting service. (COM) 312-1977w

**fine chrominance primary (national television system committee color television)** An obsolete term. Use the preferred term, I chrominance signal. (BT) 201-1979w

**fine-grain parallel architecture** Parallel architecture that uses between 1K and 256K processors. *Contrast:* coarse-grain parallel architecture; medium-grain parallel architecture.
(C) 610.10-1994

**fines (cable plowing)** Particles of earth or rock smaller than .125 in greatest dimension. (PE/T&D) 590-1977r

**finger** *See:* end finger.

**finger line (conductor stringing equipment)** A lightweight line, normally sisal, manila, or synthetic fiber rope, which is placed over the traveler when it is hung. It usually extends from the ground, passes through the traveler and back to the ground. It is used to thread the end of the pilot line or the pulling line over the traveler and eliminates the need for workers on the structure. These lines are not required if pilot lines are installed when the travelers are hung.
(PE/T&D) 524-1992, 524a-1993

**finger overlap (acoustic aperture)** The length of a finger pair between which electromechanical interaction takes place.
(UFFC) 1037-1992

**finishing (electrotype)** The operation of bringing all parts of the printing surface into the same plane, or, more strictly speaking, into positions having equal printing values.
(EEC/PE) [119]

**finishing rate (storage battery) (storage cell)** The rate of charge expressed in amperes to which the charging current for some types of lead batteries is reduced near the end of charge to prevent excessive gassing and temperature rise. *See also:* charge. (EEC/PE) [119]

**finite state machine (software)** A computational model consisting of a finite number of states and transitions between those states, possibly with accompanying actions.
(C) 610.12-1990

**finite-time stability** *See:* stability, finite-time.

**finline** An E-plane line in which the planar conducting structure is affixed to a dielectric substrate. The thin conducting strips (fins) may be insulated or grounded. They can be arranged in various configurations. (MTT) 1004-1987w

**finsen** The recommended practical unit of erythermal flux or intensity of radiation. It is equal to one unit of erythermal flux per square centimeter. (EEC/PE) [119]

**FIPS PUB XXXX** *See:* federal information processing standard publication.

**fire-alarm system** An alarm system signaling the presence of fire. *See also:* protective signaling. (EEC/PE) [119]

**fire-control radar (navigation aid terms)** A radar whose prime function is to provide information for the manual or automatic control of artillery or other weapons.
(AE) 172-1983w, 686-1990w

**fire detection and fire protection systems (nuclear power generating station)** Definitions of terms relating to fire detection and protection systems and equipment may be found in the National Fire Protection Association (NFPA) Handbook. (PE) 567-1980w

**fire-door magnet** An electromagnet for holding open a self-closing fire door. (EEC/PE) [119]

**Exhibit B**



# THE ART OF ELECTRONICS
## Second Edition

**Paul Horowitz** HARVARD UNIVERSITY

**Winfield Hill** ROWLAND INSTITUTE FOR SCIENCE, CAMBRIDGE, MASSACHUSETTS


CAMBRIDGE UNIVERSITY PRESS

generating Gray-code states: Begin with a state of all zeros. To get to the next state, always change the single least significant bit that brings you to a new state.

0000
0001
0011
0010
0110
0111
0101
0100
1100
1101
1111
1110
1010
1011
1001
1000

Gray codes can be generated with any number of bits. They find use also in "parallel encoding," a technique of high-speed A/D conversion that you will see later. We will talk about translation between Gray-code and binary-code representations in the next section.

### 8.04 Gates and truth tables

#### Combinational versus sequential logic

In digital electronics the name of the game is generating digital outputs from digital inputs. For instance, an *adder* might take two 16-bit numbers as inputs and generate a 16-bit (plus carry) sum. Or you might build a circuit to multiply two numbers. These are the kinds of operations a computer's processing unit should be able to do. Another task might be to compare two numbers to see which is larger or to compare a set of inputs with the desired input to make sure that "all systems are go." Or you might want to attach a "parity bit" to a number to make the total number of 1's even, say, before transmission over a data link; then the parity could be checked on receipt as a simple check of correct transmission. Another typical task is to take some numbers expressed in binary and display, print, or punch them as decimal characters. All of these are tasks in which the output or outputs are predetermined functions of the input or inputs. As a class, they are known as "combinational" tasks. They can all be performed with devices called *gates*, which perform the operations of Boolean algebra applied to two-state (binary) systems.

There is a second class of problems that cannot be solved by forming a combinational function of the inputs alone, but require knowledge of past inputs as well. Their solution requires the use of "sequential" networks. Typical tasks of this type might be converting a string of bits in serial form (one after another) into a parallel set of bits, or keeping count of the number of 1's in a sequence, or recognizing a certain pattern in a sequence, or giving one output pulse for each four input pulses. All these tasks require digital memory of some sort. The basic device here is the "flip-flop" (the fancy name is "bistable multivibrator").

We will begin with gates and combinational logic, since they're basic to everything. Digital life will become more interesting when we get to sequential devices, but there will be no lack of fun and games with gates alone.

#### OR gate

The output of an OR gate is HIGH if either input (or both) is HIGH. This can be expressed in a "truth table," as shown in Figure 8.2. The gate illustrated is a 2-input OR gate. In general, gates can have any number of inputs, but the standard packages usually contain four 2-input gates, three 3-input gates, or two 4-input gates. For instance, a 4-input OR gate will have a HIGH output if any one input (or more) is HIGH.

interconnection you want – you're limited by the built-in structure. Figure 8.44 shows the basic design of combinational (no registers) PALs and PLAs. To keep this figure simple, the AND and OR gates, though drawn with a single input line, are actually multiple-input gates, with an input implied at every connected crossing.

Each (three-state) output of a combinational PAL comes from an OR gate, each of whose inputs is prewired to an AND gate with dozens of inputs. For example, the 16L8 (Fig. 8.45) has eight 7-input OR gates; every possible signal is available at each AND gate, including the 10 dedicated input pins (and their inverts) and the 8 outputs (and their inverts). Each tristate enable is also derived from a 32-input AND gate.

PLAs are similar to PALs, but with the added flexibility that the AND-gate outputs can be connected to the OR-gate inputs in any combination (i.e., programmable), rather than being prewired as in a PAL.

Note that the PALs and PLAs that we have described are *combinational* (i.e., gates only, no memory). Both kinds of programmable logic are also available as *sequential* logic, i.e., with memory (registers), a subject we will take up in the next section.

To use PALs or PLAs, you get yourself a *programmer*, a piece of hardware that knows how to burn fuses (or otherwise program the device) and verify the finished product. All programmers connect via a serial port to a microcomputer (engineers have standardized on the IBM PC or compatible), on which you run some form of programmer software. Some of the fancier programmers include an on-board computer that runs its own software. The simplest kind of software simply lets you select the fuses to burn; you figure that out by deciding what logic you want, at the gate level, then listing (or marking on a graphics display) those fuses.

Figure 8.46 shows a trivial example, forming an exclusive-OR of two inputs as one of the outputs. Better programmers let you specify Boolean expressions (if you know them) or truth tables; the software does the rest, including minimization, simulation, and programming.

Although PLAs are more flexible, the overwhelming favorite in recent design has been the PAL. That is because they are faster (the signal passes through only one array of fuses) and cheaper and will usually do the job. As we'll see shortly, sophisticated new PALs using "macrocells" and "folded architecture" give you some additional flexibility within the fixed-OR PAL design. PALs provide a flexible and compact alternative to fixed-function ICs and should not be overlooked by the serious circuit designer. We'll show how (and when) to use programmable logic, along with useful tricks, in Section 8.27.

## SEQUENTIAL LOGIC

### 8.16 Devices with memory: flip-flops

All our work with digital logic so far has been with combinational circuits (e.g., arrays of gates), for which the output is determined completely by the existing state of the inputs. There is no "memory," no history, in these circuits. Digital life gets really interesting when we add devices with memory. This makes it possible to construct counters, arithmetic accumulators, and circuits that generally do one interesting thing after another. The basic unit is the flip-flop, a colorful name to describe a device that, in its simplest form, looks as shown in Figure 8.47.

Assume that both $A$ and $B$ are HIGH. What are $X$ and $Y$? If $X$ is HIGH, then both inputs of $G_2$ are HIGH, making $Y$ LOW. This is consistent with $X$ being HIGH, so we're finished. Right?

$X$ = HIGH
$Y$ = LOW