**LiLaw Inc., a Law Corporation**
J. James Li (SBN 202855)
5050 El Camino Real, Suite 200
Los Altos, California 94022
Telephone: (650) 521-5956
Facsimile:  (650) 521-5955
Email:  lij@lilaw.us

Attorneys for Plaintiff Dynetix Design Solutions Inc.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| DYNETIX DESIGN SOLUTIONS INC., a California corporation,<br><br>            Plaintiff,<br><br>      vs.<br><br>SYNOPSYS INC., a Delaware corporation, and DOES 1-50<br><br>            Defendants. | Case No. CV11-05973 PSG<br><br>**PLAINTIFF'S REPLY IN SUPPORT OF ITS THIRD MOTION TO COMPEL**<br><br>Date:  April 16, 2013 (original)<br>          April 9, 2013 (updated)<br>Time: 10:00 a.m.<br>Court: Courtroom 5 - 4th Floor<br>Judge: Hon. Paul S. Grewal |
| SYNOPSYS INC.,<br><br>            Counterclaimant,<br><br>      vs.<br><br>DYNETIX DESIGN SOLUTIONS INC.,<br><br>            Counter-Defendant. | Redacted |



# TABLE OF CONTENTS

I.   INTRODUCTION ................................................................................................................ 1

    A.   SYNOPSYS HAS ACTED IMPROPERLY ........................................................................... 1

    B.   INTEL SHOULD BE COMPELLED TO PRODUCE THE RUN SCRIPTS AND OTHER DOCUMENTS .... 2

II.  REPLY TO SYNOPSYS'S OPPOSITION ........................................................................ 4

    A.   SYNOPSYS HAS BEHAVED INAPPROPRIATELY REGARDING THE WITHHELD EMAILS ............... 4

    B.   SYNOPSYS HAS ACTED IN BAD FAITH TO WITHHOLD THE SUN DOCUMENTS ......................... 5

    C.   SYNOPSYS CANNOT CAPRICIOUSLY AND ARBITRARILY LIMIT THE DISCOVERY TO DLP ........ 6

    D.  DYNETIX HAS GOOD CAUSE TO QUESTION THE VERACITY OF INTEL'S DENIAL OF ITS USE OF VCS MULTICORE AND TO DEMAND DOCUMENTS THAT ARE REASONABLY CALCULATED TO LEAD TO ADMISSIBLE EVIDENCE SHOWING INTEL'S USE OF VCS MULTICORE ................. 7

    E.   SYNOPSYS'S COLLATERAL ATTACKS ARE AS BASELESS AS THEY ARE IRRELEVANT ............. 8

    F.   DYNETIX IS COMPELLING INTEL TO PRODUCE INFORMATION ABOUT ITS OWN USE OF VCS ............................................................................................................................... 9

III. REPLY TO INTEL'S OPPOSITION ................................................................................ 10

    A.   INTEL'S DENIAL SHOULD NOT BLOCK DISCOVERY ............................................................ 10

    B.   DYNETIX HAS FULLY MET AND CONFERRED WITH INTEL ................................................. 11

    C.   THE DOCUMENT PRODUCTION AT ISSUE INVOLVES ONLY REASONABLE EFFORTS ............... 13

    D.   INTEL SHOULD BE COMPELLED TO ATTEND ANOTHER DEPOSITION ................................... 13



# TABLE OF AUTHORITIES

**CASES**

*Spencer Sav. Bank v. Excell Mortg. Corp.*,
   960 F. Supp. 835, 836 (D.N.J. 1997) .................................................................................7



## I. INTRODUCTION

### A. Synopsys Has Acted Improperly

As this case is approaching the end of discovery, two improper discovery conducts by Synopsys have become obvious. The first is to strenuously refuse to produce certain information throughout meet-and-confers until a motion to compel is filed, and to ask the Court to moot the motion to compel on the promise to produce the withheld information. We have seen this conduct in the context of Dynetix's first motion to compel regarding the license keys, where Synopsys made a belated effort trying to convince the Court that the motion was moot, after the parties had gone through many rounds of meet-and-confer and had briefed and even argued the motion. The same pattern of act appears in this motion, where Synopsys refused to produce the emails of Adaikalasamy and Peng at issue for a long time, until after the motion to compel was filed. An order should be issued to prevent any further litigation on this issue despite Synopsys's promise to produce the improperly withheld emails.

The second improper discovery conduct of Synopsys is to delay the production of important documents for as long as possible, to stall the meet-and-confer process for as long as possible, and to oppose the motion to compel on the ground of insufficient meet-and-confer. This conduct was demonstrated in the context of Dynetix's Second Motion to Compel, where Synopsys did not produce the specifications for VCS-MX and VCS-Cloud for a year, but asked the Court to deny the motion to compel on these items on the ground of insufficient meet-and-confer. The same pattern of conduct is again at display here regarding the Sun Documents. On this issue, what Synopsys has done is inexcusable and sanctionable. For over a year, Synopsys withheld the Sun Documents with the aid of its brand of "rolling production," despite the fact that the documents were explicitly requested at the beginning of the case. Synopsys also repeatedly confirmed, at the end of its rolling production, that it had not withheld any responsive documents, until the specific issue of Sun Documents were raised. Even after that, instead of immediately producing the documents as they should have done if the nonproduction was due to inattention, Synopsys continued to make frivolous arguments and continued to attempt to delay the production. Now, after the motion to compel is filed, Synopsys of

course promised to produce the documents. Not only was it too late, but even now, more than three weeks after the promise, Synopsys still has not produced these documents. Synopsys cannot handle its discovery duty in such a willy-nilly fashion. It should be compelled to produce the Sun Document so that the parties do not come back to litigate the same issue again.

### B. Intel Should Be Compelled to Produce the Run Scripts and Other Documents

Regarding the Intel subpoena, Synopsys behaved like it had won a summary judgment to knock ALP out of the case, because it focused on the seemingly incredible claim that this case was only about DLP. Fortuitously for Synopsys, in the middle of Dynetix's writing this reply, this Court did grant the summary judgment on ALP. On that point, Dynetix is very surprised because ALP is an easier case than DLP for infringement, which was why the opposition to summary judgment was primarily focused on DLP. For ALP, the evidence is sufficient to defeat the summary judgment motion even based on the White Paper, which is the basis for the prima facie case set forth in the Infringement Contentions. In any event, Synopsys had no justification, unless it was clairvoyant as to what the Court would do, to justify blocking discovery on something that is clearly part of the Infringement Contentions.

With or without ALP, despite Intel's distorted description of what happened during the meet-and-confer, it is indisputable that Dynetix had patiently met-and-conferred with Intel for several months, from October 2012 to March 2013, and exhausted all possible ways to accommodate Intel, without getting a single piece of document from Intel. Intel spent much ink on why it was justified not to produce certain documents and why certain documents were not even requested. Intel, however, cannot deny the fact that the usage documents, especially the run scripts, were explicitly requested by the subpoena and repeatedly discussed during the meet-and-confer. Nor can Intel dispute the fact that the use data, including the run scripts and logs, hold the direct evidence on whether and how Intel uses VCS Multicore. The run scripts are a good example here because they are the ultimate evidence showing whether or not Intel uses the multicore switch "–parallel." If Intel indeed has not used the multicore, it should produce the scripts because they would exonerate it. On the other hand, despite Intel's denial, Dynetix should have the right to cross-examine Intel on that



PLAINTIFF'S REPLY ISO ITS THIRD MOTION TO COMPEL

1   denial by having the ultimate evidence showing the use of the multicore function.  It is difficult to see
2   why discovery can be denied on such direct evidence for an ultimate infringement issue.

3         There is no legitimate argument of overburden, either.  Despite Intel's claim that there are
4   over 10,000 users scattered all over the world, Intel, especially Mr. Maidment who is Intel's point
5   man regarding the subpoena, could have easily obtained the usage data from the Redacted by Lilaw, Inc.
6-9  [Redacted by Lilaw, Inc.]
10  according to Mr. Maidment.  Intel cannot claim that they are hard to locate, especially in
11  light of the fact that Redacted by Lilaw, Inc.
12  Similarly, it should not be much of a burden to Intel to find and copy the log files used by the
13  Redacted by Lilaw, Inc.  Thus, the Court should compel Intel to produce the use data associated with the
14  Redacted by Lilaw, Inc.

15        The Court should also compel Intel to produce the usage data stored on the Redacted by Lilaw, Inc.
16  Mr. Maidment could query Redacted by Lilaw, Inc from the comfort of his office.  There is no reason for Intel
17  to refuse to produce the license keys, the license logs, and the license usage records residing on the
18  Redacted by Lilaw, Inc.

19        The Court should also compel Intel to produce the Redacted by Lilaw, Inc.  Although Intel has
20  agreed to produce them in its opposition, there is no guarantee that Intel will indeed do that and do it
21  in a proper way, given the history of the matter.  An order is needed to ensure that the parties will not
22  return to this Court to again litigate this issue.

23        The Court further should compel Intel to attend another deposition.  Other than the issues
24  raised in the opening, such as improper preparation, there is a fundamental issue of right of
25  confrontation at stake.  Intel's current denial on the record will likely be played by Synopsys during
26  the trial to prove its nonuse.  Because of the complete lack of document production, Dynetix had no
27  effective way of cross-examining Intel on this issue during the deposition, which would result in
28  significant prejudice for Dynetix and which was caused by Intel's improper refusal to produce



responsive documents.  Thus, Intel should be compelled to sit for another deposition upon the production of the relevant documents.

## II.  REPLY TO SYNOPSYS'S OPPOSITION

### A.  Synopsys Has Behaved Inappropriately regarding the Withheld Emails

As discussed in detail in the opening brief, the motion to compel Synopsys to produce the withheld emails had been a long time in the making.  Dynetix started to meet and confer with Synopsys on these emails as early as January 3, 2013.  Li Decl. ¶ 2.  On February 14, 2013, the parties essentially had reached an impasse on the issue, although Mr. Yu was going to let Dynetix know "in one or two days to confirm [the] impasse so that [Dynetix] can move to compel."  Li Decl. Ex. 2 at 2 (item 6).  On February 19, Mr. Yu indeed confirmed the impasse, although he claimed that it would not be "appropriate for [Dynetix] to file a motion to compel without proposing replacement terms."  *Id.* at 3.  The impasse on the email issue is further confirmed by a letter from Dynetix on February 20, 2013, which states:

> You have refused to produce any of the documents containing the hit terms "Dasgupta" and "Goraya" for Adaikalsamy and the hit terms "Nvidia" and "Usha Gaira" for Peng. You have even refused to provide 10% random sampling of these hits. We have reached impasse on these issues through several conferences among us.  <u>But, as always, if you have a change of mind that can take the issue out of motion practice, we are here to listen.</u>

Li Reply Decl. Ex. A, p. 3 (item 6).

As shown by the above underlined text, even on February 20, 2013, Dynetix still left an opening for Synopsys to produce the emails to avoid the motion to compel.  In the time period of 23 days from February 20 to March 12, when the instant motion was filed, Synopsys did not do anything about the emails.   One day after the motion had been filed, however, Synopsys suddenly agreed to produce the emails and asked Dynetix to withdraw the motion.  *Id.* Ex. B.  Synopsys even had the audacity to threaten monetary sanction if Dynetix did not withdraw the motion.  This kind of stonewalling for no justifiable reasons should be sanctioned under Rule 37 of the Federal Rules of



Civil Procedure.[1]  Synopsys had ample opportunities and a lengthy period of time to do the right thing to obviate the motion, but chose not to.  Instead, it waited until after the motion had been filed with a great expense of time and resource to ask the Court to moot the motion.  This kind of litigation conduct has no place in the orderly administration of justice.  Synopsys, as one of the largest corporations in Silicon Valley, especially has no excuse for behaving so badly in the court of law.

Importantly, at this point, simply claiming to produce the emails should not moot the issue.  Given the past bad behavior of Synopsys on this matter, it is no guarantee that all of the emails will indeed be properly produced, without a court order and a threat of contempt.  Thus, Dynetix respectfully requests that the Court issue an order to compel the production of the emails at issue.

**B.    Synopsys Has Acted in Bad Faith to Withhold the Sun Documents**

As discussed in the opening brief, the Sun Documents were specifically requested early 2012, at the beginning of the case.  Li Decl. ¶ 5.  Sun Microsystems's name was even mentioned in one request for production.  *See* Mo. Attachment, Request 15.  Another request asks for all documents related to Dynetix's letter regarding the collaboration between Sun and Synopsys on the multithreaded simulator.  *Id.* at Request 10; Li Decl. Ex. 18 (the letter).  In its rolling production stretched for many months, Synopsys did not produce any of the Sun Documents.  In January 2013, in response to Dynetix's inquiry on whether Synopsys has withheld any responsive documents, Synopsys did not disclose that it was withholding all the Sun Documents.  Li Decl. ¶ 6.  In a letter on February 25, 2013, Dynetix directly confronted Synopsys regarding the fact that no Sun Documents had been produced.  *Id.* ¶ 7.  Only then did Synopsys's counsel admit that it had withheld the Sun Documents because "Synopsys has not identified Sun Microsystems as a potential user of the multicore features and, therefore, has not produced agreements with Sun Microsystems." *Id.* Ex. 5 at 1.

Not only did this action by Synopsys reflect how arbitrary and capricious its attitude is toward its discovery duty, but this claim was also in bad faith because Synopsys's own website shows a

---

[1] Dynetix understands that under the Civil Local Rules, Motion for Sanction must be filed as a separate motion.  To avoid further burdening the Court, Dynetix is not asking the Court to impose monetary sanction on Synopsys at this point. Dynetix, however, plans to ask the Court to impose evidentiary sanction before the trial.



1   video where Sun presented how it had used VCS Multicore to improve simulation performance. *See*

2   *http://www.synopsys.com/tools/verification/functionalverification/pages/vcs-dac09lunch.aspx*.

3   Recent production by Sun in response to a subpoena also revealed that the Sun-Synopsys

4   collaboration on VCS Multicore went all the way back to at least 2006 if not earlier. Thus, Synopsys

5   had no good faith basis to believe Sun had never used VCS Multicore and for that reason to withhold

6   the Sun Documents.

Further, when Dynetix's counsel pointed out that it was "highly improper" for Synopsys to withhold the Sun Documents for so long (*Id.* Ex. 6 at 2), rather than immediately producing these documents, Synopsys cavalierly said that "they [would] get back to [Dynetix]." *Id.* Ex. 6 at 1.

Again, Synopsys's conduct is sanctionable. It has no justifiable reason to withhold the Sun Documents, given the explicit requests for them and the obvious importance of the documents to the willfulness infringement issues. This conduct is an intentional obstruction of Dynetix's discovery.

At this point, although Synopsys has promised to produce the Sun Documents after this motion is filed, at the time of writing this Reply, these documents still have not been produced. It will take a considerable amount of time for Dynetix, after the documents are produced, to verify the production. Given the past bad faith withholding, it would not be a surprise that some crucial documents are still not forthcoming. Thus, a court order on this issue is necessary so that Dynetix does not have to re-litigate this issue again.

**C.    Synopsys Cannot Capriciously and Arbitrarily Limit the Discovery to DLP**

Synopsys's Opposition in support of Intel is based on a claim that the discovery in this case should be limited to DLP. This is a new theory that Synopsys has apparently come out with recently. This new theory again serves as a good example of how arbitrary and capricious Synopsys has been treating its discovery duty in this case. Both DLP and ALP were explicitly discussed in Dynetix's infringement disclosures. Before the Court, unexpectedly, granted the summary judgment on ALP, regardless of how Synopsys itself might think about the merits of Dynetix's case, it simply could limit discovery based on its own fancies.

Synopsys is wrong to say that "there is no infringement theory for the use of ALP on its own."



To the contrary, there is no fundamental difference between ALP and DLP, both of which involve a design where "the problem domain is partitioned into a number of partitions (or process objects); one or several objects for each processor." *See* Amin MSJ Decl.[2] Ex. 15 (PVCS White Paper) at 1. The reason that Dynetix's opposition focused on DLP was that DLP was where the controversy was. Just the White Paper alone establishes the prima facie case of ALP's infringement of the '898 patent. Unlike in DLP, where the contentions are on whether VCS automatically partitions the designs, ALP undisputedly partitions the problem domains (which are applications) automatically. *Id.* At 3 ("Partitioning for application-level parallel simulation is automatically done by the compiler."). This is why the controversy on autopartitioning in DLP was the focal point in DLP and in the summary judgment motion. Dr. Amin also discussed the automatic CPU detection and other features of the VCS runtime, which are used by both ALP and DLP. Amin MSJ Decl. ¶ 39. The White Paper alone provides sufficient disputed issues of facts as to the ALP issue. On this point, Dynetix will be filing a motion for reconsideration because, if the Court cannot even grant summary judgment on DLP, there should be no reason why summary judgment should be granted on ALP; the latter is an easier infringement case.

Importantly, throughout the meet-and-confer, not a single time did Intel argue that it is not producing documents because of the discovery being limited to DLP. Synopsys is thus trying to justify something that should never have been justified.

> **D.    Dynetix Has Good Cause to Question the Veracity of Intel's Denial of Its Use of VCS Multicore and to Demand Documents That Are Reasonably Calculated to Lead to Admissible Evidence Showing Intel's Use of VCS Multicore**

Synopsys and Intel are trying to block discovery based on their denials. If the defendants' denials can be a reason to deny discovery, discovery will seldom be allowed. To the contrary, under the liberal standard of discovery, factual disputes should be resolved in favor of disclosure, so that the facts may speak for themselves. *Spencer Sav. Bank v. Excell Mortg. Corp.*, 960 F. Supp. 835, 836 (D.N.J. 1997) ("Under Rule 26, there is a broad policy which favors full disclosure of facts during

---

[2] The Declaration of Minesh B. Amin, Ph.D., in Support of Plaintiffs' Consolidated Opposition to Defendant's Motions for Summary Judgment ("Amin MSJ Decl" hereinafter), which was filed under seal on December 14, 2012.

discovery.")

Synopsys has acted in direct contradiction to this basic principle of resolving a discovery dispute. It submitted a declaration from Mr. Dasgupta in an attempt to buttress Intel's denial of use of VCS Multicore. Whatever Intel and Synopsys may say to avoid liabilities, however, the claim that Intel never used DLP and seldom used ALP is simply not credible. It is established by Synopsys's own document that [Redacted by Lilaw, Inc.] Li Decl Ex. 29.

In a Milestone Agreement between Intel and Synopsys [Redacted by Lilaw, Inc.] Li Decl. Ex. 26 at 4. [Redacted by Lilaw, Inc.] *Id.* Ex. 25 (Maidment Dep.), 91:20-92:3. Thus, Dynetix has established the good cause to seek documentation to at once establish the substantive proof for direct infringement by Synopsys's customers and to impeach Intel's and Synopsys's credibility. Under the liberal standard of discovery, this Court should resolve the factual dispute as to whether Intel has used VCS Multicore by compelling the disclosure, so that the facts may speak for themselves.

### E.     Synopsys's Collateral Attacks Are as Baseless as They are Irrelevant

Synopsys spent much ink to characterize Dynetix's subpoena efforts as a harassment of Intel, simply because Intel denies its use of VCS Multicore. As discussed above, if Dynetix has the right to subpoena any third party, it would be Intel, which is the largest customer of VCS and for which the multicore was custom tuned.

Synopsys characterizes Dynetix's efforts as collecting evidence for a new case against the customers. Synopsys is misinterpreting the facts. There is no secret that Dynetix intends to sue the customers. There is no secret either that Dynetix has asked the Court to allow the evidence produced in this case to be used in the new case. But that has nothing to do with the urgent matter in this case where Dynetix is trying to collect the evidence of direct infringement for the method claims where Synopsys is being accused of induced infringement. To the extent that the parties have spent time

and effort collecting evidence in this case, the evidence should be applied in the new case for the purpose of judicial economy.  That, however, does not mean that Dynetix should waste its precious discovery time to collect evidence simply for the future use.  It would indeed be a foolish thing to do because Dynetix would have plenty of time to collect such evidence directly from Intel in the future case when Intel is sued and appears as a party.  No reasonable trial lawyer would try to collect evidence from a third party when it can collect the same evidence directly from a party.  Synopsys's argument, while finding no support in facts, is also illogical.

Synopsys baselessly claimed that "Dynetix recently admitted that the deposition was taken for the primary purpose of investigating a new theory based on the 'Partition Compile' feature of VCS." It is indeed an absolute misrepresentation to say that because anybody could see that is not the case by simply reading the deposition transcripts that Dynetix has submitted to support this motion.  Li Decl. Ex. 25.  Partition Compile was only a small portion of the six hour deposition.  Dynetix does have the right to investigate this feature because, as discussed in its motion for leave to amend infringement contentions, this feature is in fact included in the current infringement contentions.

### F.  Dynetix Is Compelling Intel to Produce Information About Its Own Use of VCS

Contrary to Synopsys's and Intel's allegation that Dynetix is forcing Intel to produce cumulative information, nothing that is the subject of the motion to compel is in any way cumulative to anything that Synopsys has produced.  These use-related documents are reasonably calculated to lead to admissible evidence about the extent of Intel's use of VCS Multicore.  As Synopsys argued strenuously to the Court during the hearing for its summary judgment motions, this kind of evidence can only come from Intel, not Synopsys.  Synopsys's behavior on this aspect is a fine example of an obstructionist's operational manual: While arguing to the Court that Dynetix must lose the case without the customer use information, Synopsys uses all its might to collude with the customers to deny Dynetix of such evidence.

The fact is just opposite to Synopsys's claim of cumulativeness.  All the documents that Dynetix is compelling Intel to produce, such as the use-related documents, are created by Intel, and only Intel could produce them.  Some of the evidence, such as the run scripts, will most definitively



9                           Case No. CV11-05973 PSG
PLAINTIFF'S REPLY ISO ITS THIRD MOTION TO COMPEL

prove the extent of Intel's use of the VCS Multicore.  If Intel uses the multicore, at least some of the run scripts will have the multicore switch "-parallel."  Amin Decl. ¶ 3.  The cumulative argument is thus misplaced.

### III.   REPLY TO INTEL'S OPPOSITION

In its Opposition, Intel essentially made three major arguments: (1) it should not produce any documents because it never used VCS Multicore; (2) the documents at issue were not properly met and conferred; and (3) the production of such documents are overly burdensome.  These arguments are inapposite.

#### A.   Intel's Denial Should Not Block Discovery

Like discussed in the reply to Synopsys's opposition, a party's denial of a fact should never be a reason to deny discovery, based on the liberal discovery rules in favor of disclosure.  If Intel truly believes that it did not use the multicore, it should produce the use data to prove it.  To the contrary, Dynetix has presented evidence that Redacted by Lilaw, Inc. Li Decl Ex. 29.  Dynetix thus has the good cause to collect evidence from Intel, both for substantive proof and for impeachment.

One category of evidence is particularly pertinent.  The use data, especially the run scripts, bear direct proof of whether or not Intel has used the multicore option of VCS. Redacted by Lilaw, Inc. Amin Decl. ¶ 3.

Intel faults Dynetix for not staying the subpoena until the Court rules on the summary judgment motions.  Dynetix, however, acted properly, especially given the fact that Synopsys has tried and failed to shut down the customer discovery before.  Dynetix does not believe that Synopsys's summary judgment motions have any merits.  Dynetix cannot simply wait and waste away time as the discovery deadline is fast approaching.  It is very difficult to see how Dynetix's conduct can be viewed as abusive under these circumstances.

To be sure, Dynetix is not going after some trivial evidence.  It is trying to obtain the evidence of direct infringement for Synopsys's induced infringement liability, from the largest customer of



VCS. If Dynetix easily gives up on this pursuit, it might as well fold its case. This is one of the most basic rights of a litigant, especially in light of the denial by Intel, because otherwise Dynetix would have no effective way to cross-examine Intel and Synopsys.

### B. Dynetix Has Fully Met and Conferred with Intel

Dynetix spent several months to patiently meet and confer with Intel over the subpoena served on October 3, 2012. Li Decl. Ex. 7. Intel's opposition, however, makes it appear that Dynetix's meet-and-confer was nothing but a harassing act of insisting that Intel go through 10,000 users' personal computers to collect data. Intel has distorted the fact. In response to Intel's main excuse that it could not collect any use data as they were scattered among over 10,000 users, Dynetix suggested a 10% random sampling, which Intel rejected. At that point, Dynetix was in the dark as to what are the possible ways to limit the requests. Later, as revealed by the Intel deposition and presented in the opening brief, Intel was willfully ignoring the obvious way of collecting at least a significant portion of the responsive files without undue burden, i.e., [Redacted by Lilaw, Inc.] Intel did not need to go through all the troubles to collect documents globally because [Redacted by Lilaw, Inc.] [Redacted by Lilaw, Inc.], which is located in Hillsborough, Oregon where Mr. Maidment is based. Li Decl. Ex. 25, 53:1-5; 54:23-55:1. Mr. Maidment at least should have collected the use data for the Haswell project, which would not involve collecting random use data from users across the globe. Mr. Maidment knew very well that [Redacted by Lilaw, Inc.]" (*id.* at 54:15-18). Thus, the discussion about the "over 10,000 users" was entirely a smoke screen set up by Intel during the meet-and-confer. It was in response to that smoke screen that Dynetix attempted to alleviate Intel's burden, by suggesting various ways of dealing with it, including a 10% random sampling. The "over 10,000 users" argument should never have even come out because the most relevant documents sat right under the nose of Mr. Maidment, Intel's point man in Dynetix's subpoena. Although Intel's counsel now denies the proposal of 10% sampling, this debate should not change the fact that, contrary to Intel's accusation of harassment, Dynetix was patient and reasonable during the meet-and-confer and focused on the proper way of obtaining important evidence.



PLAINTIFF'S REPLY ISO ITS THIRD MOTION TO COMPEL

It is now clear that, other than the use data, Mr. Maidment should have easily collected other documents at issue in the instant motion. For example, he testified about Redacted by Lilaw, Inc. Redacted by Lilaw, Inc. Even Intel has to admit that it should have produced the presentations, but blamed Dynetix for not specifically asking for them. It is not clear how Dynetix might have specifically asked for the TUG presentations without first learning of them from the deposition. These are the kind of documents that are obviously responsive to the subpoena and obviously within the knowledge of Mr. Maidment. If Mr. Maidment pretends they do not exist, the subpoena process would certainly fall apart. The subpoenaing party either goes away quietly, which probably has happened many times before when Intel was subpoenaed, or has to go through the trouble of deposition and a motion to compel in order to discover and obtain these documents, as Dynetix is doing here. In contrast, if Mr. Maidment and Intel were even somewhat serious about their duty under the subpoena, all parties involved would have been much better off in terms of the amount of efforts they had to spend in this whole matter. Thus, contrary to what Intel claims in its Opposition, it was Intel, not Dynetix, which has unnecessarily complicated the subpoena process.

Intel also incredibly claims that even the use data (i.e., the logs and run scripts) were not properly requested. To the contrary, the subpoena explicitly requests the use data and specifically mentions the run scripts. See Li Decl. ¶ 7 (document requests 4 and 5). A substantial amount of time of the parties' meet-and-confer was indeed spent on discussing the use data issues. Li Decl. ¶ 11.

Intel's lengthy description regarding limiting the discovery to DLP and ALP is either true or material. Intel's counsel misunderstood the explanation of the VCS Multicore features, as including DLP and ALP, as limiting the search to ALP and DLP, which was later repeatedly explained to counsel. In any event, the real issue is not whether Intel's conduct is justified if the scope is limited to ALP and DLP. That has never been an issue. Intel's conduct is not justified even if the discovery is strictly limited ALP and DLP.



### C. The Document Production at Issue Involves only Reasonable Efforts

At this point, with the aid of the deposition, Dynetix has narrowed its demand for the use data on Redacted by Lilaw, Inc. It should not be overly burdensome for Intel to collect all the use data of the Redacted by Lilaw, Inc., including the records of usage, the run scripts (which include scripts that are only for the compilation stage of the simulation), and the run logs. The data should be all in one location, i.e., Redacted by Lilaw, Inc. Especially for the scripts, there should be no problem of locating them and producing them because they are placed Redacted by Lilaw, Inc. Li Decl. Ex. 25 at 168:9-17. The scripts contain no confidential information of Intel; they are VCS commands that are Synopsys's secrets, which are squarely at issue in this case. Although the log files may reveal some design information of Intel, there is nothing that cannot be properly protected by the existing Protective Order. The data are potentially highly relevant, given the high likelihood that Redacted by Lilaw, Inc.

While even Intel did not contend any undue burden for producing the scripts, it argued that the log files, even for six months of time, would be voluminous. At this point, Dynetix is only asking for Redacted by Lilaw, Inc., which should not be as voluminous as Intel claims for the entire company. Dynetix is also willing to take a 10% random sampling of these log files if necessary.

The license server data, including license keys, use statistics, and license server logs, are located on Redacted by Lilaw, Inc. Li Decl. Ex. 25 at 75:1-6; 131-132.

Given the high relevancy of the documents at issue and the relevantly low burden of producing them, the Court should compel Intel to produce these documents.

### D. Intel Should Be Compelled to Attend Another Deposition

Because of Intel's improper resistance to document production, Dynetix has to spend most of its deposition time inquiring the whereabouts of the responsive documents that Intel withheld. Dynetix also has no effective way of cross-examining Intel without any documentation. For example, at the end of the deposition, Synopsys allows Mr. Maidment to state that Intel does not use VCS Multicore, which is very likely an inaccurate statement. However, without any documents produced by Intel, Dynetix has no way to effectively cross-examine Mr. Maidment and impeach his

credibility or contradict his testimony. Therefore, a new deposition of Intel should be ordered due to Intel's withholding of the highly relevant documents, so that Dynetix can have some realistic chance of cross-examining Intel.

DATED:  April 4, 2013, 2013   LILAW INC.
ATTORNEYS FOR PLAINTIFF DYNETIX DESIGN SOLUTIONS, INC.

By   /s/ J. James Li
J. James Li, Ph.D.

