CHRIS R. OTTENWELLER (STATE BAR NO. 73649)
cottenweller@orrick.com
I. NEEL CHATTERJEE (STATE BAR NO. 173985)
nchatterjee@orrick.com
JASON K. YU (STATE BAR NO. 274215)
jasonyu@orrick.com
ANDREW S. ONG (STATE BAR NO. 267889)
aong@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
1000 Marsh Road
Menlo Park, California 94025
Telephone:    +1-650-614-7400
Facsimile:    +1-650-614-7401

BENJAMIN J. HOFILEÑA (STATE BAR NO. 227117)
bhofilena@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
777 South Figueroa Street Suite 3200
Los Angeles, California  90017
Telephone:    +1-213-629-2020
Facsimile:    +1-213-612-2499

Attorneys for Defendant and Counterclaimant
SYNOPSYS, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DYNETIX DESIGN SOLUTIONS, INC., a California corporation,<br><br>Plaintiff,<br><br>v.<br><br>SYNOPSYS, INC., a Delaware corporation, and DOES 1-50,<br><br>Defendant. | Case No. 5:11-cv-05973-PSG<br><br>**DEFENDANT SYNOPSYS, INC.'S NOTICE OF MOTION AND MOTION TO EXCLUDE OPINIONS AND TESTIMONY OF PLAINTIFF'S DAMAGES EXPERT**<br><br>Date:      July 30, 2013<br>Time:      10:00 a.m.<br>Court:     5<br>Judge:    Honorable Paul S. Grewal |
| SYNOPSYS, INC., a Delaware corporation,<br><br>Counterclaim Plaintiff,<br><br>v.<br><br>DYNETIX DESIGN SOLUTIONS, INC., a California corporation,<br><br>Counterclaim Defendant. | |

**TABLE OF CONTENTS**

Page

NOTICE OF MOTION AND MOTION .................................................................................. 1

MEMORANDUM OF POINTS AND AUTHORITIES ............................................................ 1

I.      INTRODUCTION .................................................................................................. 1

II.     BACKGROUND .................................................................................................... 2

        A.      Dr. Black's Royalty Rate Analysis Is Arbitrary.................................... 2

        B.      VCS Has Many Non-Accused Features ................................................. 3

        C.      Dr. Black Performed No Apportionment Between DLP And Non-
                Infringing Features ............................................................................... 4

        D.      Dr. Black Relies On Irrelevant Agreements ........................................ 6

III.    LEGAL STANDARD ............................................................................................ 7

IV.     ARGUMENT .......................................................................................................... 8

        A.      Dr. Black's Starting Royalty Rate Based On A 50% Split Of The Gross
                Profit Margin Is Arbitrary ................................................................... 8

        B.      Dr. Black Failed To Apportion Between The Allegedly Infringing Feature
                And The Many Non-Infringing Features ............................................ 10

        C.      Dr. Black Violated Federal Circuit Law By Relying On Non-Comparable
                Agreements ......................................................................................... 13

V.      CONCLUSION .................................................................................................... 15

1

## TABLE OF AUTHORITIES

**Page(s)**

2

3

**Cases**

4

*Cooper v. Brown,*
    510 F.3d 870 (9th Cir. 2007)...................................................................................... 8

5

*Daubert v. Merrell Dow Pharmaceuticals, Inc.,*
    509 U.S.579 (1993) ............................................................................................... 7, 8

6

7

*Fresenius USA, Inc. v. Baxter Int'l, Inc.,*
    No. C 03-1431 PJH, 2012 WL 761712 (N.D. Cal. Mar. 8, 2012) ......................... 13

8

9

*Kumho Tire Co., Ltd. v. Carmichael,*
    526 U.S. 137 (1999) .................................................................................................. 7

10

*LaserDynamics, Inc. v. Quanta Computer, Inc.,*
    694 F.3d 51 (Fed. Cir. 2012)...................................................................... 2, 11, 12

11

12

*Lucent Techs., Inc. v. Gateway, Inc.,*
    580 F.3d 1301 (Fed. Cir. 2009)....................................................................... *passim*

13

14

*Oracle Am., Inc. v. Google Inc.,*
    798 F. Supp. 2d 1111 (N.D. Cal. 2011) ................................................................... 9

15

*Oracle Am., Inc. v. Google Inc.,*
    No. C 10-03561 WHA, 2011 WL 6055505 (N.D. Cal. Dec. 6, 2011)................... 13

16

17

*ResQNet.com, Inc. v. Lansa, Inc.,*
    594 F.3d 860 (Fed. Cir. 2010)........................................................................ 2, 7, 13

18

19

*Suffolk Techs. LLC v. AOL Inc.,*
    No. 1:12-cv-00625-TSE-IDD, Dkt. No. 518 at 4-5 (E.D. Va. Apr. 12, 2013) ....... 9

20

*Uniloc USA, Inc. v. Microsoft Corporation,*
    632 F.3d 1292 (Fed. Cir. 2011)........................................................................ *passim*

21

22

*United States v. Freeman,*
    498 F.3d 893 (9th Cir. 2007)..................................................................................... 7

23

**Federal Rules**

24

Federal Rule of Evidence 702 ........................................................................................ 7

25

26

27

28

1

## NOTICE OF MOTION AND MOTION

2          PLEASE TAKE NOTICE that on July 30, 2013, at 10:00 a.m., or as soon as the matter

3    may be heard thereafter, in the San Jose Courthouse, 280 South 1st Street, San Jose, California

4    95113, Floor 4, Courtroom 5, before the Honorable Paul S. Grewal, Defendant Synopsys, Inc.

5    ("Synopsys") will move to exclude the opinions and testimony of Plaintiff Dynetix Design

6    Solutions, Inc.'s ("Dynetix") damages expert, William H. Black, as irrelevant and unreliable

7    under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S.

8    579 (1993).

9          This motion is supported by the attached Memorandum of Points and Authorities, the

10   Declaration of Benjamin Hofileña ("Hofileña Decl."), all pleadings and papers which are of

11   record and are on file in this case, and on such other oral and documentary evidence as may be

12   presented at the hearing of this motion.

13

14   Dated: June 25, 2013                    Respectfully submitted,

15                                           CHRIS R. OTTENWELLER
                                             I. NEEL CHATTERJEE
16                                           BENJAMIN J. HOFILEÑA
                                             JASON K. YU
17                                           ANDREW S. ONG
                                             Orrick, Herrington & Sutcliffe LLP
18

19
                                             By: _____/s/ *Chris R. Ottenweller*_____
20                                               CHRIS R. OTTENWELLER
                                                   Attorneys for Defendant
21                                                 SYNOPSYS, INC.

22

23

24

25

26

27

28

DEFENDANT SYNOPSYS, INC.'S MOTION TO
EXCLUDE PLAINTIFF'S DAMAGES EXPERT
5:11-CV-05973-PSG

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.      INTRODUCTION**

The arbitrary and fundamentally flawed opinions of Dynetix's damages expert, Dr. William H. Black, should be excluded because they are inherently unreliable.  Only one feature remains at issue in this case—Design-Level Parallelism (DLP), an optional feature that exists among many non-accused features in Synopsys's VCS product.  There is no evidence that DLP drives demand for VCS.  Yet Dr. Black opines that if infringement is established, Synopsys should pay $117 million in damages, which he calculates by applying (1) an exorbitant 14.25% royalty rate, (2) against *all* VCS revenues (no apportionment), (3) going back to 2006, three years before DLP was even released.

Dr. Black's opinions are arbitrary and violate at least three established principles of Federal Circuit law.  First, Dr. Black assumes—without tying the assumption to any facts—that in a hypothetical negotiation the parties would adopt as a "starting point" a royalty rate that is 50% of Synopsys's gross profit margin.  Dr. Black then adjusts this starting point, up and down, by more arbitrary adjustments under the guise of applying the *Georgia-Pacific* factors.  In *Uniloc USA, Inc. v. Microsoft Corporation*, 632 F.3d 1292 (Fed. Cir. 2011), the Federal Circuit rejected the 25% rule of thumb under which damages experts would assume as a starting point that the accused infringer would pay 25% of its expected profits for the allegedly infringing product.  Deeming the 25% rule of thumb "fundamentally flawed," the Federal Circuit held that it has no place in a damages analysis.  *Id*. at 1315.  Dr. Black's rule of thumb—that the parties would start at 50% of the VCS profit margin—is even more extreme and indefensible than the rejected 25% rule.

After adjusting the starting point, Dr. Black settled on a royalty rate of 14.25%, a rate he could not justify under any patent license agreement.  He applied this 14.25% rate to all VCS revenues from 2006 to 2012, without making any attempt to apportion between DLP and the many non-infringing features in VCS.  He presented no evidence that DLP drives demand for VCS.  Even Dr. Black acknowledged the flaw in his approach, conceding in deposition "you should not collect damages on technology that doesn't infringe."  *See* Hofileña Decl. Ex. B

1  ("Black Dep") at 186:22-24.  Yet that is exactly what Dynetix is attempting to do through its non-

2  apportionment – to collect damages on non-infringing technology.  Such an approach violates

3  established Federal Circuit law.  *See*, *e.g.*, *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301

4  (Fed. Cir. 2009); *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51 (Fed. Cir. 2012).

5          Finally, Dr. Black's opinions violate the Federal Circuit's holding in *ResQNet.com, Inc. v.*

6  *Lansa, Inc.*, 594 F.3d 860 (Fed. Cir. 2010), that a damages expert may not rely on agreements that

7  have no relationship to the claimed invention.  Dr. Black cited no patent license agreement to

8  support his 14.25% royalty rate.  Instead, he relied on two non-patent transactional agreements,

9  one involving an OEM purchase of software and the other involving the license and transfer of a

10  software business line.  Neither agreement represents anything remotely comparable to the

11  hypothetical negotiation between Dynetix and Synopsys.

12          Dr. Black's damages opinions are unreliable and impermissible under controlling law.  In

13  the exercise of its gatekeeping responsibilities, the Court should strike and exclude them.

14  **II.      BACKGROUND**

15          Dynetix served Dr. Black's damages report on May 3, 2013.  In that report Dr. Black

16  opines that the reasonable royalty rate in this case should be 14.25%, and the royalty base should

17  be all VCS revenues from 2006 through 2012.  Applying the royalty rate to the royalty base, Dr.

18  Black arrives at a damages number of $156 million.  He allocates 75% of that to DLP and 25% to

19  ALP, in the hopes that ALP will later be reinserted in the case.

20          **A.      Dr. Black's Royalty Rate Analysis Is Arbitrary.**

21          Dr. Black's royalty rate analysis begins by assuming that, in a hypothetical negotiation

22  between Dynetix and Synopsys, the parties would adopt as a "starting point" a rate representing

23  one-half of Synopsys's gross profit margin.  The report states:  "One reasonable starting point for

24  a reasonable royalty rate is half of the gross margin of the infringing products."  Hofileña Decl.,

25  Ex. A ("Black Rept.), ¶ 24.  The gross profit margin for all Synopsys products in 2006, when Dr.

26  Black assumed the hypothetical negotiation would occur, was 76%; thus, Dr. Black opined that

27  "the starting point for rate assessment should be 38%."  *Id*., ¶ 27.

28

The entire "basis" for Dr. Black's opinion is set forth in a single conclusory paragraph that does not mention a single fact in the record of this case:

> 24.     One reasonable starting point for a reasonable royalty rate is half of the gross margin of the infringing products …. If two parties get together to discuss the royalty rate, assuming the making and selling of a product of one party infringes the other party's patent, one reasonable starting point for the licensing rate is to divide the gross margin of the product between the parties. Of course, this is just a starting point of the assessment. This starting rate will be enhanced or reduced according to further analysis based on other factors. Thus, I start the rate assessment by first looking at the gross margin of VCS.[1]

*Id.*   ¶ 24. Dr. Black cites no facts peculiar to this case to justify his 50% split of the gross profit margin.

Dr. Black then proceeds to adjust the 38% starting royalty rate up or down under the guise of analyzing the *Georgia-Pacific* factors. *Id.*, ¶ 27 ("[t]his rate is then modified by the 15 *Georgia-Pacific* factors"). Dr. Black makes three adjustments, each time adjusting the royalty rate by 50%. First, Dr. Black notes that, because the parties would have negotiated a non-exclusive license, the parties would have agreed to a 50% decrease in the royalty from 38% to 19%. *Id.*, ¶ 58. Next, Dr. Black notes that, due to the unsuccessful nature of Dynetix's own logic simulation product, the parties would "be willing to reduce the rate further by half, from 19% to 9.5%." *Id.*, ¶ 59. Finally, Dr. Black states that the parties would agree to increase the rate by 50% (from 9.5% to 14.25%) because of "the value of the parallel simulation technology of the patent." *Id.*, ¶ 60. Dr. Black did not base the use of 50% on facts peculiar to the case. When asked in deposition why each adjustment was 50%, he explained that he used a midpoint because he lacked information. *See* Hofileña Decl., Ex. B ("Black Dep.") at 95:16-18 ("[t]he neutral position, the midpoint, is appropriate when you don't have sufficient information to weight it one way or the other").

**B.      VCS Has Many Non-Accused Features.**

VCS is a large complex software product that is dominated by many non-accused features. *See* Hofileña Decl., Ex. C (VCS/VCSi User Guide Table of Contents); Ex. D (2010 VCS

---

[1] While Dr. Black states that he will begin his "rate assessment by first looking at the gross margin of VCS," he uses the gross margin of Synopsys as a company. *See* Black Rept., ¶¶ 24-27.

1  presentation) at SYN-DLIT-0104030; Ex. E (Apr. 26, 2013 Dep. of John Girard) at 20:12-16

2  ("we support VCS.  So any feature that VCS has, we support.[  ]There's -- there's hundreds of

3  features").  In performing his damages analysis, Dr. Black recognized that there are many non-

4  infringing features in VCS.  *See* Black Dep. at 64:20-23 ("Q.  But you understand that there are

5  many features in VCS that are not accused of infringing by Dynetix, correct?  A.  Yes").

6       DLP is a minor—and optional—feature.  It is a "Limited Customer Availability" ("LCA")

7  feature, which means that it was added to the software on an experimental basis to see if it would

8  garner customer support.  *See* Hofileña Decl., Ex. F (VCS/VCSi LCA Features) at SYN-DLIT-

9  0002460; Ex. G (LCA feature release process) at SYN-DLIT-0265855.  An LCA feature can

10 transition to a "General Availability" feature, one that is a standard feature in VCS, if it receives

11 positive feedback from at least five customers.  *Id.*, Ex. H (VCS/VCS MX – New Beta and LCA

12 Policy) at SYN-DLIT-0265874.  DLP has not achieved this threshold and thus remains a LCA

13 feature four years after it was released.  Notably, Dr. Black was not even aware that DLP is an

14 LCA feature.  Black Dep. at 71:2-4 ("Q.  'LCA features in this release.'  Do you know what

15 'LCA' refers to?  A.  No").  DLP is seldom used, if at all, by Synopsys's customers.  Several of

16 Synopsys's largest customers have provided sworn statements that they do not use—and have

17 never used—DLP in their design and production processes.  *See* Hofileña Decl., Ex. I (Dep. of

18 Intel) at 247:2-23; Ex. J (Decl. of Uday Kapoor (Oracle)), ¶¶ 6-7; Ex. K (Decl. of Daniel Smith

19 (NVIDIA)), ¶¶ 3-4; Ex. L (Decl. of Saket Goyal (LSI)), ¶¶ 4-5.

**C.  Dr. Black Performed No Apportionment Between DLP And Non-Infringing Features.**

20
21       Dr. Black performed no apportionment between DLP and the numerous other VCS

22 features that are not accused of infringement.  The only allocation he performed was between

23 DLP and ALP, opining that of the total damages of $156 million, DLP would account for 75% of

24 that amount.  *See* Black Rept., ¶ 61.  He simply applied his 14.25% royalty rate to the revenues

25 for VCS from 2006 through 2012, ignoring the significant volume of non-accused features.  *Id.*,

26 ¶¶ 20-21.  As Dr. Black stated, "*I have not done an apportionment of contribution from VCS -- or*

27
28

*of VCS sales from DLP and non-infringing components.*  That analysis is not in [my expert

report]."  Black Dep. at 63:20-23 (emphasis added).

Nor did Dr. Black present any evidence that DLP drives consumer demand for VCS.  Not

only is his report silent on the point, but Dr. Black acknowledged a complete lack of interest in

whether any customers have ever used DLP:

> [Q.]  So whether or not DLP is used by customers does not in any way factor
>       into your opinion that Synopsys should pay over $100 million in damages;
>       is that what you're saying?
>
> A.    That -- I think I've said that already.  Yes.
>
>               *       *       *
>
> Q.    Would that make a difference to you whether Intel does or does not use
>       DLP?
>
> A.    No.
>
> Q.    Would it make a difference to you whether Sun Microsystem, now part of
>       Oracle, does or does not use DLP?
>
> A.    No.
>
> Q.    Or whether NVIDIA uses DLP?
>
> A.    No.

*Id.* at 67:12-17; 145:18-146:1.

At deposition, Dr. Black recognized that his failure to apportion has no basis in logic or

law.  When asked why he made an allocation between DLP and ALP he answered:  "If that

component, the ALP component, is not infringing, then you would not pay the hypothetical

royalty on those non-infringing sales."  *Id.* at 185:20-186:10.  Dr. Black implicitly conceded that

his damages opinions are overly inflated because he made no attempt to apportion between DLP

and non-accused features:

> Q.    Alright.  So the theory here in your analysis of DLP and ALP is that
>       Synopsys should not have to pay damages for non-infringing technology,
>       correct?
>
> A.    Yes.
>
> Q.    And if the holdings hold true in the case that ALP is a non-infringing
>       technology, Synopsys should not have to pay for that, correct?
>
> A.    That's what my calculations say, yes.

Q.     And, of course, that would apply to other non-infringing technology, correct?

A.     If there is any non-infringing technology, you don't – you should not collect damages on technology that doesn't infringe.

*Id.* at 186:11-24.

### D.     Dr. Black Relies On Irrelevant Agreements.

Dr. Black cited no patent license agreement to support his 14.25% royalty rate. *See* Black Rept., ¶¶ 22-23. To support his royalty rate, he refers to only two agreements, an OEM Sales Agreement between Synopsys and ViewLogic and a business transaction between Agilent Technologies and Ansoft Corporation. *Id.*, ¶ 23. Dr. Black asserts that the Synopsys-ViewLogic Agreement reflects "a royalty rate of 70% on gross sales." *Id*. He characterizes the Agilent-Ansoft Agreement as reflecting "a royalty rate of 75% of after-tax revenue." Both characterizations are grossly inaccurate and misleading.

Under the Synopsys-ViewLogic Agreement, ViewLogic was appointed an OEM reseller for Synopsys software. The 70% royalty that Dr. Black refers to is in fact the purchase price for the software ViewLogic agreed to resell— ViewLogic would pay 70% of the list price of the software. *See* Black Rept., Ex. D (Synopsys-Viewlogic Agreement) at 19. It was not until confronted in deposition that Dr. Black admitted that the Synopsys-ViewLogic agreement is not a patent license agreement and the 70% rate referenced in his report is not a patent royalty rate:

Q.     The agreement between Synopsys and Viewlogic is not a patent license agreement; is it?

A.     No.

Q.     And it does not contain any information in it on a patent license royalty; does it?

A.     Not that I recall.

Black Dep. at 111:21-112:1.

The Agilent-Ansoft Agreement is also not a patent license agreement. Dr. Black also confirmed this at his deposition:

Q.     And the agreement between Agilent and Ansoft is not a patent license agreement; is it?

A.     I don't think so, no.

Q.     And it has no information in it bearing on a patent license royalty; does it?

A.     No.

*Id.* at 112:2-6.  Rather, Agilent agreed to transfer a business line of software to Ansoft.  *See* Black Rept., Ex. E (Agilent-Ansoft Agreement) at 1.  What Dr. Black refers to in his report as a "royalty rate of 75% of after-tax revenue" is in fact a temporary revenue sharing split for orders during the transition of customers to Ansoft.  Ansoft would keep 75% of the revenue and Agilent would take 25%.  *Id.*, § 2.13.  This revenue sharing split lasted for only 1.5 months.  *Id.*

## III.     LEGAL STANDARD

Federal Rule of Evidence 702 imposes a "basic gatekeeping obligation" on district courts to "ensure that any and all scientific testimony"—including testimony based on "technical or other specialized knowledge"—"is not only relevant, but reliable."  *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993); *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999); *United States v. Freeman*, 498 F.3d 893, 901 (9th Cir. 2007).  The district court's gatekeeping function is important to make certain that an expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."  *Kumho Tire*, 526 U.S. at 152.  As part of this gatekeeping function, district courts must ensure that a damages expert's reasonable royalty opinion is sufficiently "tied to the relevant facts and circumstances of the particular case at issue and the hypothetical negotiations that would have taken place in light of those facts and circumstances at the relevant time."  *Uniloc*, 632 F.3d at 1318; *see also Daubert*, 509 U.S. at 591 ("An additional consideration under Rule 702—and another aspect of relevancy—is whether expert testimony proffered in the case is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute") (citation omitted).  Evidence of a reasonable royalty rate relying on a general rule of thumb, such as the 25 percent rule of thumb, is "inadmissible under *Daubert* and the Federal Rules of Evidence, because it fails to tie a reasonable royalty base to the facts of the case at issue."  *Uniloc*, 632 F.3d at 1315.  Thus, "[t]o be admissible, expert testimony opining on a reasonable royalty rate must 'carefully tie proof of damages to the claimed invention's footprint in the market place.'"  *Id.* at 1317 (quoting *ResQNet*, 594 F.3d at 869).  The proponent of expert

testimony bears the burden of proving its admissibility. *See Cooper v. Brown*, 510 F.3d 870, 942 (9th Cir. 2007).

## IV.    ARGUMENT

### A.    Dr. Black's Starting Royalty Rate Based On A 50% Split Of The Gross Profit Margin Is Arbitrary.

Dr. Black's assumption that a reasonable starting point for the Dynetix-Synopsys hypothetical negotiation is one half of Synopsys's gross profit margin violates Federal Circuit law.  In *Uniloc USA, Inc. v. Microsoft Corp.,* 632 F.3d at 1292, the Federal Circuit struck down the 25% rule of thumb that patent damages experts had widely used in calculating a reasonable royalty.  The 25% rule of thumb assumes that the patent owner and accused infringer, in their hypothetical negotiation, would start with the assumption that the accused infringer would pay to the patent owner 25% of the expected profits for the accused product.  The Federal Circuit noted several key criticisms of the 25% rule: (1) "it fails to account for the unique relationship between the patent and the accused product," (2) "it fails to account for the unique relationship between the parties," and (3) "the rule is essentially arbitrary and does not fit within the model of the hypothetical negotiation within which it is based." *Id.* at 1313 (citations omitted).

The *Uniloc* court held "as a matter of Federal Circuit law that the 25 percent rule of thumb is a fundamentally flawed tool for determining a baseline royalty rate in a hypothetical negotiation.  Evidence relying on the 25 percent rule of thumb is thus inadmissible under *Daubert* and the Federal Rules of Evidence, because it fails to tie a reasonable royalty base to the facts of the case at issue." *Id.* at 1315.  The Federal Circuit then stated:

> [T]here must be a basis in fact to associate the royalty rates used in prior licenses to the particular hypothetical negotiation at issue in the case.  The 25 percent rule of thumb as an abstract and largely theoretical construct fails to satisfy this fundamental requirement.  The rule does not say anything about a particular hypothetical negotiation or reasonable royalty involving any particular technology, industry, or party.

*Id.* at 1317.

The Federal Circuit expressly addressed the issue of whether an expert's opinion can be saved if he or she adjusts the 25% rule—up or down—based on the *Georgia-Pacific* factors.  The

Federal Circuit held such adjustments do not cure the fundamental flaw of the starting point: "It is of no moment that the 25 percent rule of thumb is offered merely as a starting point to which the *Georgia–Pacific* factors are then applied to bring the rate up or down.  Beginning from a fundamentally flawed premise and adjusting it based on legitimate considerations specific to the facts of the case nevertheless results in a fundamentally flawed conclusion." *Id.* at 1317.

Subsequent to *Uniloc*, several courts have addressed, and rejected, another general rule of thumb known as the Nash Bargaining Solution.  This rule of thumb reflects an assumption that in a hypothetical negotiation the accused infringer would be willing to pay 50% of the incremental profits on the accused product to the patent owner.  Courts have excluded damages opinions based on this assumption.  *See Oracle Am., Inc. v. Google Inc.*, 798 F. Supp. 2d 1111, 1120 (N.D. Cal. 2011) ("[t]he Nash bargaining solution would invite a miscarriage of justice by clothing a fifty-percent assumption in an impenetrable facade of mathematics"); *Suffolk Techs. LLC v. AOL Inc.*, No. 1:12-cv-00625-TSE-IDD, Dkt. No. 518 at 4-5 (E.D. Va. Apr. 12, 2013) (noting that the Nash Bargaining Solution's 50/50 rule "is indistinguishable from the 25% rule of thumb in issue in *Uniloc*, and accordingly, Dr. Weinstein's expert report must be excluded").[2]

Dr. Black's 50% rule of thumb is improper under *Uniloc* and its progeny.  If anything, it is even more extreme and arbitrary than the 25% rule the Federal Circuit rejected.  Dr. Black makes no effort to tie his 50% assumption to any facts in the case.  He presents it as a general proposition that would apply in any hypothetical negotiation.

Like the patentee in *Uniloc*, Dr. Black adjusts his "starting point" on the basis of *Georgia-Pacific* factors.  But that does not cure the flaw.  The observation made by the Federal Circuit in *Uniloc* could not be more on point: "It is of no moment that the 25% rule of thumb is offered merely as a starting point to which the *Georgia-Pacific* factors are then applied to bring the rate up or down."  Nor can Dr. Black's flawed opinions be attributed to ignorance; he acknowledged in his report and deposition that he was aware of the Federal Circuit's decision rejecting the 25% rule of thumb.  *See* Black Rept., ¶ 33 ("in several previous cases, the royalty rate was presumed to

---

[2] The *Suffolk* court's opinion is attached to the Hofileña Declaration as Exhibit M.

be 25% as a starting point for rate negotiation, although I understand the Federal Circuit recently

has overturned precedents on this point"); Black Dep. at 31:4-6 ("we did have a conversation

about the recent decision throwing out the Goldscheider 25 percent rule").

In compounding the mistake of starting his analysis with "a fundamentally flawed

premise," Dr. Black then arbitrarily adjusted the rate up and down by a 50% factor.  These 50%

adjustments were arbitrary and not tied to the Dynetix-Synopsys relationship, any prior

negotiation history, or any other fact unique to the situation.  For example, regarding his 50%

adjustments, Dr. Black testified:

> Q.  Why did you choose a 50 percent reduction?
>
> A.  Because if you don't have detailed information about the strengths and weaknesses of each position or if you don't have all of the information about what was in the mind of the parties, you will be subject to some error.  That error is minimized if you take an intermediate position, a middle ground.
>
> Q.  All right.  So you didn't have the information that you're referring to, right?
>
> A.  Right.
>
> *Q.  Okay.  So without that information -- I just want to make sure I understand your thought process -- you said, "I'll just use a 50 percent reduction," right?*
>
> *A.  In this step, yes.*
>
>                *         *         *
>
> Q.  But why 50 percent; that's my point?  What is the basis for 50 percent as opposed to a 25 percent or a 75 percent reduction?
>
> A.  Again, that's -- absent more information, it's a attempt to minimize the bias in the -- in the calculation.

Black Dep. at 94:3-18 (emphasis added); 100:3-8.

Dr. Black's opinions must be excluded in their entirety because they are all premised on a

violation of *Uniloc*.

**B.    Dr. Black Failed To Apportion Between The Allegedly Infringing Feature And The Many Non-Infringing Features.**

Dr. Black's failure to apportion is a fundamental flaw in his opinions.  On the one hand,

he acknowledged in deposition that "there are many features in VCS that are not accused of

1  infringing by Dynetix," and that "if there is any non-infringing technology [ in VCS] … you

2  should not collect damages on technology that doesn't infringe."  *Id.* at 64:20-23; 186:20-24.  Yet

3  on the other hand, Dr. Black admittedly made no attempt to apportion and used the entirety of

4  VCS revenues to calculate his damages.  *Id.* at 63:20-23 ("I have not done an apportionment of

5  contribution from VCS -- or of VCS sales from DLP and non-infringing components").

6       Dr. Black's failure to apportion violates well-established Federal Circuit law, which has

7  become the cornerstone for controlling runaway damages opinions.  One of the seminal cases in

8  this area is *Lucent Technologies, Inc. v. Gateway, Inc*., 580 F.3d at 1301, in which the plaintiff

9  based its reasonable royalty calculation on the entire revenue base of Microsoft's Outlook

10 software product, even though the only accused feature was the "date-picker" tool.  The Federal

11 Circuit noted that "the infringing use of the [patented] date-picker tool in Outlook is but a very

12 small component of a much larger software program.  The vast majority of the features, when

13 used, do not infringe."  *Id.* at 1337.  The Federal Circuit held that the plaintiff could base its

14 damages on the entire value of Outlook only if "the feature patented constitutes the basis for

15 customer demand."  *Id*. at 1336.  The plaintiff thus had the burden of demonstrating that anyone

16 had ever purchased Outlook because of the date-picker tool.  The plaintiff failed to meet its

17 burden.  "Indeed, Lucent's damages expert conceded that there was no 'evidence that anybody

18 anywhere at any time ever bought Outlook, be it an equipment manufacturer or an individual

19 consumer, [ ] because it had a date picker.'"  *Id.* at 1337-38.  The Federal Circuit vacated the

20 jury's damages award and remanded for a new trial on damages.  *Id.* at 1338, 1340.

21       In *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d at 51, the Federal Circuit also

22 rejected an expert's damages opinion because he failed to apportion between the allegedly

23 infringing feature and non-accused features.  The plaintiff's expert calculated his damages as a

24 percentage of the entire market value of a laptop computer rather than of the patent-practicing

25 optical disk drive alone.  *Id.* at 68.  The Federal Circuit held that use of the entire market value of

26 the laptops was improper because the plaintiff had not presented any evidence showing that the

27 patented disk drive drove consumer demand for laptop computers.  *Id.*; *see also id.* at 69 ("[t]here

28

is no evidence that this feature alone motivates consumers to purchase a laptop computer, such that the value of the entire computer can be attributed to the patented disc discrimination method"). On this point, the Federal Circuit noted, "It is not enough to merely show that the disc discrimination method is viewed as valuable, important, or even essential to the use of the laptop computer. Nor is it enough to show that a laptop computer without an ODD practicing the disc discrimination method would be commercially unviable." *Id.* at 68. Given the plaintiff's failure to apportion, the Federal Circuit affirmed the lower court's decision offering the plaintiff either a new trial on damages or a remittitur of the verdict from $52 million to $6.2 million. *Id.* at 64, 71.

Because VCS contains many features outside of the accused DLP feature, Dr. Black had the burden of establishing that DLP drives consumer demand for VCS. *See LaserDynamics*, 694 F.3d at 68; *Lucent*, 580 F.3d at 1336. He presented no evidence on this issue. Not only did Dr. Black express no interest in pursuing such evidence, but he exhibited no interest in whether customers even use DLP. He professed the right to calculate damages on the basis of all VCS revenues even if no Synopsys customer ever used DLP.

> Q. So if the record were to show that, after DLP were introduced, it was never used by Synopsys customers, you would still be of the opinion that Synopsys should pay Dynetix $156 million in damages; is that what you're saying?
>
> A. I am -- my opinion stands … The use or non use of DLP – and we're going outside the accounting realm – is not a factor that I separately considered.

Black Dep. at 67:18-68:6.

Because Dr. Black failed to apportion, his damages opinions are wildly inflated. And this is not a matter that can be handled on cross-examination. Allowing Dr. Black to testify at trial about the entire VCS revenue base would unjustifiably "skew the damages horizon for the jury, regardless of the contribution of the patented component to this revenue." *Uniloc*, 632 F.3d at 1320. In the exercise of its gatekeeping responsibilities, the Court must strike the entirety of the Black opinion and report because of Dr. Black's violation of *Lucent* and *LaserDynamics*.

**C.      Dr. Black Violated Federal Circuit Law By Relying On Non-Comparable Agreements.**

It is well settled that "[d]amages experts cannot use noncomparable licenses, with little relationship to the claimed invention or parties-in-suit, as a basis for calculating reasonable royalties." *Oracle Am., Inc. v. Google Inc.*, No. C 10-03561 WHA, 2011 WL 6055505, at *8 (N.D. Cal. Dec. 6, 2011) (citation omitted); *see also Fresenius USA, Inc. v. Baxter Int'l, Inc.*, No. C 03-1431 PJH, 2012 WL 761712, at *13 (N.D. Cal. Mar. 8, 2012).  The Federal Circuit's seminal case in this area is *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d at 860.  In that case the Federal Circuit rejected a plaintiff's attempt to inflate the reasonable royalty rate by relying upon irrelevant and noncomparable license agreements.  The plaintiff's expert "used licenses with no relationship to the claimed invention to drive the royalty rate up to unjustified double-digit levels." *Id.* at 870.  "[N]one of these licenses even mentioned the patents in suit or showed any other discernible link to the claimed technology." *Id.*  Because the district court improperly considered these licenses in determining a reasonable royalty, the Federal Circuit vacated the damages award and remanded for a recalculation of the reasonable royalty. *Id.* at 873.  The Federal Circuit held that courts and experts "must consider licenses that are commensurate with what the defendant has appropriated.  If not, a prevailing plaintiff would be free to inflate the reasonable royalty analysis with conveniently selected licenses without an economic or other link to the technology in question." *Id.* at 872.

In *Lucent*, the Federal Circuit similarly rejected a patent owner's reliance on irrelevant license agreements.  After reviewing the various agreements, the Federal Circuit concluded: "First, some of the license agreements are radically different from the hypothetical agreement under consideration for the [patent-in-suit].  Second, with the other agreements, we are simply unable to ascertain from the evidence presented the subject matter of the agreements, and we therefore cannot understand how the jury could have adequately evaluated the probative value of those agreements." *Id.* at 1327-28.  Because the agreements plaintiff presented had no relation to the hypothetical negotiation, the Federal Circuit reversed the jury's damages award, stating, "[A] lump-sum damages award [based on a reasonable royalty] cannot stand solely on evidence which

1 amounts to little more than a recitation of royalty numbers, one of which is arguably in the

2 ballpark of the jury's award, particularly when it is doubtful that the technology of those license

3 agreements is in any way similar to the technology being litigated here." *Id.* at 1329.

4       In his report, Dr. Black purports to support his 14.25% royalty rate by citing to the

5 Synopsys-ViewLogic and Agilent-Ansoft agreements. Referring to these agreements as "license

6 arrangements," the Black Report asserts: "These licenses are for different technology than the

7 subject of this report, but are provided to illustrate that substantial royalty rates have been charged

8 in this industry in the years prior to the hypothetical negotiation." Black Rept., ¶ 23. The report

9 characterizes the Synopsys-ViewLogic Agreement as reflecting "a royalty rate of 70% on gross

10 sales" and the Agilent-Ansoft Agreement as reflecting "a royalty rate of 75% of after-tax

11 revenue." *Id.* The insinuation is that both agreements are "licenses" in the "design simulation

12 industry" with very high "royalty rates." At his deposition Dr. Black attempted to obscure his

13 reliance on these two agreements, though his report clearly reflects such reliance. *See* Black Dep.

14 at 110:14-24 ("I included those license agreements to indicate that I looked for publicly available

15 data for licenses in this -- in the design simulation industry, and there were two in the ktMINE

16 Royalty Database. I am not using that as support for a particular rate, but only as a illustration

17 that large percentage royalty rates have been utilized in this industry. That -- that's the purpose of

18 it. It's just to provide, you know, just one indication of the background, but it's not used as

19 support for the 14.25 percent").

20       It is undisputed that the Synopsys-ViewLogic and Agilent-Ansoft Agreements are not

21 patent license agreements, reflect no information on patent royalty rates, and have no relevant

22 connection to the hypothetical negotiation between Dynetix and Synopsys. The Black Report

23 leads one to believe that the two agreements are patent licenses with astronomically high patent

24 royalty rates, when in fact nothing could be further from the truth.

25       Dr. Black's mischaracterization of the agreements, which offends notions of candor,

26 exposes a key fact—Dr. Black can point to no patent license agreement supporting his 14.25%

27 royalty rate. It is arbitrary and unreasonable, and the Court should strike any reliance on it.

28

14

1   **V.   CONCLUSION**

2         For the reasons stated above, the Court should grant Synopsys's motion to exclude the

3   opinions and testimony of Dynetix's damages expert in their entirety.

4

5   Dated: June 25, 2013                           Respectfully submitted,

6                                                  CHRIS R. OTTENWELLER
                                                   I. NEEL CHATTERJEE
7                                                  BENJAMIN J. HOFILEÑA
                                                   JASON K. YU
8                                                  ANDREW S. ONG
                                                   Orrick, Herrington & Sutcliffe LLP
9

10

11                                                 By: _____ /s/ Chris R. Ottenweller _____
                                                            CHRIS R. OTTENWELLER
12                                                          Attorneys for Defendant
                                                             SYNOPSYS, INC.
13

14   OHSUSA:753847032.16

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANT SYNOPSYS, INC.'S MOTION TO
EXCLUDE PLAINTIFF'S DAMAGES EXPERT
5:11-CV-05973-PSG