1  CHRIS R. OTTENWELLER (STATE BAR NO. 73649)
   cottenweller@orrick.com
2  I. NEEL CHATTERJEE (STATE BAR NO. 173985)
   nchatterjee@orrick.com
3  JASON K. YU (STATE BAR NO. 274215)
   jasonyu@orrick.com
4  ORRICK, HERRINGTON & SUTCLIFFE LLP
   1000 Marsh Road
5  Menlo Park, California 94025
   Telephone:   +1-650-614-7400
6  Facsimile:   +1-650-614-7401

7  BENJAMIN J. HOFILEÑA (STATE BAR NO. 227117)
   bhofilena@orrick.com
8  ORRICK, HERRINGTON & SUTCLIFFE LLP
   777 South Figueroa Street Suite 3200
9  Los Angeles, California 90017
   Telephone:   +1-213-629-2020
10 Facsimile:   +1-213-612-2499

11 Attorneys for Defendant and Counterclaimant
   SYNOPSYS, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DYNETIX DESIGN SOLUTIONS, INC., a California corporation,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>SYNOPSYS, INC., a Delaware corporation, and DOES 1-50,<br><br>　　　　　Defendant.<br><br>SYNOPSYS, INC., a Delaware corporation,<br><br>　　　　　Counterclaim Plaintiff,<br><br>　　v.<br><br>DYNETIX DESIGN SOLUTIONS, INC., a California corporation,<br><br>　　　　　Counterclaim Defendant. | Case No. 5:11-cv-05973-PSG<br><br>***CORRECTED* SYNOPSYS, INC.'S MOTION TO STRIKE INFRINGEMENT EXPERT REPORT OF DR. MINESH AMIN AND EXCLUDE EXPERT TESTIMONY**<br><br>Date:　July 30, 2013<br>Time:　10:00 a.m.<br>Court:　5<br>Judge:　Honorable Paul S. Grewal |

**TABLE OF CONTENTS**

**Page**

NOTICE OF MOTION AND MOTION ................................................................................... 1

MEMORANDUM OF POINTS AND AUTHORITIES ........................................................... 1

I. INTRODUCTION ....................................................................................................... 1

II. BACKGROUND ......................................................................................................... 2

III. LEGAL STANDARD .................................................................................................. 3

IV. DR. AMIN'S TESTIMONY SHOULD BE EXCLUDED. ......................................... 4

    A. Linear to Super-Linear Scalable Speedup. ..................................................... 4

        a. Dr. Amin's Test Results Did Not Take Into Account The "Number Of Available Processing Units." ................................... 6

        b. Dr. Amin Undercounted The Number Of CPUs Used. ................... 7

    B. Creating A Master Thread And A Plurality Of Slave Threads. ...................... 8

    C. Multithreaded Simulation. ............................................................................. 10

    D. Pre-Examining Each User-Specified HDL Source File. ............................... 11

V. DR. AMIN'S OPINIONS RELATING TO "HIDDEN AUTOPARTITION" ARE UNRELIABLE AND SHOULD BE EXCLUDED ...................................................... 12

    A. Legal Standard .............................................................................................. 12

    B. Dr. Amin's New "Hidden Autopartitioning" Theory Should be Excluded .......... 12

VI. CONCLUSION ........................................................................................................... 14

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Chicago Mercantile Exch., Inc. v. Technology Research Grp., LLC.*,
 782 F. Supp. 2d 667 (N.D. Ill. April 29, 2011) ........................................................................ 3

*Cooper v. Brown*,
 510 F.3d 870 (9th Cir. 2007) ................................................................................................... 4

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
 509 U.S. 579 (1993) ...................................................................................................... 1, 3, 12

*G.E. Co. v. Joiner*,
 552 U.S. 136 (1997) .......................................................................................................... 12, 13

*Hebert v. Lisle Corp.*,
 99 F.3d 1109 (Fed. Cir. 1996) .................................................................................................. 3

*Hochstein v. Microsoft Corp.*,
 No. 04-73071, 2009 WL 2022815 (E.D. Mich. July 7, 2009) ................................................. 3

*Kumho Tire Co., Ltd. v. Carmichael*,
 526 U.S. 137 (1999) ................................................................................................................. 3

*Optivus Tech., Inc. v. Ion Beam Apps., S.A.*,
 469 F.3d 978 (Fed. Cir. 2006) .................................................................................................. 3

*Perez v. State Farm Mut. Auto Ins. Co.*,
 No. C 06-01962 JW, 2012 WL 3116355 (N.D. Cal. July 31, 2012) ...................................... 12

*Poosh v. Phillip Morris USA, Inc.*,
 287 F.R.D. 543 (N.D. Cal. 2012) ........................................................................................... 12

*United States v. Freeman*,
 498 F.3d 893 (9th Cir. 2007) .................................................................................................... 3

**Federal Rules**

Federal Rule of Evidence 702 ......................................................................................... 1, 3, 12

| | |
|---|---|
| 1 | **NOTICE OF MOTION AND MOTION** |
| 2 | PLEASE TAKE NOTICE that on July 30, 2013, at 10:00 a.m., or as soon as the matter |
| 3 | may be heard thereafter, in the San Jose Courthouse, 280 South 1st Street, San Jose, California |
| 4 | 95113, Floor 4, Courtroom 5, before the Honorable Paul S. Grewal, Defendant Synopsys, Inc. |
| 5 | ("Synopsys") will move to exclude the opinions and testimony of Plaintiff Dynetix Design |
| 6 | Solutions, Inc.'s ("Dynetix") infringement expert, Dr. Minesh Amin, as irrelevant and unreliable |
| 7 | under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. |
| 8 | 579 (1993). |
| 9 | This motion is supported by the attached Memorandum of Points and Authorities, the |
| 10 | Declaration of Jason Yu ("Yu Decl."), all pleadings and papers which are of record and are on file |
| 11 | in this case, and on such other oral and documentary evidence as may be presented at the hearing |
| 12 | of this motion. |

Dated: June 25, 2013

Respectfully submitted,

CHRIS R. OTTENWELLER
I. NEEL CHATTERJEE
BENJAMIN J. HOFILEÑA
JASON K. YU
ANDREW S. ONG
Orrick, Herrington & Sutcliffe LLP


By: _____/s/ *Chris R. Ottenweller*_____
CHRIS R. OTTENWELLER
Attorneys for Defendant
SYNOPSYS, INC.

1

SYNOPSYS, INC.'S MOTION TO STRIKE PORTIONS OF
INFRINGEMENT REPORT OF DR. MINESH AMIN
5:11-CV-05973-PSG

# MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

Synopsys seeks to exclude the testimony of Dynetix's infringement expert, Dr. Minesh Amin, for three reasons: (1) he applied legally incorrect claim constructions, (2) he applied a legally incorrect standard for his test results, and (3) he has no reliable foundation for a newly disclosed infringement theory.

First, in forming his infringement opinions, Dr. Amin disregards many of the Court's claim constructions. In forming his opinions, he relies on at least four claim constructions different from the claim constructions adopted by the Court. Because he based his opinions on constructions other than those provided by the Court, Dr. Amin's opinions are unreliable and legally irrelevant.

Second, Dr. Amin reports results of certain testing he performed, the sole evidence he relies upon to prove that VCS meets the linear to super-linear scalable limitations. Under the Court's claim constructions, whether a simulation achieves linear to super-linear speedup in performance is to be determined on the basis of "the number of available processing units." Dr. Amin ignored this limitation, claiming instead to rely on the "cores" actually used. And even then, Dr. Amin undercounted the number of cores by one because he did not take into account the core assigned to the master thread. Consequently, all of the results he reports as linear to super-linear, when recalculated using the correct number of processors, are sub-linear results. Dr. Amin does not contest this error.

Third, Dr. Amin advances for the first time an infringement theory he characterizes as "Hidden Auto Partitioning," a term he has coined for the purposes of this litigation. There is no such functionality in DLP, and Dr. Amin's theory is based on sheer speculation. He did not and cannot identify any code that implements such functionality. His opinions that it exists in DLP are entirely speculative and without any basis whatsoever.

As a result of these errors, Dr. Amin's infringement opinions are flawed, unreliable, and legally irrelevant. His entire report should be struck and he should be precluded from testifying at trial.

## II. **BACKGROUND**

The Court announced its constructions for the '898 Patent at the conclusion of the October 9, 2012 claim construction hearing. Yu Decl., Ex. D (Excerpts from Claim Construction Hearing Transcript). The Court was clear that although it could change its mind, these constructions were not merely tentative and would govern the case going forward. Yu Decl., Ex. D (Claim Construction Excerpts) at 172:22-173:4 ("But I think it's important to give you guidance as to where we stand and you should assume these are the instructions going forward").

Seven months later, Dynetix served Dr. Amin's expert report on infringement. Yu Decl., Ex. A ("Amin Rept."). Nevertheless, Dr. Amin expresses his disagreements with the Court's constructions, referring to them as "tentative" and incorrect. *See, e.g., id.* at ¶ 156 ("[The Court's] construction is obviously incorrect") and ¶ 51 ("I, however, am of the opinion that the Tentative Construction is not a correct interpretation of the phrase"). Rather than apply the Court's constructions, Dr. Amin relies on his own conflicting claim constructions to assess infringement. *See, e.g., id.* at ¶¶ 150-162 (opining that VCS practices the "Concurrency-1" element, which Dr. Amin defines in a way that conflicts with the properly construed claim limitations), ¶¶ 171-187 (opining that VCS practices the "MTO-1" element, which Dr. Amin defines in a way that conflicts with the properly construed claim limitations), ¶¶ 75-85, 100-102 (opining that VCS practices the "pre-examining" element, which Dr. Amin defines in a way that conflicts with the properly construed claim limitations), and ¶¶ 196-202 (opining that VCS achieves "linear to superlinear scalable performance speedup," which Dr. Amin defines in a way that conflicts with the Court's construction).

When asked at his deposition how many of the Court's constructions he disagreed with, Dr. Amin identified all but one (including a stipulated construction). Yu. Decl., Ex. B, (Amin Depo. Trans.) at 165:19-21. In both his report and deposition, Dr. Amin confirmed that he applied his own constructions – instead of the Court's constructions – to at least the following terms: (1) "linear to super-linear scalable performance speedup" and "super-linear scalable simulation;" (2) "create a master thread and plurality of slave threads;" (3) "pre-examining each

user-specified source file;" and (4) "multithreaded simulation." These terms pervade all of the asserted claims.

## III. **LEGAL STANDARD**

Federal Rule of Evidence 702 imposes a "basic gatekeeping obligation" on district courts to "ensure that any and all scientific testimony"—including testimony based on "technical or other specialized knowledge"—"is not only relevant, but reliable." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993); *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999); *United States v. Freeman*, 498 F.3d 893, 901 (9th Cir. 2007). The district court's gatekeeping function is important to make certain that an expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire*, 526 U.S. at 152. As part of this gatekeeping function, district courts must ensure that an expert's opinion is sufficiently tied to the relevant facts and circumstances of the particular case at issue. *See Daubert*, 509 U.S. at 591 ("An additional consideration under Rule 702—and another aspect of relevancy—is whether expert testimony proffered in the case is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute") (citation omitted).

Incorrect statements of law are no more admissible through experts than are flawed scientific theories. *Hebert v. Lisle Corp.*, 99 F.3d 1109, 1117 (Fed. Cir. 1996) ("We encourage exercise of the trial court's gatekeeper authority when parties proffer, through purported experts, not only unproven science, but markedly incorrect law.") (*citing Daubert*, 509 U.S. 579). Expert opinions based on claim constructions that conflict with a court's construction must be excluded as irrelevant and unreliable. *See Hochstein v. Microsoft Corp.*, No. 04-73071, 2009 WL 2022815, *1 (E.D. Mich. July 7, 2009) (excluding expert testimony that conflicts with the Court's claim construction); *Chicago Mercantile Exch., Inc. v. Technology Research Grp., LLC.*, 782 F. Supp. 2d 667, 673 (N.D. Ill. April 29, 2011) ("Exclusion [of expert testimony] is proper . . . because evidence based upon a mistaken construction of a patent is irrelevant.") (citations omitted); *see also Optivus Tech., Inc. v. Ion Beam Apps., S.A.*, 469 F.3d 978, 992 (Fed. Cir. 2006) (upholding district court's grant of summary judgment, noting that because plaintiff's "evidence failed to

address the *entirety of the court's construction*, it did not properly rebut [defendant's] evidence.") (emphasis added). The proponent of expert testimony bears the burden of proving its admissibility. *See Cooper v. Brown*, 510 F.3d 870, 942 (9th Cir. 2007).

## IV. DR. AMIN'S TESTIMONY SHOULD BE EXCLUDED.

Dr. Amin's entire report is infected by his failure to follow the Court's claim constructions. The terms identified above pervade all of the asserted claims. Three of the limitations are required by all three independent claims, 1, 36, and 45: (1) "linear to super-linear scalable performance speedup" and "super-linear scalable simulation," (2) "create a master thread and plurality of slave threads," and (3) "multithreaded simulation." The "pre-examining" limitation is also included in claim 1. For each claim, therefore, Dr. Amin disputes the Court's construction and then bases his infringement opinion on his own conflicting construction. Such testimony should not be admitted because it is legally irrelevant.

### A. Linear to Super-Linear Scalable Speedup.

Dr. Amin's testimony related to the speedup should be excluded because (a) he applied the wrong claim construction and (b) he incorrectly counts the number of cores used in his test results. The Court construed the phrases "linear to super-linear scalable performance speedup" and "super-linear scalable simulation" as follows:

> The terms linear and super-linear describe the speedup that a parallel simulation will achieve when performing hardware containing one or more processing units.
>
> A simulation is linear if the speedup that is achieved is equal to the number of available processing units. For example, a simulation that runs two times as fast on hardware containing two processing units is linear.
>
> Similarly, if the simulation runs four times as fast on four processing units, it is again linear.
>
> A simulation that has a speedup greater than the number of processing units is super-linear. For example, if a process executed on two processing units runs three times as fast as the same simulation on one processing unit, it is super-linear.
>
> Scaleable performance means there is a consistent increase in performance for each added processing unit.

Yu Decl., Ex. D (Excerpts from Claim Construction Hearing) at 174:10-25. These limitations are found in claims 1, 36 and 45 of the '898 patent.

Dr. Amin rejects the Court's construction in his opinion and applies a different construction. *See* Amin Rept. at ¶ 51 ("I understand that on this issue the Court has rendered a tentative ruling on the meaning of linear or super-linear scalable performance speedup (the 'Tentative Construction'). I, however, am of the opinion that the Tentative Construction is not a correct interpretation of the phrase"). Dr. Amin then advances his own conflicting construction:

> "Linear performance speedup" is defined by the formula $S = C \times N$, where S is the speedup, N [is] the number of CPUs, and C is any constant greater than 0 and less than or equal to 1 . . . .
>
> "Super-linear performance speedup" means C starts to drift to any value(s) greater than the original constant as the number of CPUs increases.

*Id.* at ¶¶ 58-59.

Dr. Amin's opinion that the "linear to super-linear scalable" and "super-linear scalable simulation" limitations are met should be excluded because he bases his opinion on his construction, not the Court's construction. In particular, Dr. Amin relies on a set of tests he conducted that he contends demonstrate that DLP achieves linear to super-linear scalable speedup in performance. But his reporting of the test results is flawed in two respects. He did not conduct the tests in compliance with the Court's construction, and he omits one of the cores, substantially skewing the results. The tests do not show linear to super-linear results under the proper test parameters.

Dr. Amin presents his test data in Exhibit 29 of his report and claims that the results highlighted in green demonstrate linear to super-linear scalable performance:

**Test A: -parallel+autopart** (Runtime [secs])

| # of Cores | Run 1 | Run 2 | Run 3 | Run 4 | Run 5 | Run 6 | Run 7 |
|---|---|---|---|---|---|---|---|
| 1 | 138.14 | 137.51 | 137.86 | 138.08 | 138.35 | 138.51 | 138.80 |
| 2 | 63.00 | 64.00 | 63.00 | 63.00 | 63.00 | 63.00 | 63.00 |
| 4 | 33.00 | 33.00 | 32.00 | 32.00 | 32.00 | 33.00 | 32.00 |
| 6 | 22.00 | 22.00 | 22.00 | 22.00 | 22.00 | 21.00 | 22.00 |
| 8 | 22.00 | 22.00 | 21.00 | 21.00 | 22.00 | 22.00 | 21.00 |
| 10 | 22.00 | 22.00 | 22.00 | 22.00 | 22.00 | 22.00 | 22.00 |
| 12 | 14.00 | 15.00 | 14.00 | 13.00 | 14.00 | 14.00 | 14.00 |

Amin Rept. at Exhibit 29 and ¶¶ 198, 201.  In Run 1, for example, Dr. Amin's chart *appears* to demonstrate super-linear speedup for platforms with 2, 4, and 6 cores available as follows:

| # of Cores | Simulation Time (Run 1) | Speedup |
|---|---|---|
| 1 | 138.14 | 1X |
| 2 | 63 | 2.2X  (138.14/63) |
| 4 | 33 | 4.18X (138.14/33) |
| 6 | 22 | 6.27X (138.14/22) |
| 8 | 22 | 6.27X |
| 10 | 22 | 6.27X |
| 12 | 14 | 9.8X |

However, Dr. Amin admitted that the number reported in his chart fails to take into account that the number of available cores for his test was actually 16.  Dr. Amin also admitted that the "# of cores" was actually the threshold value of "slave" partitions and did not include the core on which the master thread was executed.

        **a.**    <u>**Dr. Amin's Test Results Did Not Take Into Account The "Number Of Available Processing Units."**</u>

Under the Court's construction of the linear to super linear limitations, the relevant number for determining the amount of speedup achieved is the number of "available" CPUs.  Dr. Amin did not base his test results on available CPUs.

According to his report, there were 16 cores available for each of the simulations that Dr. Amin ran.  Amin Rept., at ¶ 199 (stating that the platform had "16 virtual CPU cores").  Dr. Amin admitted in deposition he did not do anything to limit the number of available CPUs.  Yu Decl., Ex. B (Amin Depo. Trans.) at 180:6-23.  Under these circumstances, the Court's construction requires that Dr. Amin's 16-processor platform must have achieved at least 16x speedup (*i.e.*, linear speedup) in order to satisfy the linear to super-linear limitations.  As shown below, none of Dr. Amin's results come close to demonstrating this performance:

| # of Cores Available | Simulation Time (Run 1) | Speedup | Speedup |
|---|---|---|---|
| 16 | 138.14 | 1X | *Sub-linear* |
| 16 | 63 | 2.2X | *Sub-linear* |
| 16 | 33 | 4.18X | *Sub-linear* |
| 16 | 22 | 6.27X | *Sub-linear* |
| 16 | 22 | 6.27X | *Sub-linear* |
| 16 | 22 | 6.27X | *Sub-linear* |
| 16 | 14 | 9.8X | *Sub-linear* |

### b. Dr. Amin Undercounted The Number Of CPUs Used.

Even if Dr. Amin were allowed under the Court's construction to base his tests on the number of CPUs *used*—and he was not—his results are still flawed. He undercounted the number of CPUs used by one.

In counting the number of cores used, Dr. Amin failed to include the core used to execute the master thread. Instead, he used the "N" value of autopartitioning, which he admits only accounted for the number of slave threads:

> Q: So let me just ask the question as related to this. When I set the N value under the approach that you specified in the first test A of Exhibit 29, that N value is setting the upper boundary for the number of slave threads that can be created in DLP?
>
> A: True.
>
> *Q: And that N value does not include the master thread in the count; correct?*
>
> *A: That's right.*

Amin Depo. Trans. at 126:14-126:20 (emphasis added); *see also id.* at 126:11-20 ("Well, master thread is not created. It's there. It's like the original process . . . . So we don't count that.")

As a consequence of this omission, Dr. Amin undercounted the number of CPUs used for each of his tests. Each of the numbers set forth in the column of his Exhibit 29 entitled "# of Cores" is understated by one. When the core assigned to the master thread is taken into account, every single run resulted in sub-linear performance. The following chart reflects how a proper calculation should be done (using Run 1 as an example).

| Cores Counted by Amin | # of Cores Used | Simulation Time (Run 1) | Speedup | Speedup |
|---|---|---|---|---|
| 1 | 1 | 138.14 | 1X | *Sub-linear* |
| 2 | 3 | 63 | 2.2X | *Sub-linear* |
| 4 | 5 | 33 | 4.18X | *Sub-linear* |
| 6 | 7 | 22 | 6.27X | *Sub-linear* |
| 8 | 9 | 22 | 6.27X | *Sub-linear* |
| 10 | 11 | 22 | 6.27X | *Sub-linear* |
| 12 | 13 | 14 | 9.8X | *Sub-linear* |

Dr. Amin admitted at his deposition that, by failing to account for the master thread, his test results do not satisfy the Court's construction of linear to super-linear performance:

> Q: My question was really simple. In the Court's tentative construction -- I understand you disagree with it -- isn't it true that if you left out the core for the master thread in your tests, both Tests A, you would actually get sub-linear performance?
>
> A: According to the Court's tentative construction, that's true.

Amin Depo Trans. at 150:9-16.

### B. Creating A Master Thread And A Plurality Of Slave Threads.

The Court construed "creating a master thread and plurality of slave threads" to mean "creating *one thread for each processor* where the master thread is executed on one processor and each of the slave threads is executed on *a separate remaining* processor." Yu Decl., Ex. D (Excerpts from Claim Construction Hearing) (emphasis added). This limitation is found in claims 1, 36, and 45. Dr. Amin rejects the Court's construction as incorrect. Amin Rept. at ¶ 156 ("[The Court's] construction is obviously incorrect"). In advancing his own construction, Dr. Amin disregards the requirement that one thread be created for each available processor. *E.g. id.* at ¶ 36 ("Note that the claim does not require the usage of all the available CPUs, only that the total number of threads should not exceed the number of CPUs available"). Dr. Amin instead opines that the total number of available CPUs is only a maximum value for the number of threads.

Thus, according to Dr. Amin, this limitation is satisfied so long as there are threads created for *some* of the available processors:

> The function or purpose for automatically detecting the number of CPUs in claim 1 is to make sure that the total number of threads, which includes one master thread and a plurality of slave threads, *does not exceed* the number of available CPUs . . . The [limitation] does not require each available CPU to have its own thread.

*Id.* at *¶* 162 (emphasis added); *see also id.* at ¶ 16 (the limitation "requires that the number of threads *be less or equal* to the number of available CPUs"); *id.* at ¶¶ 36-37 ("[n]ote that the claim does not require the usage of all the available CPUs, only that the total number of threads *should not exceed the number of CPUs available*").

Dr. Amin's opinion that this limitation is met should be excluded because he bases his opinions on his construction, not the Court's. Dr. Amin concedes that if the Court's construction of the "creates a master thread and a plurality of slave threads" limitation were followed, there is no literal infringement. *See* Amin Rept. at ¶ 157 ("if this tentative construction were to be adopted later without change, I am still of the opinion that VCS practices this element at least under the doctrine of equivalents").[1] But in expressing a DOE opinion, Dr. Amin does not apply the Court's construction; instead, he resorts to his own legally irrelevant construction.

> The function or purpose for automatically detecting the number of CPUs in claim 1 is to make sure that the total number of threads, which includes on master thread and a plurality of slave threads, *does not exceed the number of available CPUs*.
>
> \*   \*   \*
>
> *The purpose of the [limitation] is to ensure each thread is mapped to [a] unique CPU for maximum performance.* That is exactly the purpose of PVCS. Thus even though PVCS creates the threads not directly based on the number of CPUs, to get the best performance from PVCS, each thread should be mapped to a unique CPU.

*Id.* at ¶¶ 162, 158 (opining that DLP performs substantially the same function as the claimed invention) (emphasis added). Contrary to Dr. Amin's construction, the purpose and function of detecting the number of available CPUs under the Court's construction is to ensure that the total number of threads is *equal* to the number of available CPUs, not merely to ensure that the number

---

[1] It is undisputed that the DLP feature will only set a maximum number of partitions or threads and that it does not perform the function of creating one thread for each processor, which is required by the Court's construction. *Id.* at ¶ 122 (VCS automatically generates up to 'maxParts' partitions of the design").

of threads does not exceed the number of available CPUs. Yu Decl., Ex.D (Claim Construction Hearing) ("creating *one thread for each processor*") (emphasis added). His DOE analysis is improper because it is also not based on the correct claim construction.

### C. Multithreaded Simulation.

The Court construed the claim limitation "multithreaded simulation" to mean "simulation of circuit functionalities by executing multiple process flows concurrently on multiple CPU's." Yu Decl., Ex. D (Excerpts from Claim Construction Hearing) (emphasis added). This limitation is found in independent claims 1, 36, and 45. Dr. Amin disregards this claim construction and offers his own claim construction. In fact, Dr. Amin offers two claim constructions and adopts them at different times depending on when it suits his argument. Amin Rept. at ¶ 175 ("For interpreting the term 'prior to simulation," the question is whether it should be prior to compilation or prior to runtime. The answer is: It depends."); *id.* at ¶ 176 ("Generally speaking, the word 'simulation,' when used in a compiled code simulator like VCS, means the whole process of simulating a design which starts with simulation"). Dr. Amin's construction is contrary to the Court's because the Court requires the "simulation of circuit functionalities," which is not done during compilation.

In his report, Dr. Amin relies on his conflicting construction in opining that a feature called "parallel compile" meets the limitations of the asserted claims. *See e.g.*, Amin Rept. at ¶ 142 ("One infringing feature of the 2006 Model is the parallel compile at the compile time"). This theory is not disclosed in the infringement contentions and was never disclosed prior to Dr. Amin's expert report.[2] This opinion is clearly inconsistent with the Court's construction for "multithreaded simulation" because the parallel compile feature creates multiple threads for the purpose of compiling a design, not for the purpose of simulation. *Id.*; Amin Depo. Trans. at 280:13-19. Dr. Amin concedes that the parallel compile threads are created at the beginning of compilation, and they terminate before simulation starts. Amin Rept. at ¶ 178; Amin Depo. Trans. at 281:16-21 ("These threads, yes, they do terminate before runtime starts . . . They're created as part of compilation"). As a result, parallel compile does not create threads "for

---

[2] Synopsys reserves the right to exclude Dr. Amin's opinions on partition compile on the basis that this theory was not timely disclosed in Dynetix's infringement contentions.

concurrent execution of the multithreaded event-driven simulation" as is required by claim 1. Yu Decl., Ex. C ('898 Patent) at claim 1; Amin Rept. at ¶ 177 ("Compilation . . . is, therefore, a preparatory stage of the actual simulation"). Parallel compile also does not assign event queues or fanout queues to the threads or use threads to process signals as is required by claims 36 and 45 because those are tasks executed during simulation. Yu Decl., Ex. C ('898 Patent) at claims 36 and 45. Accordingly, it is undisputed that parallel compile cannot infringe under the Court's construction.

### D. Pre-Examining Each User-Specified HDL Source File.

The Court construed the phrase "preexamining each user-specified HDL Source File" to mean: "*the simulator* examining *the content* of each source file to *automatically detect* its coded file language *before compiling* the source files." Yu Decl., Ex. D (Excerpts from Claim Construction Hearing) (emphasis added). This limitation is found in claim 1 of the '898 patent.

Dr. Amin adopts his own conflicting construction. First, Dr. Amin asserts that this limitation does not require the "pre-examining" to be performed by the simulator. *See* Amin Rept. at ¶ 81 ("[s]o literally, *a user* preexamining the file types would satisfy this element") (emphasis added). Second, he asserts that this limitation does not require the simulator to examine the content of the file but rather just the file extension. *See id.* at 5:9-10 ("the claim requires 'preexamining' the source file, *not necessarily the content of the source file* by, for example, looking at the file extension") (emphasis added). Third, he asserts that the limitation does not require the examining to be automatic. *See id.* at ¶ 81 ("[n]otice here, 'pre-examining' is *not required to be 'automatic'* by the claim language") (emphasis added). Fourth, he fails to acknowledge that the "pre-examining" must be done *before* compiling the source files. *See id.* at ¶¶ 14-15.

Dr. Amin's opinion that this limitation is met should be excluded because he bases his opinions on his construction, not the Court's construction. In particular, Dr. Amin opines that specific languages of code are determined when a user *manually* enables a compiler using a particular "switch." *Id.* at ¶¶ 76, 97 (identifying the various switches that have to be used to enable compilers, including vlogan for the Verilog analyzer). Dr. Amin further opines that this

function is performed during the analyzing step, which he admits is *during compilation*, as opposed to before compiling. *Id.* at ¶ 77 ("VCS starts the compilation by first analyzing the codes . . . the executable 'vlogan' is used to analyze the Verilog source files"), ¶ 82 ("the Verilog analyzer, Vlogan, automatically pre-examines the code"); Amin Depo. Trans. at 208:6-8 ("Compilation is . . . analyzing, elaboration, producing the binary"). His opinions plainly contradict the Court's construction, which requires that the compilers be invoked "automatically" and that the pre-examining is done "before" compiling the source files. Indeed, Dr. Amin identifies nothing in any version of the VCS code which actually looks at the contents of the code, as required by the claim, to determine the type of HDL code and invoke the appropriate compiler.

## V. DR. AMIN'S OPINIONS RELATING TO "HIDDEN AUTOPARTITION" ARE UNRELIABLE AND SHOULD BE EXCLUDED

### A. Legal Standard

Pursuant to *Daubert* and Rule 702, "a court may exclude expert testimony on the ground that an expert's purported methodology fails to explain his final conclusion." *Poosh v. Phillip Morris USA, Inc.*, 287 F.R.D. 543, 547 (N.D. Cal. 2012) (citing *G.E. Co. v. Joiner*, 552 U.S. 136, 146, (1997) ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert"). Accordingly, "[a] court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Joiner*, 522 U.S. at 146. Moreover, "[e]xpert testimony is not admissible if it is speculative." *Perez v. State Farm Mut. Auto Ins. Co.*, No. C 06-01962 JW, 2012 WL 3116355, at *2 (N.D. Cal. July 31, 2012).

### B. Dr. Amin's New "Hidden Autopartitioning" Theory Should be Excluded

In his report, Dr. Amin sets forth a new infringement theory which he describes under a term he has coined for this litigation – Hidden Autopartitioning. Amin Rept. at ¶¶ 119, 125-129, 146-149, 153-154, 160, 182. There is no such term or feature in VCS. This theory is brand new,

never having been disclosed anywhere in this case until his expert report, and it is not disclosed in Dynetix's infringement contentions.[3]

Dr. Amin claims that when a user simulates a Gate Level Design ("GLS")[4] design and chooses *not* to execute DLP or Autopartitioning, the Autopartitioning functionality will still occur without the user being aware of it. *Id.* Specifically he opines that when a user that inputs the "-parallel" command without the autopartitioning option ("+autopart=N"), Autopartitioning will still be invoked. *Id.* at ¶ 128, 146. Because a user has not actually asked for the Autopartitioning function, Dr., Amin calls his construct "Hidden Autopartitioning."

Dr. Amin's "Hidden Autopartitioning" theory is based on pure speculation. He did not identify any code that activates so called "Hidden" functionality in his report. He also could not identify any source code that would execute the Autopartitioning feature without a user entering the Autopartitioning command (+autopart). Specifically, Amin testified that a variable DLPAutopart had to be set to TRUE in order to call the Autopartitioning function, but he could identify no way this occurred other than the user entering the autopartitioning command. Amin Depo. Trans. at 251:18-253:18. In his deposition, he also could not identify anything that shows this functionality actually can be invoked without a user request.[5] This is exactly the type of "analytical gap between the data and the proffered opinion" that necessitates the exclusion of expert testimony. *Joiner*, 522 U.S. 136, 146 (1997).

---

[3] Synopsys reserves the right to exclude Dr. Amin's opinions on "Hidden Autopartitioning" on the basis that this theory was not timely disclosed in Dynetix's infringement contentions.

[4] A Gate Level Design (GLS) is a design that is modeled at the gate level as opposed to the component level. VCS can simulation GLS designs and Non-GLS designs.

[5] Notably, despite having access to functional versions of the VCS software for approximately five months, Dr. Amin was unable to execute a single simulation in which "Hidden Autopartitioning" actually occurred. Amin Depo. Trans. at 210:11-17 ("I have not been able to successfully create a circuit that satisfies the conditions where that default behavior continues to be default. It always gets turned off.")

# VI. CONCLUSION

For the foregoing reasons, Synopsys requests that the Court strike the requested opinions from Dr. Amin's expert report on infringement of the '898 Patent and exclude such opinions from trial.

Dated: June 25, 2013

Respectfully submitted,

CHRIS R. OTTENWELLER
I. NEEL CHATTERJEE
BENJAMIN J. HOFILEÑA
JASON K. YU
Orrick, Herrington & Sutcliffe LLP

By:      */s/ Chris R. Ottenweller*
CHRIS R. OTTENWELLER
Attorneys for Defendant
SYNOPSYS, INC.