1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**LiLaw Inc., a Law Corporation**
J. James Li (SBN 202855)
5050 El Camino Real, Suite 200
Los Altos, California 94022
Telephone: (650) 521-5956
Facsimile:  (650) 521-5955
Email:  lij@lilaw.us

Attorneys for Plaintiff Dynetix Design Solutions Inc.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| DYNETIX DESIGN SOLUTIONS INC., a California corporation,<br><br>    Plaintiff,<br><br>  vs.<br><br>SYNOPSYS INC., a Delaware corporation, and DOES 1-50<br><br>    Defendants. | Case No. CV11-05973 PSG<br><br>**PLAINTIFF DYNETIX'S OPPOSITION TO DEFENDANT SYNOPSYS'S MOTION TO EXCLUDE OPINIONS AND TESTIMONY OF PLAINTIFF'S DAMAGES EXPERT**<br><br>**Date:  August 15, 2013**<br>**Time: 2:00 p.m.**<br>**Court: Courtroom 5 - 4th Floor**<br>**Judge: Hon. Paul S. Grewal** |
| SYNOPSYS INC.,<br><br>    Counterclaimant,<br><br>  vs.<br><br>DYNETIX DESIGN SOLUTIONS INC.,<br><br>    Counter-Defendant. | |

Redacted



Case No. CV11-05973 PSG

# TABLE OF CONTENTS

I.   SUMMARY OF ARGUMENT ................................................................................ 1

   A. Dr. Black's Opinion on Royalty Base Is Legally Sound ................................. 1

   B. Dr. Black's Analysis of the Royalty Rate Is Based on Proper Methodologies ........................ 2

II.  STATEMENT OF FACTS ................................................................................... 3

   A. Dr. Black's Expert Reports Are Based on the Specific Facts of the Case ................................ 3

   B. Dr. Black Further Explained the Basis of His Opinions during Deposition ........................... 5

III. ARGUMENT ....................................................................................................... 6

   A. The Admissibility of Expert Testimony Depends on the Soundness of the Principles
     and Methods, Not the Correctness of Its Conclusions ............................................. 6

   B. Dr. Black's Opinions on Royalty Base Are Based on the Well-Established Law ................... 6

     *1. Royalty Base Is Generally the Sales of the Smallest Salable Infringing Unit Unless
       the Entire Market Value Exception Is Invoked* ................................................. 7

     *2. Dr. Black Used the Smallest Salable Infringing Unit for the Royalty Base and Thus
       Did Not Need to Consider Apportionment* .......................................................... 8

     *3. Synopsys Misconstrued Cornell and Other Cases on the Issue of Apportionment* ............. 9

     *4. Dr. Black's Opinion on Royalty Base Is Internally Consistent* ........................................... 11

   C. Dr. Black's Methodology for Royalty Rate Analysis Is Unassailable .................................... 12

     *1. Dr. Black Based His Royalty Rate Assessment on the Particular Facts of the Case* ......... 12

     *2. Dr. Black's Approach Is Consistent with Uniloc* ............................................................... 14

     *3. Synopsys Intentionally Distorts Dr. Black's Analytical Starting Point* ............................... 17

     *4. Synopsys's Quarrel with Dr. Black Goes to the Weight of the Opinion, Not Its
       Admissibility* .......................................................................................................... 18

     *5. Suffolk and Oracle Are Inapplicable Where a Holistic 50/50 Split of Profit Based
       on an Unexplained Economic Theory Were Excluded* ....................................... 19

   D. Dr. Black's Discussion of the Two License Agreements in the Industry Are
     Admissible ............................................................................................................. 21

IV.  CONCLUSION ................................................................................................... 23



1

2

# TABLE OF AUTHORITIES

3

4

## CASES

5

6
*ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*,
    694 F.3d 1312, 1333 (Fed. Cir. 2012) ................................................................6

7
*Cornell Univ. v. Hewlett-Packard Co.*,
    609 F. Supp. 2d 279 (N.D.N.Y 2009) .........................................................7, 9

8
*Daubert v. Merrell Dow Pharms., Inc.*,
    509 U.S. 579, 597 (1993) .....................................................................6

9

10
*Fresenius USA, Inc. v. Baxter Int'l, Inc.*,
    2012 U.S. Dist. LEXIS 30949 (N.D. Cal. Mar. 8, 2012) ..........................22, 23

11
*Georgia-Pacific Corp. v. United States Plywood Corp.*,
    318 F. Supp. 1116 (S.D.N.Y. 1970) .........................................................21

12

13
*i4i Ltd. P'ship v. Microsoft Corp.*,
    598 F.3d 831, 852 (Fed. Cir. 2010), aff'd, 131 S. Ct. 2238 (2011) ..............6, 14

14
*LaserDynamics, Inc. v. Quanta Computer, Inc.*,
    694 F.3d 51, 67 (Fed. Cir. 2012) ....................................................7, 8, 10

15

16
*Lucent Techs., Inc. v. Gateway, Inc.*,
    580 F.3d 1301 (Fed. Cir. 2009) ...........................................................10

17
*Oracle America, Inv. v. Google, Inc.*,
    798 F. Supp. 2d 1111, 1119 (N.D. Cal. 2011).............................................20

18

19
*ResQNet.com, Inc. v. Lansa, Inc.*,
    594 F.3d 860, 869 (Fed. Cir. 2010) .......................................................22

20
*Sanofi-Aventis Deutschland GmbH v. Glenmark Pharms., Inc.,*
    *USA*, 2011 U.S. Dist. LEXIS 10512 (D.N.J. Feb. 3, 2011).............................15

21

22
*Suffolk Techs. LLC v. AOL Inc.*,
    No. 1:12-cv-00625-TSE-IDD, Dkt. No. 518 at 4-5 (E.D. Va. Apr. 12,
    2013) ...........................................................................................19

23

24
*Uniloc USA, Inc. v. Microsoft Corp.,*
    632 F.3d 1292 (Fed. Cir. 2011) .......................................................7, 12

25

26

## STATUTES

27

Fed. R. Evid. 702 .........................................................................................6

Fed. R. Civ. Proc. 26(a)(2)(B) ...................................................................21

28



1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# I.   <u>SUMMARY OF ARGUMENT</u>

Dynetix's damage expert, Dr. William Black, is experienced in estimating the value of intangible assets.  In his expert report on reasonable royalty, Dr. Black took the traditional approach of estimating royalty by first calculating the royalty base and then estimating the royalty rate using the 15 Georgia-Pacific factors.  Dr. Black based his analysis on the specific facts of the case as well as his own experience in the field, and nothing else.  Specifically, Dr. Black did not rely on any unproven economic theory or on any data that had no connection with the facts of the case.  Thus, any attack on Dr. Black's opinion necessarily goes to the weight, instead of the admissibility, of the opinion.

## A.   Dr. Black's Opinion on Royalty Base Is Legally Sound

For the royalty base, Dr. Black used the sales figure of the undisputable smallest salable infringing unit, which is VCS.  Dr. Black did not even attempt to include any related sales that are not part of VCS sales.  Under the established law, Dr. Black does not need to conduct any apportionment within the smallest salable unit to account for non-infringing components, as such apportionment is better reflected in the royalty rate analysis when the value of patented technology to VCS is considered.

Synopsys, however, faults Dr. Black for not conducting apportionment analysis for the royalty base.  Synopsys's argument confuses the general rule for royalty base assessment—using the smallest salable infringing unit—with a narrow exception to the general rule where the entire market value analysis is used to expand the royalty base to a larger unit in the product hierarchy.  While no apportionment analysis is required for calculating the royalty base under the general rule--using the smallest salable infringing unit--apportionment must be done in the entire market value analysis, unless there is a showing of the connection between the market demand for the larger unit and the patented technology.  Because Dr. Black did not use the entire market value rule in this royalty base determination, Synopsys's argument on apportionment is thus inapposite.

Synopsys appears to confuse the analysis of royalty rate with that of royalty base, ignoring the established law that requires the apportionment factor among infringing and noninfringing



features within the smallest salable unit be conducted as part of the royalty rate analysis, not the royalty base.  Synopsys also confuses Dr. Black's apportionment between DLP and ALP with the issue of royalty base assessment.  The apportionment between DLP and ALP was a provisional opinion that further apportioned the royalty rate, although the apportionment was applied directly to the total royalty, which is the product of royalty base and royalty rate.  Thus, there is nothing internally inconsistent in Dr. Black's royalty rate determination.

**B.      Dr. Black's Analysis of the Royalty Rate Is Based on Proper Methodologies**

Dr. Black took an analytical approach for the estimation of the royalty rate, using the 15 Georgia-Pacific factors and various facts of the case.  The analytical starting point is a neutral "clean slate" where no facts relative to any of the 15 factors are assumed and where the only assumption is the legal assumption that the patent is valid and infringed.  From that clean slate, Dr. Black added the 15 factors one by one and carefully considered specific facts of the case that are relevant to each factor, to weigh the impact of each factor on the royalty rate.  At each stage of the analysis, Dr. Black provided his opinion as to how the royalty rate should be in consideration of a certain factor or factors, based on his learning and experience.  This methodology is unassailable.  Synopsys's quarrels with Dr. Black's royalty rate analysis, although coated in methodological terms, are in fact attacks on the correctness of Dr. Black's opinions while offering no direct challenge to his qualifications for rendering such opinions.

Synopsys equates Dr. Black's starting point analysis with the 25% rule of thumb rejected in the *Uniloc* case.  This argument distorts both *Uniloc* and Dr. Black's opinion.  Unlike the 25% rule which was used in *Uniloc* as the starting offer of the hypothetical negotiation, Dr. Black made it clear that his starting point was an analytical one that had nothing to do with a hypothetical initial offer in the hypothetical negotiation.  Dr. Black's starting point is simply the analytical "ground zero", where none of the 15 factors has yet to take its effect on the royalty rate.  This starting point is like the starting line of a 100--meter race where runners of various levels are placed at the same point, although their different running abilities start to separate them immediately upon the start of the race.  Like the starting line of a race, Dr. Black's starting point assumes a neutral position where



1    different cases with different fact patterns are placed in the same clean slate, to allow an ordered

2    examination of the effect of adding various factors to the analysis.  The clarity of Dr. Black's

3    methodology contrasts sharply with some other damage experts' "holistic" approach where factors

4    are pretended to be analyzed holistically, leading to an arbitrary "black box" conclusion, thus

5    rendering effective cross-examination impossible.  Therefore, if anything, Dr. Black's methodology

6    has set a good example on how a royalty rate analysis should be conducted.

     Unlike the 25% rule in *Uniloc*, which is based on irrelevant past licensing data, Dr. Black's

8    starting point relies on nothing but the assumptions that the patent is valid and infringed, and that

9    there is no other information.  Under these starting point assumptions, it is Dr. Black's considered

10   opinion that an even split of the infringer's gross profit is mandated.  Indeed, no reasonable damage

11   expert can quarrel with that conclusion because by definition there is no data to bias the split upward

12   or downward from the midpoint.  Not only is the even split conclusion highly reasonable, but any

13   challenge to this conclusion also goes to its weight instead of its admissibility, because the opinion is

14   not based on any fancy economic theory or any irrelevant economic data.  Thus, nothing handicaps

15   Synopsys from an effective cross-examination of Dr. Black on this opinion, as it has done during his

16   deposition.

## II.   STATEMENT OF FACTS

### A.    Dr. Black's Expert Reports Are Based on the Specific Facts of the Case

     On May 3, 2013, Dr. Black issued his expert report entitled "Report of William H. Black on

Reasonable Royalty."  The report is based on the case files of the action, particularly a list of 47

references, including production documents, deposition transcripts, and Synopsys's annual reports.

Hofilena Decl., Ex. A (Black Rpt.), ¶ 13; Li Decl., Ex. A.  The report also referenced industry

licensing data that Dr. Black obtained from a research database, ktMine.   Hofilena Decl. Ex. A, ¶ 22;

Li Decl. Ex. B.  The report further discussed two particular license agreements in the EDA industry

that Dr. Black downloaded from ktMine.  Hofilena Decl. Ex. A, ¶ 23.

     For his royalty analysis, Dr. Black first opined that, since there was no established royalty for

the '898 patent, the royalty must be determined by the so-called hypothetical negotiation method.  *Id*.



¶ 7.  Based on his understanding that the infringement started in 2006, Dr. Black used 2006 as the date of the hypothetical negotiation.  *Id.* at 4-5.

Dr. Black took the traditional approach of calculating the reasonable royalty by the product of royalty base and royalty rate.  *Id.* ¶ 9.  On the issue of royalty base, Dr. Black grounded the analysis on his understanding of the law that the royalty base should be the "smallest salable infringing unit with the close relation to the claimed invention."  *Id.* ¶ 10.  Dr. Black first identified VCS as the smallest salable infringing unit, by relying on Synopsys's own Price Book.  *Id.* ¶ 20.  For the royalty base from 2009 to 2012, Dr. Black used Synopsys's own accounting reports of VCS sales.  *Id.* ¶ 21.  Because such data has not been produced by Synopsys for fiscal years 2006 to 2008, Dr. Black had to use the figures provided by Synopsys's interrogatory responses to determine the royalty base for those years, which he believed are significantly lower than the actual figures (hence, the calculation is an underestimate of the actual royalty base).  *Id.* ¶ 21.

On the issue of the royalty rate analysis, Dr. Black first stated his understanding of the law as pertaining to the fifteen Georgia-Pacific factors.  *Id.* ¶ 15.  Dr. Black started his assessment of the royalty rate using VCS's gross margin.  *Id.* ¶ 24.  However, since the gross margin data for 2006, the date of hypothetical negotiation, is not available, Dr. Black turned to the gross margin of Synopsys as a whole because such data is readily available through Synopsys's annual reports.  *Id.* ¶ 25.  Eventually, Dr. Black estimated the gross margin of VCS with the three-year average of Synopsys's gross margin for fiscal years 2004 to 2006.  *Id.*  ¶ 26.

Dr. Black opined that, if everything else is equal, the starting point for estimating the royalty rate should be an even split of the gross margin.  *Id.* ¶ 24.  Dr. Black explained that the gross margin reflects the gross profit that the infringer makes from selling the infringing product; hence, a reasonable starting point for assessing the reasonable royalty rate should let the infringer and the patent owner share the gross profit equally.  *Id.* ¶ 25.  It is based on that analysis and the estimated gross margin of VCS from which Dr. Black decided that the starting point of rate assessment should be 38%.  *Id.* ¶ 27.  He emphasized that this was just the "starting point" for the royalty rate analysis and that the rate would go up or down according to the specific effects of each factor.  *Id.*

Dr. Black then went on to analyze the effect of each Georgia-Pacific factor and provided



specific opinions on how these factors bring the royalty rate up or down or have no effects, based on the specific facts of the case.  *Id.* ¶¶ 28-60.   On all important factors, Dr. Black did not just simply analyze their qualitative effect, but also provided a quantitative opinion on how much the factors affect the royalty rate.  On the negative factors, he opined that the impact of the nonexclusive nature of the license and Dynetix's willingness to license the patent to others should "halve the royalty rate" from its starting point of 38% to 19%.  *Id.* ¶ 58.  On the impact of the fact that Dynetix never had a commercially successful product, when counter-balanced by the fact that Dynetix did have a technically-sound simulator and was trying to sell the product in competition with Synopsys, Dr. Black concluded that the rate should be further halved to 9.5%.  *Id.*  ¶ 59.  On the positive impact of the importance of the technology to Synopsys, as expressly stated in its own contemporary documents, Dr. Black opined that Synopsys should be willing to pay a significant amount of royalty if it had respected the patent, thus increasing the rate by 50% from 9.5% to 14.25%.  *Id.* ¶ 60.

### B.      Dr. Black Further Explained the Basis of His Opinions during Deposition

In his deposition, Dr. Black explained the basic process of his analysis,

> I started with the gross profit and then took several steps to go from the starting gross profit point to a royalty rate that reflects the benefits that would be attributable to [ ] the contributions of the technology, the patented invention and the contributions that would be made to the production of the product or service by the company producing it.

Li Decl. Ex. C, 38: 4-11.  Dr. Black further explains why even-split is mandated by the lack of any biasing information:

> Q:  Why didn't you adjust it by 40 percent or 60 percent?
>
> …
>
> A:  The neutral position, the midpoint, is appropriate when you don't have sufficient information to weight it one way or the other.

*Id.* at 95:12-23.

Upon further questioning, Dr. Black patiently explained why taking the midpoint avoids bias:

> Q:  "To avoid bias;" what does that mean?
>
> A:  That means that if the true answer should have been 90 percent and I arbitrarily choose a different number, say 13 percent, the bias between my 13 percent and the 90-something percent would be substantial.  You choose a



1   factor around the midpoint in order to minimize a possible bias because you
    can have bias upwards.  You can have bias downwards.

2   *Id.* at 97:21-98:4.

3   **III.   ARGUMENT**

4       **A.   The Admissibility of Expert Testimony Depends on the Soundness of the**
5            **Principles and Methods, Not the Correctness of Its Conclusions**

6        Opinion testimony by expert witnesses is admissible if the testimony "is based on sufficient

7   facts or data", (2) "is the product of reliable principles and methods," and (3) "the expert has reliably

8   applied the principles and methods to the facts of the case." Fed. R. Evid. 702.  Under Rule 702, the

9   trial court acts as a "gatekeeper" of expert testimonies to screen out unreliable testimonies.  *Daubert*

10  *v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993).  The focus of the *Daubert* test "must be

11  solely on principles and methodology, not on the conclusions that they generate." *Id.* at 595.   "When

12  the methodology is sound, and the evidence relied upon sufficiently related to the case at hand,

13  disputes about the degree of relevance or accuracy (above this minimum threshold) may go to the

14  testimony's weight, but not its admissibility." *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 852

15  (Fed. Cir. 2010), aff'd, 131 S. Ct. 2238 (2011) (citation omitted).  "Vigorous cross-examination,

16  presentation of contrary evidence, and careful instruction on the burden of proof are the traditional

17  and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

18  Particularly, disagreements about the conclusions reached by the expert and the factual assumptions

19  and considerations underlying those conclusions, not his methodology, go to the weight of the

20  testimony and not its admissibility.  *See ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694

21  F.3d 1312, 1333 (Fed. Cir. 2012).

22       As discussed below, Synopsys's attacks on Dr. Black's expert reports are mostly disputes on

23  the merits--disguised in methodological terms--and are thus not proper grounds for a motion to

24  strike.

25       **B.   Dr. Black's Opinions on Royalty Base Are Based on the Well-Established Law**

26       Reasonable royalty is determined by the product of "two separate quantities--a royalty base,

27  or the revenue pool implicated by the infringement, and a royalty rate, the percentage of that pool

28



PLAINTIFF'S OPPOSITION TO MOTION TO EXCLUDE DAMAGE EXPERT

'adequate to compensate' the plaintiff for that infringement." *Cornell Univ. v. Hewlett-Packard Co.*, 609 F. Supp. 2d 279 (N.D.N.Y 2009).  We thus start our discussion of Dr. Black's damage opinions with the analysis of the royalty base.

### 1.  Royalty Base Is Generally the Sales of the Smallest Salable Infringing Unit Unless the Entire Market Value Exception Is Invoked

In recent years, the law of reasonable royalty is in flux, because of the Federal Circuit's rulings in several cases, such as *Uniloc USA, Inc. v. Microsoft Corp.,* 632 F.3d 1292 (Fed. Cir. 2011) (struck down the 25% rule of thumb).  In this uncertain time of legal development in this area, there is at least one thing that is clear from the recent development.  That is, the royalty base for hypothetical negotiation should be in general the sales of the smallest salable infringing unit; as an exception to the general rule, the royalty base may be the sales of a larger product unit including noninfringing components if the evidence supports the application of the entire market rule.  *See LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 67 (Fed. Cir. 2012).

The main authority for this law comes from *Cornell University v. Hewlett Package Co.*, 609 F. Supp. 2d 279 (N.D.N.Y. 2005), an opinion authored by Chief Judge Randall Rader of the Court of Appeals for the Federal Circuit, who presided over the *Cornell* trial by designation.  In *Cornell*, the claimed invention is "one component of the instruction reorder buffer (IRB)."  *Id.* at 283.  IRB itself "is a part of a processor, which is part of a CPU module, which is part of a "brick," which is itself only part of the larger server."  *Id.*  The processors in *Cornell* "were the smallest salable units incorporating [the] invention."  *Id.*  Plaintiff's expert in *Cornell* did not use the sales of processor as the royalty base. Instead, he went several levels above the smallest salable unit and initially chose the sales of the server as the royalty base in his reasonable royalty analysis, despite a pretrial warning from the court.  *Id.*  In the middle of the trial, Judge Rader conducted a *Daubert* hearing on whether the expert properly applied the entire market value rule to the server sales, and decided to exclude the expert from using the rule.  *Id.* at 283-84.  When the trial resumed, however, the expert used the sales of the CPU bricks as the royalty base, which was still several levels above the smallest salable unit (i.e., the processor) and "just one rung down the price ladder from the excluded servers and workstations."  *Id.* at 244.  The jury returned a verdict of $184 million against HP.  *Id.* at 233.



PLAINTIFF'S OPPOSITION TO MOTION TO EXCLUDE DAMAGE EXPERT

After the trial, Judge Rader granted HP's JMOL motion to reduce the damages by using the sales of the processors, the smallest salable infringing unit, as the royalty base. *Id.* at 282 & 290.

Based on Judge Rader's legal analysis in *Cornell*, there are two ways of estimating the royalty base. The basic approach is to use the sales or estimated sales of the smallest salable infringing units, such as the processor in *Cornell*. On this point, citing the plaintiff's own expert, Judge Rader stated that "the right way to start the intellectual exercise is to consider the smallest possible measure of sales or any measure for a royalty base," which would be the processor itself. *Id.* at 287. Judge Rader found that "[t]he logical and readily available alternative [to using the CPU bricks as royalty base] was the smallest salable infringing unit with close relation to the claimed invention." *Id.* at 288. If a component larger than the smallest salable unit is used for royalty base, the patentee must offer evidentiary proof for the entire market value rule; that is, a showing of the connection between the market demand for the larger product unit and the patented invention. *Id.* at 287. On that point, Judge Rader held that the plaintiff in *Cornell* had failed to present adequate evidence:

> Cornell asked the jury to award damages on a royalty base including not only the revenues Hewlett-Packard would have earned had it sold the infringing processors alone, but on the revenues Hewlett-Packard would have earned had it sold the processors in conjunction with CPU bricks. Cornell sought damages on this inflated base without offering additional market evidence that the claimed invention formed the basis for demand for the CPU bricks, or even the existence of a market for CPU bricks.

*Id.* at 287.

The Federal Circuit recently has confirmed the validity of the *Cornell* analysis, stating that the general approach for calculating the royalty base is to use the "smallest salable patent-practicing unit," while the entire market value rule may be invoked as "a narrow exception" to the general rule. *LaserDynamics, Inc.*, 694 F.3d at 67.

**2. Dr. Black Used the Smallest Salable Infringing Unit for the Royalty Base and Thus Did Not Need to Consider Apportionment**

Using the general rule was exactly what Dr. Black did in this royalty base calculation. On this issue, he stated that "royalty base should be the smallest salable infringing unit with close relation to the claimed invention." Hofilena Decl. Ex. A, ¶ 10. He then identified VCS as the



smallest salable unit in three infringing permutations (Basic VCS, VCS MX, and VCSi). *Id.* ¶ 20. The decision was based on Synopsys' Price Book which listed only VCS, VCS MX, VCSi, and VCS MXi (which are collectively referred to as "VCS") as the unitary products that contain the infringing features. *See, e.g.,* Li Decl. Ex. D & E. The two infringing features, DLP and mixed languages, are integral features of VCS that cannot be sold separately from VCS. Thus, Dr. Black did not in any way attempt to expand the royalty base beyond the smallest salable unit. It actually would be impossible for any reasonable negotiating party to use any royalty base smaller than VCS itself in this case.

Thus, Dr. Black's approach to royalty base is completely opposite to that of *Cornell*'s expert. Dr. Black took the general approach for assessing royalty base, by using the sales of the smallest infringing unit, which is VCS, while the *Cornell* expert used the CPU blocks which were several levels up from the smallest salable infringing unit, which was the processor. While the Cornell expert's approach was excluded for its failure to meet the evidentiary requirement for the entire market value rule, Dr. Black's approach does not even invoke the entire market value exception because it falls within the general rule of calculating royalty base.

### 3. Synopsys Misconstrued *Cornell* and Other Cases on the Issue of Apportionment

Relying on *Cornell* and other cases, Synopsys argues that Dr. Black did not further apportion the royalty base to take into account the noninfringing features of VCS. To be clear, Synopsys is not contending that VCS is not the smallest salable unit. That fact is indisputable.[1] To the extent that Synopsys faults Dr. Black for not further parsing the smallest salable unit, Synopsys's position has no legal basis. In *Cornell*, such a position would have led to the requirement that the royalty base be determined by a sub-component of the IRB which is itself a component of the processor. *Cornell University,* 609 F. Supp. 2d at 283. Instead, the processor is chosen by Judge Rader as the royalty base because it is the smallest salable infringing component, despite the fact that the actual infringing feature is at least two levels below the processor. In finding the processor as the smallest

---



[1] Even if Synopsys disputes that fact, it goes to the weight of the opinion, not its admissibility.



salable infringing unit, Judge Rader recognized the facts that, although HP did not sell the processor

as its main business, the processor itself is separately salable and that HP indeed "sold more than

31,000 infringing processors *a la carte* during the damages period." *Id.* Judge Rader further

approved HP's way of estimating the revenues of the processor based on the sales of the servers. *Id.*

at 290. Neither HP nor Judge Rader even hinted on the possibility of requiring the royalty base to be

lower than the processor, despite the fact that the infringing feature is a component of a component

of the processor. Nowhere in *Cornell* did Judge Rader require apportionment of the royalty base

further down from the smallest salable infringing unit, as suggested by Synopsys.

Other cases cited by Synopsys are equally distinguishable. *Lucent Techs., Inc. v. Gateway,*

*Inc.*, 580 F.3d 1301 (Fed. Cir. 2009) is not even about royalty base; the court there merely decided

the issue of whether a certain jury award of <u>lump-sum royalty</u> was supported by substantial

evidence. *See id.* at 1325 ("we must decide whether substantial evidence supports the jury's implicit

finding that Microsoft  would have agreed to, at the time of the hypothetical negotiation, a lump-

sum, paid-in-full royalty of about $ 358 million.") Thus, the apportionment statement in *Lucent* has

little to do with assessing royalty base in a running royalty analysis. For that reason, the case

mentions no analysis on the smallest salable infringing unit, which should be the starting point (and

often the end point) of any discussion on royalty base. *Lucent* certainly is not an authority for

requiring further apportionment of the smallest salable infringing unit for the purpose of calculating

the royalty base.

To be sure, the kind of apportionment analysis discussed in *Lucent* is also part of Dr. Black's

analysis in terms of the importance of the infringing feature of VCS in deciding the <u>royalty rate</u>, as

opposed to royalty base, which is discussed later in this brief. For the royalty base determination,

however, Dr. Black does not need to discuss the apportionment because he was using the smallest

salable unit as the royalty base. The contribution of the infringing feature to the smallest salable

infringing unit is reflected by the royalty rate analysis. To do otherwise is to put the cart in front of

the horse.

In *LaserDynamics*, 694 F.3d at 67, the Federal Circuit explicitly followed *Cornell* on the

issue of royalty base, recognizing the use of the "smallest salable patent-practicing unit" for royalty



base as the general rule while recognizing the use of the entire market value rule as "a narrow exception" to the general rule.  The court affirmed the district court's decision to grant the motion for a new trial because the damage theory advanced by the plaintiff was based on the entire market value rule, not on the smallest salable infringing unit.  *Id.* at 70-71.  *LaserDynamics* thus represents one of many cases that struck down royalty base analysis predicated on the entire market value rule instead of the smallest salable infringing unit.  It affirms, instead of contradicting, *Cornell*'s general principle of using the smallest salable infringing unit as royalty base.  As Dr. Black used the general method of smallest salable infringing unit for his royalty base analysis, *LaserDynamics* supports Dr. Black's analysis.  Synopsys's reliance on *LaserDynamics* is again misplaced.

**4.  Dr. Black's Opinion on Royalty Base Is Internally Consistent**

Synopsys criticizes Dr. Black for conceding that the noninfringing feature should not be considered for damages and yet not apportioning the royalty base.  Synopsys is taking Dr. Black's statement out of context.  The statement that damages should not consider non-infringing features is a general statement.  In the actual approach, this consideration is implemented in part by using the smallest salable unit as the royalty base and in part by apportionment analysis for assessing the royalty rate.  Synopsys's argument is thus pointless, because there is no conflict between the general principle and Dr. Black's approach.

Synopsys also criticizes Dr. Black for not considering the noninfringing features and yet apportioning between DLP and ALP.  This again distorts the opinion.  The apportionment between ALP and DLP was provided as a provisional opinion in the event that ALP would be out of the case.  Hofilena Decl. Ex. A, ¶ 61.  The apportionment was not on the royalty base, as Synopsys suggests, but a further apportionment of the royalty rate, although it was applied directly to the total royalty, which is the product of royalty base and royalty rate. *Id.*  This opinion supplements the analysis on royalty rate, which takes into consideration of the relative contribution of the infringing features.  It does not in any way change the royalty base analysis where the smaller salable infringing unit is always used as the royalty base.  Thus, there is nothing internally inconsistent in Dr. Black's opinion on reasonable royalty.



In sum, because Dr. Black used the smallest salable infringing unit as the royalty base, he is not required to perform further apportionment of the royalty base.  Synopsys's criticism of Dr. Black's royalty base determination is without merit.

**C.      Dr. Black's Methodology for Royalty Rate Analysis Is Unassailable**

**1.    Dr. Black Based His Royalty Rate Assessment on the Particular Facts of the Case**

The use of the *Georgia-Pacific* factors for royalty rate analysis is sanctioned by the Federal Circuit.  *See Uniloc USA, Inc. v. Microsoft Corp.,* 632 F.3d 1292 (Fed. Cir. 2011).  Though somewhat overlapping, the 15 *Georgia-Pacific* factors cover essentially all the factors that may affect the reasonable royalty.  After the royalty base was set, as in this case, the 15 factors became the analytical tools for royalty rate determination.

For any credible analysis using multiple factors, there must be a neutral starting point where none of the factors are present.  That was the starting point of Dr. Black's analysis of royalty rate where a clean slate is assumed without any assumptions about any of the 15 factors.  The only assumption in a clean slate scenario is the legal assumption for any hypothetical negotiation, i.e., that the patent is valid and infringed.  It is from this unbiased starting point that Dr. Black assumes an even split of the gross profit margin between Synopsys and Dynetix.  As Dr. Black explained in his deposition, "[t]he neutral position, the midpoint, is appropriate when you don't have sufficient information to weight it one way or the other."  Li Decl. Ex. C, 95:12-23.  By definition, at the starting point of his assessment of the royalty rate, there is no information to weigh the profit sharing between the patentee and the infringer one way or another.  Naturally, the midpoint, which allows the infringer and the patent holder to split the profit of the infringing product, should be the starting point of the royalty rate assessment.

From this unbiased starting point, Dr. Black introduced the impact of all the relevant factors that potentially affect the royalty rate.  He first conducted a qualitative analysis of the upward and downward effects of each factor based on the specific facts of the case.  Rpt. ¶¶ 28-56.  He ruled out the irrelevant factors in light of the facts of the case, including factor 1 ("the royalties received by the patentee for the licensing of the patent in suit, proving or tending to prove an established



royalty") and factor 2 ("the rates paid by the licensee for the use of other patents comparable to the patent in suit"), because there is no evidence of established royalties or license rates in this case. Rpt. ¶¶ 28-30.  Dr. Black further opined that factor 15 ["The amount that a licensor (such as the patentee) and a licensee (such as the infringer) would have agreed upon (at the time the infringement began) if both had been reasonably and voluntarily trying to reach an agreement"] was not directly relevant because that was essentially a summary of the entire analysis.  Rpt. ¶ 31.

Dr. Black then analyzed 7 positive factors that tend to increase the royalty rate based on the facts of the case.  ¶¶ 32-51.  The most important positive factors, according to Dr. Black's analysis, are the factors pertaining to the value of the patented technology to VCS, including the 6th factor ("the effect of selling the patented specialty in promoting sales of other products of the licensee; the existing value of the invention to the licensor as a generator of sales of his non-patented items; and the extent of such derivative or convoyed sales"), the 9th factor ("the utility and advantages of the patent property over the old modes or devices, if any, that had been used for working out similar results"), and the 11th factor ("the extent to which the infringer has made use of the invention; and any evidence probative of the value of that use).  Rpt.  ¶¶ 34-48.  For the 6th factor, Dr. Black relied on Dr. Amin's view that the patented technology provided greater value than the prior art.  *Id.* ¶ 35. For the 9th factor, Dr. Black concluded "the technical features of the patent are not trivial, but go to the very essence of beating competition," based on his analysis of a series of Synopsys's internal documents showing the importance of the parallel VCS feature.  *Id.* ¶¶ 36-44.  For the 11th factor, Dr. Black based his analysis also on Synopsys's internal documents which stated that ▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮   *Id.* ¶ 45.  He also discounted the alleged lack of use of DLP, based on Dr. Amin's analysis (*id.* ¶ 46), and his view of how the license scheme affected the use of DLP.  *Id.* ¶ 47.  It is based on these analyses that Dr. Black concluded that the licensed technology was very valuable to Synopsys and that Synopsys should be willing to pay a significant rate of royalty if it actually respects other people's intellectual property.  *Id.* ¶ 47.

Dr. Black then analyzed five negative factors based on the facts of the case, i.e., the 3rd factor



("the nature and scope of the license, as exclusive or non-exclusive; or as restricted or non-restricted in terms of territory or with respect to whom the manufactured product may be sold"), the 4th factor ("the licensor's established policy and marketing program to maintain his patent monopoly by not licensing others to use the invention or by granting licenses under special conditions designed to preserve that monopoly"), the 8th factor ("The established profitability of the product made under the patent; its commercial success; and its current popularity"), the 10th factor ("The nature of the patented invention; the character of the commercial embodiment of it as owned and produced by the licensor; and the benefits to those who have used the invention."), and the 13th factor ("The portion of the realizable profit that should be credited to the invention as distinguished from non-patented elements, the manufacturing process, business risks, or significant features or improvements added by the infringer"). *Id.* ¶¶ 52-56. Dr. Black candidly analyzed the negative impact of these factors on the royalty rate based on the specific facts of the case. *Id.*

Finally, Dr. Black quantitatively weighed the opposing factors based on his years of experience of assessing the value of intangible asset. *Id.* ¶¶ 57-60. He started with the negative factors, opining that the non-exclusive nature of the license should halve the royalty rate from 38% to 19%, and that the lack of commercial success of Dynetix's product at the time of the hypothetical negotiation should further halve the rate to 9.5%. *Id.* ¶¶ 58, 59. He then opined that the strong evidence of the value of the patent should increase it by 50%, ending in 14.25%. *Id.* ¶ 60.

As seen above, each and every step of Dr. Black's analysis is based on the specific facts of the case and the accepted methodology of *Georgia-Pacific* factors. As further discussed in the next subsection, the only disputes that Synopsys may raise go to the accuracy of Dr. Black's assessment, which is an issue of weight instead of admissibility. *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 852 (Microsoft's quarrel with plaintiff's expert Wagner's testimony were "[a]t their heart … disagreements … with Wagner's conclusions, not his methodology).

### 2.  Dr. Black's Approach Is Consistent with *Uniloc*

Before *Uniloc*, damage experts and courts often used the so-called 25% rule of thumb as an initial reference point for royalty rate. *Uniloc*, however, struck down this practice. Synopsys's



PLAINTIFF'S OPPOSITION TO MOTION TO EXCLUDE DAMAGE EXPERT

attempt to equate Dr. Black's approach to the excluded 25% rule of thumb, however, merely reflects a lack of real understanding of *Uniloc*.

The 25% rule of thumb, though used widely before *Uniloc*, is an arbitrary rule based on some observations of specific licenses and an empirical study. *Uniloc USA, Inc*, 632 F.3d at 1312-13. Although the rule has been used as the initial royalty rate before applying the *Georgia-Pacific* factors, it is also widely criticized. *Id.* at 1313-14. *Uniloc* struck down the 25% rule because "it fails to tie a reasonable royalty base to the facts of the case at issue." *Id.* at 1315. As *Uniloc* holds, the established law mandates that "there must be a basis in fact to associate the royalty rates used in prior licenses to the particular hypothetical negotiation at issue in the case." *Id.* at 1317. Because the expert in *Uniloc* used the 25% rule as an arbitrary general rule, without any connection between the past licensing data and the facts of that case, the 25% rule was stricken. *Id.* at 1318.

Thus, the rationale of *Uniloc* is that royalty rate analysis should not rely on assertions or facts that lack any connection to the facts of the case. *Uniloc* does not bar a damage analysis where the expert opinions on the royalty split depend on the facts of the case, as what Dr. Black did in this case. Indeed, after *Uniloc*, at least one district court has ruled that the mere application of a profit split is not indicative of an inappropriate use of a rule of thumb. *Sanofi-Aventis Deutschland GmbH v. Glenmark Pharms., Inc., USA*, 2011 U.S. Dist. LEXIS 10512 (D.N.J. Feb. 3, 2011). In that case, the court found that the expert "did not arbitrarily apply a 50/50 profit split akin to the 25 percent rule rejected in *Uniloc* but rather based his reasonable royalty analysis on the specific facts of [the] case." *Id.* at *37. Therefore, it is not a profit split that indicates unreliable testimony, but a thorough disconnection with the facts of the case.

While *Uniloc* is a long-awaited correction of a legal aberration that substitutes facts with arbitrariness, the result of the case has left a vacuum on how, given a royalty base, a royalty rate should be determined. Dr. Black in this case has offered a specific approach that is based on nothing but the facts of the case.

In contrast to the arbitrary application of the 25% rule established through unrelated past royalty rates, Dr. Black started his analysis assuming a blank slate, without any information but only the assumptions that the patent is valid and that VCS has infringed it. This is a very natural starting



point for the *Georgia-Pacific* analysis because by "starting point," it necessarily means the point before any of the facts underlying the 15 factors are considered.  Given the assumption of infringement and the required blank state regarding all other information, this starting point mandates a profit split because there is no information to bias the split upward or downward.

Unlike the excluded *Uniloc* opinion, Dr. Black cannot be faulted for relying on studies based on unrelated facts.  Dr. Black's starting point relies on nothing but VCS's own gross margin, as well as his own experience and judgment on how to apportion profit between the licensee and licensor where there is no other information to slant the apportionment one way or another.

Neither can Dr. Black be faulted for not considering other facts of the case at the starting point.  By definition, it is a neutral starting point where none of the facts underlying the 15 factors should be considered.  All the facts were thoroughly discussed in his subsequent analysis.  For example, Synopsys may argue that the starting point cannot be a 50/50 split because VCS is an established product while Dynetix was struggling to make its first dollar in 2006.  That analysis, however, is not part of the starting point.  It is in fact not even supposed to be part of the starting point.  It is one of the 15 *Georgia-Pacific* factors to be considered after the starting point.  Indeed, Dr. Black specifically considered this factor in his analysis.  Rpt. ¶ 54, 59.

Dr. Black's analytical process in one way can be analogized to a 100-meter race, where the fastest and the slowest men are placed at same starting line, despite the fact that their specific running ability will separate them immediately upon the firing of the gun.  Like a race, an analysis with multiple factors should start at a neutral position without any impacts of the factors.  It is based on this simple logic that Dr. Black started his analysis on a clean slate, as discussed above.  There is nothing improper for that methodology.

Synopsys also argued that Dr. Black's approach is the same as the rejected *Uniloc* approach where the 25% rule of thumb is later modified using the Georgia-Pacific factors.  This argument contorts the logic.  The reason for the rejection in *Uniloc* is that the entire analysis grows out of the poisonous seed of 25% royalty rate, which is not based on any facts of the case.  Surely Synopsys is not suggesting that the process itself, i.e., starting from a starting point and modifying the starting point, using the 15 factors, is improper.  As Mr. Black's starting point is not tainted with irrelevant



facts, his process of modifying the starting point, using the 15 factors and specific facts of the case, is equally untainted and sound.

### 3. Synopsys Intentionally Distorts Dr. Black's Analytical Starting Point

Synopsys claims that Dr. Black has assumed that "in hypothetical negotiation the parties would adopt as a 'starting point' a royalty rate that is 50% of Synopsys's gross profit margin." Mo. at 1:12-14. This is an intentional distortion of Dr. Black's opinion. During his deposition, Synopsys repeatedly attacked him on this point, and Dr. Black repeatedly explained that was not the case:

> I don't believe that parties would start off in their discussion at 50/50. I believe that the parties would come to the negotiation with an understanding of the relative importance of contributions made by Dynetix and [ ] the contributions made by Synopsys. So the starting point for negotiation is not 'I'll give you 50 percent.'

Li Decl. Ex. C, 46: 10-20. Dr. Black made his point even more clearly in the following testimony:

> Q What did you mean by the phrase "starting point" as you used it in your expert report?
>
> A I mean initial calculation step, not as a trial balloon, not as a -- as an initial offer, but just as a step in apportionment.

*Id.* at 47:4-8.

Thus, Dr. Black's starting point is very different from the starting point used in the rejected *Uniloc* approach, where 25% is assumed to be the starting point of the negotiation. The inherent logic problem of the 25% rule is its supposition that the parties in a transaction make their first offer, considering nothing but irrelevant past studies, while in fact they always make their initial offer based on their understanding of the specific facts in that transaction. Another logic problem of the 25% rule is, while it purports to be the starting point of *Georgia-Pacific* analysis, it is nonetheless based on the studies of the past royalty rates which were the end results after having considered all the factors, albeit in light of irrelevant facts. Thus, the 25% rule uses irrelevant facts to bias the starting point of the analysis before the relevant facts on the same factors are applied.

Dr. Black's starting point avoids all the logic problems of the 25% rules. The starting point has nothing to do with the actual negotiation process; it is the starting point of an intellectual assessment of the royalty rate, using the 15 *Georgia-Pacific* factors, regardless of the would-be



events of the actual negotiation process.  In fact, it is highly questionable whether a damage expert should even be allowed to testify on how the negotiation process would have proceeded, as that would be pure speculation.  In contrast, a damage expert with experience in assessing value of intellectual property is fully qualified to present their step-by-step evaluation process of the likely royalty rate to be reached during a hypothetical negotiation, based on their learning and experience and without speculating on how exactly the negotiation process would have transpired.  That was exactly what Dr. Black did, drawing from his experience of assessing the value of intangible property and conducting a step-by-step analysis, using a blank slate as the analytical starting point.  Because this starting point assumes no particular facts, it is very different from the starting offer in a hypothetical negotiation where the parties have presumably already taken into consideration the particular facts of the case in making their initial offer.  For example, surely the first offer between Synopsys and Dynetix would have taken into consideration the fact that VCS was an established product while Dynetix was a mere startup.  Thus, the opening offer cannot be even near 50% because it is not a result of a blank slate as Dr. Black's analytical starting point.  Synopsys surely knew this difference through Dr. Black's deposition, but still intentionally distorted the fact to gain unfair advantage.

### 4. Synopsys's Quarrel with Dr. Black Goes to the Weight of the Opinion, Not Its Admissibility

It is obvious that Synopsys disagrees with Dr. Black's opinion regarding the starting point, i.e., the profit sharing between the infringer and patentee should be 50/50 at the neutral position without any information other than the assumption that the patent is valid and infringed.  Although it is not clear how Synopsys can justify any apportioning ratio other than 50/50, given the fact there is no information to bias the apportionment, this disagreement in any event goes to the weight of Dr. Black's opinion.

Synopsys certainly does not argue that Dr. Black cannot start his analysis of the 15 *Georgia-Pacific* factors at a neutral starting point where none of the factors have made their impact.  That argument would be tantamount to saying that the fastest and slowest runners in a race should not be placed on the same starting line.  The analysis of the 15 factors must be started somewhere; the

logical starting point would be a neutral point where none of the factors are considered.

Neither does Synopsys argue that Dr. Black lacks the credential to render an opinion on how the parties would share the infringer's profit, absent any information. It is in fact a damage expert's job to render such opinion on how to reach a royalty rate, given the available information, based on his education, training, and experience. At the starting point of the analysis, as there are no facts to bias the profit apportionment, not only is it reasonable for Dr. Black, an experienced IP assessor, to render an opinion of 50/50 split, but that conclusion is also not beyond the common sense of a non-expert.

Nor does Synopsys argue that Dr. Black's use of Synopsys's company-wide gross margin as an estimate of VCS's gross margin is an overestimate of the VSC gross margin.

Thus, the only thing that Synopsys can argue about Dr. Black's opinion at the starting point is that the 50/50 split of the gross margin is, for whatever reason, wrong. That argument, of course, goes to the weight of the opinion, not its admissibility. In fact, Dynetix challenges Synopsys to render a rationale analysis in its reply brief of why, absent any information, the split of the gross profit should be anything other than 50/50. Such an opinion, even if rendered, merely sets up a triable issue of fact. This kind of dispute should be addressed through a proper cross-examination of Dr. Black as to how he reached the opinion, not by precluding Dr. Black from offering the testimony.

### 5. *Suffolk* and *Oracle* Are Inapplicable Where a Holistic 50/50 Split of Profit Based on an Unexplained Economic Theory Were Excluded

Synopsys labels Dr. Black's approach as a 50/50 split rule and relies on an unpublished order, *Suffolk Techs. LLC v. AOL Inc.*, No. 1:12-cv-00625-TSE-IDD, Dkt. No. 518 at 4-5 (E.D. Va. Apr. 12, 2013) (Hofilena Decl. Ex. M), for the general exclusion of any such rules. Again, Synopsys is comparing apples with oranges, as these cases struck holistic approaches to royalty rate analysis without any discussion about the analytical starting point.

In *Suffolk*, the expert in question, Roy Weinstein, gave a "holistic" opinion regarding the royalty rate based on the mathematical theory called Nash Bargaining Solution. As the court found,

1

> the hypothetical negotiation conducted by Weinstein, based on the Nash
> Bargaining Solution ("NBS"), does not appear to be tied to the facts of this
> case. Instead, Weinstein appears to summarily conclude that the result of this
> hypothetical negotiation would be a "50/50 split of the incremental profits
> attributable to the patent-in-suit."

2

3

Hofilena Decl. Ex. M at 3.

4

Thus Weinstein, using his holistic approach, paid only lip service to the facts of the case.

5

This contrasts sharply with Dr. Black's step by step approach on how the facts of the case under

6

each factor either increase or decrease the royalty rate, qualitatively and quantitatively.  The only

7

seeming similarity between this case and *Suffolk* is Dr. Black's use of the 50% factor in some

8

instances.  Contrary to the holistic use of the 50% factor without any explanation, Dr. Black uses the

9

50% approach in each factor analysis where, qualitatively speaking, an effect is required, but

10

quantitatively speaking, there is no way to bias from the midpoint either upward or downward.  The

11

end results of the two approaches also contrast sharply; while Weinstein reached a holistic 50% split

12

without any effective ties to the facts of the case, Dr. Black reached a royalty rate of 14.25%, step by

13

step, using facts of the case at each step.  Thus, *Suffolk* does not compel the exclusion of all expert

14

testimony where any 50% formula is used based on the facts of the case.

15

The same analysis applies to *Oracle America, Inv. v. Google, Inc.*, 798 F. Supp. 2d 1111,

16

1119 (N.D. Cal. 2011), where a Dr. Cockburn "purported to use the Nash bargaining solution to

17

'project[] bargaining outcomes and calculat[e] the resulting payments and royalties' in the

18

hypothetical negotiation."  The court found that the expert "did not, however, adequately explain this

19

method or tie it to facts in the record.  In particular, Dr. Cockburn glossed over the axioms

20

underlying the Nash solution without citing any evidence to show that those assumptions were

21

warranted in the present case."  *Id.*  Based on that finding, the court ruled that the expert's analysis

22

"was not based on sufficient facts," and excluded the evidence on the ground that "allowing him to

23

testify to his results would risk misleading the jury as to the soundness of the foundation for his

24

conclusions." *Id.*

25

None of the holdings of *Oracle* applies to this case.  Dr. Black did not use any fancy

26

mathematical theory and did not take a holistic approach to assessing the royalty rate.  Every step of

27

Dr. Black's approach is based on the facts of the case and his years of experience assessing the value

28



PLAINTIFF'S OPPOSITION TO MOTION TO EXCLUDE DAMAGE EXPERT

of intangible assets.  Not only did he explain each and every step in detail, he also provided the

quantitative effects of all important factors, thus allowing adequate cross-examination.  There is no

risk of misleading the jury; nor is there any unjustified reliance on any theory or irrelevant data.

Thus, *Oracle* is fully distinguishable.

### D.      Dr. Black's Discussion of the Two License Agreements in the Industry Are Admissible

Synopsys claims that Dr. Black "purports to support his 14.25% royalty rate by citing the

Synopsys-ViewLogic and Agilent-Ansoft agreements."  Mo. at 14:4-5.   This statement is again a

mischaracterization of Dr. Black's opinion.  Nowhere in the report did Dr. Black rely on the two

license agreements in his quantitative process of reaching the 14.25% royalty rate.  Though Dr.

Black does cite both of these agreements in the report, he makes it clear that he is not using them to

calculate the reasonable royalties, but merely to "illustrate that substantial royalty rates have been

charged in this industry in the years prior to hypothetical negotiation." Hofilena Decl. Ex. A, ¶ 23.

In his deposition, this point was again made clear to Synopsys's counsel:

> Q: You cite these two agreements as evidence that your conclusion that a
> reasonable royalty for a patent license involving the '898 patent would be
> 14.25 percent, correct?
>
> A:  I think you're mischaracterizing what I state in the report.  I included
> those license agreements to indicate that I looked for publicly available data
> for licenses in [ ] the design simulation industry…It's just to provide [ ] one
> indication of the background, but it's not used as support for the 14.25%.

Li Decl. Ex. C at 110: 9-24.

After all, Dr. Black is entitled and required to describe all the background information

relevant to the royalty rate determination.  See Fed. R. Civ. Proc. 26(a)(2)(B) (an expert witness

must disclose in his report all "facts or data considered by the witness in forming [his opinions]").

The *Georgia-Pacific* analysis itself also requires, as the 12th factor, the consideration of the profit

apportionment practice "in comparable businesses."  *Georgia-Pacific Corp. v. United States

Plywood Corp.*, 318 F. Supp. 1116 (S.D.N.Y. 1970) ("The portion of the profit or of the selling price

that may be customary in the particular business or in comparable businesses to allow for the use of

the invention or analogous inventions.")



PLAINTIFF'S OPPOSITION TO MOTION TO EXCLUDE DAMAGE EXPERT

Dr. Black's use of the two licenses at issue is markedly different from the situation in *ResQNet.com*. In that case, the expert used the plaintiff's past license agreements under the first Georgia-Pacific factor to drive up the royalty rate considerably. *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 869 (Fed. Cir. 2010). The court found that the 1st factor "considers only past and present licenses to the actual patent and the actual claims in litigation," and for that reason struck down the expert opinion. *Id.* In contrast, Dr. Black expressly stated that the 1st Georgia-Pacific factor was irrelevant because there is no past license available. Hofilena Decl. Ex. A, ¶ 28. For the same purpose, Dr. Black also ruled out the 2nd factor because "Synopsys has not produced any documents or information that shows any royalty rate it might have paid for any third party's patents." *Id.* ¶ 30. Dr. Black also did not use the two license agreements at issue to adjust the royalty rate in any way. Thus, the holding of *ResQNet.com* is inapplicable.

Similarly, Synopsys's reliance on *Lucent* is also misplaced. In *Lucent*, the non-comparable license agreements are used to support the expert's claim that the hypothetical negotiation would have resulted in a lump-sum royalty agreement of about $358 million, rather than the usual running royalty. See *Lucent*, 580 F.3d 1301, 1329. Upon examining the agreements, the court found that none were similar enough to the circumstances of the hypothetical negotiation to support the damages award, stating that "a lump-sum damages award cannot stand solely on evidence which amounts to little more than a recitation of royalty numbers…particularly when it is doubtful that the technology of those license agreements is in any way similar to the technology being litigated here." *Id.* The situation in *Lucent* again contrasts sharply with this case, where Dr. Black did not at all calculate the royalty rate using the Synopsys-ViewLogic and Agilent-Ansoft agreements.

Both *Oracle* and *Fresenius USA, Inc. v. Baxter Int'l, Inc.*, 2012 U.S. Dist. LEXIS 30949 (N.D. Cal. Mar. 8, 2012) are also distinguishable on this aspect. In *Oracle*, the court found that "because there was so little information given about [the] licenses, this order cannot see how a jury could adequately evaluate the probative value of [the] agreements." *Oracle USA*, 2011 U.S. Dist. LEXIS 141399 at 25. This cannot be the case presently as Dr. Black has not only described both licenses with moderate detail, but has also provided a copy of each as Exhibits D and E of his report. *See* Hofilena Decl. Ex. A, ¶23.



In *Fresenius*, the court rejected the expert testimony that used non-comparable licenses to show that the market range extended up to 25% in order to support a royalty rate of 25%. *Fresenius*, 2012 U.S. Dist. LEXIS 30949, 36. Again, this has little bearing on Dr. Black's testimony as he does not rely directly on either agreement in his royalty analysis. His overview of the Synopsys-ViewLogic and Agilent-Ansoft licenses shows that they reflected royalty rates of 70% of gross sales and 75% of after-tax revenue, respectively, but unlike *Fresenius*, does not go on to claim that these figures would support a 70% royalty rate in his analysis. *Id.* Dr. Black did his reasonable royalty calculation completely independent of the 70 and 75 percent figures.

Therefore, there is no ground to preclude Dr. Black from discussing the Synopsys-ViewLogic and Agilent-Ansoft agreements.

## IV.    CONCLUSION

For the reasons stated herein, the Court should deny Synopsys's motion to exclude opinions and testimony of Dynetix's damages expert in its entirety.


DATED:  July 16, 2013                LILAW INC.
                                     ATTORNEYS FOR PLAINTIFF DYNETIX DESIGN
                                     SOLUTIONS, INC.


                                     By    /s/ J. James Li
                                        _____

                                        J. James Li, Ph.D.



PLAINTIFF'S OPPOSITION TO MOTION TO EXCLUDE DAMAGE EXPERT