UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| DYNETIX DESIGN SOLUTIONS, INC., a California corporation,<br><br>Plaintiff/Counter-defendant,<br><br>v.<br><br>SYNOPSYS, INC., a Delaware corporation,<br><br>Defendant/Counter-claimant. | Case No. C 11-05973 PSG<br><br>**ORDER GRANTING MOTION TO EXCLUDE OPINIONS AND TESTIMONY OF PLAINTIFF'S DAMAGES EXPERT**<br><br>**(Docket No. 430)** |

In football, new schemes come and go faster than teenage fashion trends. One team enjoys certain success with a spread offense, and suddenly every team is running no-huddle with a quarterback shotgun and four receiver sets. No matter that every year the overwhelming majority of teams fail in whatever particular scheme is the current fad. Patent litigation is not much different. *Daubert* motions used to be relatively rare in patent cases, and *Daubert* challenges to damages experts rarer still. But with a few high profile successes, now every patent trial lawyer worth her salt brings a challenge to the damages opinions offered by her adversary. Never mind that the percentage of such challenges that succeed is exceedingly small. Or that a decent cross-examination could deal with most problems just fine.

And yet every once in a great while, a *Daubert* challenge to a patent damages expert is justified. This case presents just an instance.

Plaintiff Dynetix Design Solutions, Inc. ("Dynetix") retained Dr. William H. Black ("Dr. Black") to provide his expert opinion on the issues of reasonable royalty to compensate for patent infringement. Defendant Synopsys, Inc. ("Synopsys") moves to exclude Dr. Black's opinions and testimony under Federal Rules of Evidence 702 and 703 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). Because the court concludes that Dr. Black employed impermissible and arbitrary methodologies to determine both the royalty base and the royalty rate in his damages opinion, the court GRANTS Synopsys's motion, with leave for Dr. Black to offer a renewed expert report before trial.

## I. DR. BLACKS'S METHODOLOGY

Dr. Black started his analysis by determining a royalty base. He determined that "the royalty base would be the entire sale of [Synopsys's] VCS [product]."[1] Although the accused Design-Level Parallelism ("DLP") feature of Synopsys's VCS product is only one of many features, Dr. Black utilized the sales data from all of VCS because Synopsys has not separately sold any smaller VCS components. Dr. Black did not further apportion the royalty base to account for the non-patented features of the VCS product.

Dr. Black then determined a royalty rate. He stated: "One reasonable starting point for a reasonable royalty rate is half of the gross margin of the infringing products," i.e., "to divide the gross margin of the product between the parties."[2] He then cut the calculated profit margin of 76.7% in half, for a starting point of 38%. From there, he applied the *Georgia-Pacific* factors to alter the rate. He determined that the first factor was irrelevant because there were no other similar licenses available for him to consider, and he also ruled out the second and fifteenth factors. Based

---

[1] Docket No. 458 ¶ 20.

[2] *Id.* ¶ 24.

ORDER
Case No. CV 11-05973 PSG                                     - 2 -

on his conclusion that the hypothetical license would be non-exclusive and that Dynetix was a willing licensor (third and fourth factors), he reduced the royalty rate further, to 19%. He then further reduced the rate again, to 9.5%, based on Dynetix's lack of a successful product (factors eight and ten). But due to "strong evidence of the value of the parallel simulation technology of the patent" (factors 6, 9 and 11), he bumped the royalty rate back up, to 14.25%.

After multiplying his VCS royalty base by the 14.25% royalty rate for the relevant time period, Dr. Black concluded that a reasonably royalty at the time would have been about $156 million. Recognizing that, of the two features that were originally accused of infringement, Design-Level Parallelism ("DLP") and Application-Level Partitioning ("ALP"), only DLP remains in the case, he ultimately apportioned 75% of the royalty to DLP and 25% of the royalty to ALP, resulting in an approximately $117 million royalty.[3]

## II. DISCUSSION

The court must exercise its "basic gatekeeping obligation" to ensure that Dr. Black's damages testimony is reliable and "tied to the relevant facts and circumstances of this particular case."[4] Because Dr. Black's opinion regarding the reasonable royalty is neither reliable nor tied to the facts of this case, as explained below, the court must exclude any testimony based on the current damages report. First, in determining the royalty base, Dr. Black failed to apportion profits between the patented feature and the numerous non-infringing features in the accused product. Second, in determining the royalty rate, Dr. Black impermissibly assumed, based on no facts in this particular case, that the starting point for a hypothetical negotiation would be 50% of the gross profit margin.

### A. Reasonable Royalty Generally

35 U.S.C. § 284 provides:

---

[3] *Id.* ¶ 62.

[4] *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 591, 598 (1993); *Uniloc v. USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1318 (Fed. Cir. 2011).

> Upon finding for the claimant, the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court.

The goal of the damages award is not to punish the infringer, but rather to make the patentee whole by ascertaining what the patent holder would have made "had the infringer not infringed."[5] Infringement compensation can be the patentee's "lost profits" or the "reasonable royalty he would have received through arms-length bargaining."[6] "The burden of proving damages falls on the patentee."[7]

Here, Dynetix seeks compensation based only on the reasonably royalty approach. A reasonably royalty is the amount that Synopsys would have paid Dynetix for a license in a hypothetical world "just before infringement began."[8] In this hypothetical negotiation, the parties are presumed (1) to be willing to give and take a license and (2) to accept that the asserted patent claims are valid and infringed.[9]

The calculation of the reasonably royalty is a two-step process. First, it requires the determination of a royalty base, "or the revenue pool implicated by the infringement."[10] The second determination is the royalty rate, or "the percentage of that pool 'adequate to compensate' the plaintiff for that infringement."[11]

---

[5] *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1324 (Fed. Cir. 2009) (quoting *Aro Mfg. Co. v. Convertible Top Replacement Co.*, 377 U.S. 476, 507 (1964)).

[6] *Id.*

[7] *Id.*

[8] *Id.* at 1324. Other Federal Circuit opinions phrase the date as "the date that the infringement began," "the date of first infringement," or "the date infringement started." *See LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 75 (Fed. Cir. 2012) (citing cases).

[9] *See Lucent*, 580 F.3d at 1324-25.

[10] *Cornell Univ. v. Hewlett-Packard Co.*, 609 F. Supp. 2d 279, 286 (N.D.N.Y. 2009).

[11] *Id.*

### B. Royalty Base Analysis

Calculating the royalty base is difficult when it comes to products, such as those at issue here, where one component "may be covered by an asserted patent, while other components are not."[12] Courts—including, to be fair, this one— have struggled with whether and how to evaluate an apportionment of the royalty base in this scenario.[13] In *Lucent*, the Federal Circuit held that if the patentee seeks a royalty base equivalent to the "entire market value" of the accused product, "the patentee must prove that 'the patent-related feature is the 'basis for customer demand.'"[14] *Lucent* struck the jury's damages award where the royalty was based on the "entire market value" of the accused product, Microsoft Outlook, where there plaintiff presented no evidence to establish that the allegedly infringing smaller-component, the date-picker tool, was a substantial basis for consumer demand for Outlook.[15] *Lucent* thus stands for the proposition that, in the absence of evidence that the infringing feature drives demand, the royalty base must be somehow apportioned to reflect the value of the patent-related feature in the absence of the non-infringing features.[16] *Lucent* did not reach the challenging follow-on issue of exactly how one is to apportion the base.

In *Cornell*, Chief Judge Rader required the patentee to utilize the "smallest salable unit approach" to apportion the royalty base.[17] Under this approach, the patentee must determine the "smallest salable infringing unit with close relation to the claimed invention," which, in that case,

---

[12] *LaserDynamics*, 694 F.3d at 67 (quotations omitted).

[13] *See id.* ("To assess how much value each patentned and non-patented component individually contributes to the overallend product—e.g., a personal computer—can be an exceedingly *difficult* and error-prone task."). *Cf. Brocade Communic. Sys., Inc. v. A10 Networks, Inc.*, Case No. C 10-3428 PSG, Docket No. 998 (N.D. Cal. May 15, 2013).

[14] *Lucent*, 580 F.3d at 1336.

[15] *Id.* at 1337-38 ("Lucent's damages expert conceded that there was no evidence that anybody anywhere at any time ever bought Outlook, be it an equipment manufacturer or an individual consumer, . . . because it had  date picker."). The court also made clear that it is impermissible to compensate for an overly broad royalty base by selecting a lower royalty rate. *Id.* at 1338.

[16] *See id.* at 1337-38.

[17] *See Cornell*, 609 F. Supp. 2d at 287-90.

was the processor containing the infringing component.[18] Chief Judge Rader held that the smallest salable unit must be the starting point for the royalty base.[19] Contrary to Dynetix's assertion, however, the court did not hold that no further apportionment is ever necessary once the smallest salable unit is determined. The court's opinion in *Cornell* is explicit that the use of the entire market value is inappropriate where the patented feature is not the basis for consumer demand for the product sold.[20] This court sees no logical basis to depart from an apportionment requirement in a case, such as the present one, where the alleged smallest salable unit plainly is *not* closely tied to the patented feature. Here, DLP is an *optional* feature in the VCS product, and the patented feature is just one component of DLP.

*LaserDynamics* does not suggest the contrary. In *LaserDynamics*, the Federal Circuit "reaffirm[ed] that in any case involving multi-component products, patentees may not calculate damages based on sales of the entire product, as opposed to the smallest salable *patent-practicing* unit, without showing that the demand for the entire product is attributable to the patented feature."[21] This language affirms that the smallest salable unit must be closely tied to the patent to suffice. Later in the opinion, the court specifically addresses LaserDynamics' argument that defendant Quanta was in the business of marketing and selling only entire computers, rather than the independent purportedly infringing feature called "ODD," and thus the entire computer was the only product for which accurate market data was available.[22] The court rejected this argument, concluding that if the smallest salable unit *was* in fact the entire computer, "the exceedingly difficult and error-prone task of *discerning the ODD's value relative to all other components* in the laptop

---

[18] *Id.* at 288.

[19] *See id.*

[20] *Id.* at 286 ("The entire market value rule in the context of royalties requires adequate proof [that] . . . the infringing components must be the basis for customer demand for the entire machine including the parts beyond the claimed invnention.").

[21] *LaserDynamics*, 694 F.3d at 67-68 (emphasis added).

[22] *Id.* at 69-70.

ORDER
Case No. CV 11-05973 PSG - 6 -

remains."[23]  Thus, *LaserDynamics* supports the premise that an apportionment is required even where there the accused product is the smallest salable unit or where whatever the smallest salable unit is it is still a multi-component product encompassing non-patent related features.

Because Dr. Black relied on the blanket assumption that, once he selected the smallest salable unit—in this case the entire VCS product—he could end the analysis, his determination of the royalty base is fundamentally flawed.[24]  Here, the alleged smallest salable unit is not, in fact, any smaller or any different than the entire multi-component product, but rather *is* the multi-component VCS product.  As such, "the difficult task of determining [DLP's] value relative to all other components of [VCS] remains."[25]  Dr. Black improperly skipped this task of apportionment, and his opinion may be excluded on this basis alone.[26]

### C. Royalty Rate Analysis

To compound the problems with Dr. Black's opinion, he also starts off his royalty rate analysis with the presumption that "one reasonable starting place" for the licensing rate would be half of the gross margin of the infringing products.  While the court does not disagree that this could be "one" reasonable starting place, the law requires Dr. Black to tailor the royalty rate to the specific facts of this particular case, including the "particular technology, industry, or party."[27]  Dynetix admits in its opposition brief that "Dr. Black's starting point relies on nothing but the assumptions

---

[23] *Id.* at 70 (emphasis added).

[24] *See AVM Tech., LLC v. Intel Corp.,* Case No. 10-610-RGA, 2013 WL 126233, at *3 (D. Del. Jan. 4, 2013) ("The use of a saleable unit that is greater than the patented feature is going to introduce *Uniloc* error when the patented feature is a 'date picker' whether the saleable unit is a computer loaded with 'Outlook' or is simply 'Outlook.'").

[25] *See id.*

[26] The fact that Dr. Black excluded ALP from the total royalties (an accused feature no longer in the case) at the very end of the analysis does not cure the error.  The 75/25% apportionment to DLP and ALP respectively does not account for the plethora of other non-infringing features in VCS other than DLP and ALP.

[27] *Uniloc*, 632 F.3d at 1317.

ORDER
Case No. CV 11-05973 PSG             - 7 -

that the patent is valid and infringed, and that there is *no other information*.[28] Although Dr. Black later applies the *Georgia-Pacific* factors to this starting point based on additional evidence, an arbitrary starting point is impermissible under *Uniloc*.[29]

In *Uniloc*, the Federal Circuit rejected the now-infamous 25% "rule of thumb" (i.e., an assumption that 25% of the profit margin was a reasonable place for starting the royalty rate determination), which was based on Robert Goldscheider's studies of previous, unrelated commercial licenses in general.[30] Here, Synopsys states that Dr. Black's 50% starting place was based on "his own experience and judgment on how to apportion profit between the licensee and licensor where there is *no other information to slant the apportionment one way or another*."[31] Dr. Black's starting point is thus even more arbitrary than the 25% starting place rejected by the Federal Circuit.

To support Dr. Black's analysis, Dynetix points to a case from the District of New Jersey, *Sanofi-Aventis Deutschland GMBH v. Glenmark Pharmaceuticals Inc., USA*, where the court accepted a 50% split of the profits as the starting point for the royalty rate determination.[32] In *Sanofi-Aventis*, however, the court accepted the profit split only after accepting the plaintiffs' argument that their damages expert

> did not arbitrarily apply a 50/50 profit split, but rather reached that result after considering the facts of the case, specifically *the relationship between the parties and their relative bargaining power*, *the relationship between the patent and the accused products*, *the standard profit margins in the industry*, and the presume validity of the patent.[33]

---

[28] Docket No. 462 at 3:7-10 (emphasis added).

[29] *See Uniloc*, 632 F.3d at 1315.

[30] *Id.* Some fifty years later, Mr. Goldscheider offers a robust and fascinating defense of his analysis, *Uniloc* notwithstanding. *See* Robert Goldscheider, *The Classic 25% Rule and the Art of Intellectual Property Licensing*, 2011 Duke L. and Tech. Rev 006.

[31] Dkt. No. 462 at 16:7-8 (emphasis added).

[32] Case No. 07-5855, 2011 WL 383861, at *13 (D.N.J. Feb. 3, 2011).

[33] *Id.* (emphases added).

ORDER
Case No. CV 11-05973 PSG                    - 8 -

Admittedly, Dr. Black considered no analogous facts of the case here other than the presumed validity of the patent.  He failed to cite any evidence to support his conclusion that the 50% starting place would apply to component parts such as DLP in this particular industry.  Dr. Black's methodology is indistinguishable from 25% rule rejected in *Uniloc*, except that it may be even more arbitrary.[34]  The court recognizes the difficulty in determining an appropriate starting point given the lack of any prior licenses to Dynetix's DLP patent; however, the analysis must be based on industry evidence and must consider the relationship between the patented feature and the accused products to determine a case and party specific starting point.  The starting point should take into account any analogous license offers in the industry for patents covering component parts, or at least take into account the nature of the patented feature as a small and optional feature in the accused VCS product.  Dr. Black's royalty analysis does neither, and so it, too, must be excluded.[35]

### III.  CONCLUSION

Dr. Black's opinions and testimony based on his present damages report cannot be allowed to lead the jury into certain error.  This leaves the question of what to do about it, beyond striking the opinions and testimony tendered to date.  On balance, and in consideration of its due process rights, the court is loathe to leave Dynetix stripped of any damages expert testimony whatsoever.  This is especially so in light of Chief Judge Rader's example in *Cornell*, whereby he gave the patentee one further opportunity to tender an admissible damages opinion even as trial continued on.  Because Dynetix would otherwise be left without any real evidence of damages, the court will permit it one more opportunity to offer a new expert report on damages. With trial imminent,

---

[34] *Accord Oracle Am., Inc. v. Google Inc.*, 798 F. Supp. 2d 1111, 1120 (N.D. Cal. 2011) (rejecting the "Nash bargaining solution" under *Uniloc* because it simply "cloth[ed] a fify-percent assumption in an impenetrable façade of mathematics").

[35] The court does not go into each *Georgia-Pacific* factor specifically, but would advise Dynetix to take heed of Synopsys's objections to any reliance on the ViewLogic and Agilent *product* license agreements as evidence of royalty rates in a hypothetical *patent* license negotiation.

Dynetix shall tender any such report on or before August 27, 2013 in accordance with the guidance in this order.[36] Synopsys may update its own damages expert report, as well as depose Synopsys's expert, no later than August 30, 2013.

Dated: August 22, 2013

*[signature]*
PAUL S. GREWAL
United States Magistrate Judge

---

[36] *See Cornell*, 609 F. Supp. 2d at 284.

ORDER
Case No. CV 11-05973 PSG

- 10 -